# EXHIBIT A

THE HONORABLE RONALD B. LEIGHTON

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

JULIANNE PANAGACOS, *et al.,*

    Plaintiffs,

    v.

JOHN J. TOWERY, *et al.,*

    Defendants.

CASE NO. 3:10-cv-5018 RBL

**PLAINTIFF BERRYHILL'S
RESPONSES TO DEFENDANT
THOMAS R. RUDD'S FIRST SET OF
INTERROGATORIES AND
REQUESTS FOR PRODUCTION**

Now comes Plaintiff Jeffrey Berryhill, and sets forth his responses to "Defendant Thomas R. Rudd's First Set of Interrogatories and Requests for Production to Jeffrey Berryhill" as follows:

    **INTERROGATORY NO. 1:** State each fact upon which you base your contention that Rudd "lordered" or "directed" actions, whether taken by Defendant John Towery or others, that you allege violated your constitutional rights and identify each witness with knowledge of such facts. This Interrogatory does not seek the type of general assertions alleged in the Third Amended Complaint, such as that contained at Paragraphs 1.16, 1.17, 1.28, and 2.3, but rather the Interrogatory asks you to explain the specific instances of conduct and other facts on which you based your allegations and on which you will rely to support your claims that Rudd

*Berryhill Responses to Rudd's First Set
of Interrogatories and Requests for
Production*
Case No. 3:10-cv-5018 RBL    -1-

**Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 255-7552**

**INTERROGATORY NO. 3:** State each fact upon which you base your contention, as stated in paragraph 2.6 of your Third Amended Complaint, that Rudd "covertly br[oke] the security of and join[ed] a confidential Privileged Attorney-client listserv[] for the Defense team of a related criminal case dating from June of 2006." Your answer should include each and every alleged action of Rudd on which you based your allegation, including the date of each action and the identity of each witness with knowledge of such facts.

**ANSWER:** I was subscribed to this listserv as a defendant in a protest-related case, but do not have information regarding the particulars of law enforcement/security activity in breaching our client/attorney privileges. Rudd was supervisory of John Towery at all times when Towery first infiltrated and then continued to mine the confidential attorney/client listserv.

**REQUEST FOR PRODUCTION NO. 3:** Produce all documents upon which you rely to support your answer to Interrogatory No. 3.

**RESPONSE:** D-B Resp 18 Drews Oly 22 analysis mistrial; D-B Resp 19 Phan Analysis leak to Sheriff; D-B Resp 20 Oly 22 Trial Transcripts Partial; D-B Resp 21 More Lists he is on; D-B Resp 22 Jaamt004 on Oly 22; D-B Resp 23 Dec 1 2007 PMR list subscribers vanishd; D-B Resp 24 Compromised Riseup Creds; D-B Resp 27 Grays Harbor Miltry Mvmt 2007; D-B Responses 1 through 16; also, two Zip files of email correspondence between John Towery and Drew Hendricks delivered as email attachments by Plaintiffs' counsel to Defense counsel on October 16, 2013.

**INTERROGATORY NO. 4:** State each fact upon which you rely to show that Rudd was motivated by a desire to deter, chill, or disrupt your political speech, and identify each witness with knowledge of such facts.

**ANSWER:** In the course of performing his job responsibilities, Rudd's apparent mission was to deter, chill or disrupt the political speech of those opposed to operations involving Joint Base Lewis-McChord. In the course of Towery's facilitation of workshops on the relevance and utility of military methods, tactics, and strategy in relation to street demonstrations and protests, it is reasonable to conclude that larger, more sinister motives were at play (*i.e.*, potential for introducing actions or activities that could be described as provocative).

**REQUEST FOR PRODUCTION NO. 4:** Produce all documents upon which you rely to support your answer to Interrogatory No. 4.

**RESPONSE:** D-B Resp 18 Drews Oly 22 analysis mistrial; D-B Resp 19 Phan Analysis leak to Sheriff; D-B Resp 20 Oly 22 Trial Transcripts Partial; D-B Resp 21 More Lists he is on; D-B Resp 22 Jaamt004 on Oly 22; D-B Resp 23 Dec 1 2007 PMR list subscribers vanishd; D-B Resp 24 Compromised Riseup Creds; D-B Resp 27 Grays Harbor Miltry Mvmt 2007; D-B

Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 255-7552

Plaintiff is aware that Towery, Rudd, the Tacoma Police Department, Chris Adamson, the Tacoma Homeland Security Committee (a sub-agency of TPD) the lympia Police Department, and other individuals and agencies met in Seattle, Tacoma, and at least twice in Aberdeen where a list of individuals and license plates to be targeted was circulated. Plaintiff knows that he, Plaintiff Dunn, Plaintiff Crespo, Brian Smith, and Phil Chinn, and numerous others, including attorney Larry Hildes and his wife Karen Weill were on those lists and were followed, harassed, stopped, cited, detained, and or arrested as a result. In Tacoma, Towery and Rudd met with the Tacoma Police Department at least as early as February of 2007 to devise a strategy to prevent this Plaintiff and PMR in general from effectively lawfully demonstrating, resulting in many arrests and complete disruption of our First Amendment activity, including an arrest of Brendan Dunn for the protected act of supposedly speaking into a bullhorn that was claimed to be illegal without justification and that those meetings continued and resulting in a complete prevention of PMR and this Plaintiff and others from being able to engage in First Amendment activity at all at or near the Port of Tacoma in 2008 and 2009.

**REQUEST FOR PRODUCTION NO. 9:** Produce all documents upon which you rely to support your answer to Interrogatory 9.

**RESPONSE:** D-B Resp 27 Grays Harbor Miltry Mvmt 2007; D-B Resp 28 Threat assessment, and any and all other threat assessment documents disclosed by Defendants previously in this litigation. Also, D-B Resp 17 Towery RFP_061413 second disclosure Whole File; D-B Resp 25 Tactical Ops Intel lic plates; D-B Resp 26 Grays Harbor license logs; D-B Resp 27 Grays Harbor Miltry Mvmt 2007. Additionally, the uncategorized, unindexed documents provided by the U.S. Department of the Army on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff reserves the right to seasonably disclose.

**INTERROGATORY NO. 10:** Explain in detail every instance, by date, in which your exercise of rights protected by the First Amendment was chilled or deterred, the cause for such chill or deterrence, and each witness with knowledge of each instance of chill or deterrence. You answer should include, but is not limited to, the basis for your allegation that Rudd's conduct chilled or deterred your exercise of rights protected by the First Amendment.

**ANSWER:** I incorporate herein by reference all responses I've previously given in this litigation in the "Berryhill Responses to Defendant Towery's First Discovery Requests." I further incorporate by reference all answers previously given in response to Rudd's interrogatories.

Further, on the afternoon of May 3, 2007 I was detained by Aberdeen Police officers for walking about fifty yards from an entrance to the Port of Grays Harbor. When compelled to produce identification by a lower ranking officer, an officer of higher standing informed me that such a move would not be necessary and referred to me by name in a manner I interpreted as

*Berryhill Responses to Rudd's First Set of Interrogatories and Requests for Production*
Case No. 3:10-cv-5018 RBL                    -9-

**Terry J. Lodge, Esq.**
**316 N. Michigan St., Suite 520**
**Toledo, OH 43604-5627**
**(419) 255-7552**

threatening (depicting a "we know who you are" attitude). In the early evening of May 4, 2007, I was pulled over by an Aberdeen police officer while driving from a weekly peace vigil. The stated reason for the traffic stop was because I had a small crack in the windshield of my car. On the afternoon of May 5, 2007, following a protest of military shipments, that evening of May 5, a number of friends and I were scheduled to address a gathering of young people in attendance at a punk rock show at the local Polish Hall in Aberdeen. Local law enforcement entered thepremises and instructed the manager of the establishment that if we were permitted the right to speak at the event, they would close down the building for the evening. This also happened to be the first time Towery had openly attended a protest in our midst.

During our mobilization in the summer of 2008, I was detained a number of times while walking on public grounds in close proximity to an entrance at the Port of Tacoma. In one of these occasions, I was placed in handcuffs and put in the rear of a police cruiser for a period of a about a half-hour. The stated rationale for my arrest was that I was on private Port grounds, even though a public bus stop was in close, visible proximity.

In the course of my residence at 910 4th Ave in Olympia (HQ) my house was regularly patrolled and surveilled by local law enforcement.

Overall, I experienced at least three arrests, at least four detentions, loss of my home, disruption of my personal life, and a chilling of my First Amendment rights that continues. I was stopped and detained three times in Grays' Harbor, once in Tacoma, at least twice in Olympia, and once in Denver at the Democratic National Convention protests based on information from Towery. I had committed no crime in Denver, none in Grays Harbor, and only once in Olympia. I was evicted from my home. I was followed by law enforcement officials to work, to class, to court, to meetings with my lawyer, and while at meetings with mys lawyer. I was one of the Oly 26 whose attorney/client priveleged conversations were tampered with by Towery, resulting in a mistrial.  Under Rudd's supervision, Towery attended parties, gatherings and political conferences I went to.  I was a key organizer for PMR and was frightened out of politics permanently.  Because of the combined efforts of Towery and Rudd, my life was wrecked and I could no longer stand to live in the Puget Sound area anymore.

**INTERROGATORY NO. 11:** Identify with specificity each and every category or type of damage that you claim to have sustained as set forth in your Initial Disclosures, including the dollar value attributable to each category of damages. For purposes of this Interrogatory, categories of damages include the cost of any required medical treatment, property damage or loss, lost wages, impairment of earning capacity, lost employment opportunities, general damages and any other expense incurred. For any wage loss, impairment of earning capacity, and lost employment opportunities you are claiming, your answer should include an itemization of all such damages and the basis upon which you calculate those damages. For any other type of damages claimed, including general damages, your answer should include a specific itemization for each element of damage claimed.

**ANSWER:** Compensatory damages for pain and suffering, public humiliation and

*Berryhill Responses to Rudd's First Set*
*of Interrogatories and Requests for*
*Production*
Case No. 3:10-cv-5018 RBL                      -10-

Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 255-7552

anguish arising from serial violations of my rights to privacy, free speech, free association and freedom to petition my government absent interference.

**REQUEST FOR PRODUCTION NO. 10:** Produce all documents relating to the damages that you have identified in response to Interrogatory No. 11.

**RESPONSE:** All documents provided by me or on my behalf previously in this litigation and with these responses "relate" to my damages. Additionally, the uncategorized, unindexed documents provided by the U.S. Department of the Army on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff reserves the right to seasonably disclose.

**INTERROGATORY NO. 12:** Are you claiming to have sustained any physical or psychological injuries as a result of the acts, incidents, and/or conduct that you attribute to Rudd? If so, identify with specificity each such injury you claim to have sustained and attribute to Rudd.  Your answer should include all complaints and symptoms experienced, whether such injury or disability was aggravating of a prior condition, the particular parts of the body involved, the time period during which each symptom persisted, what medical attention was sought, and when such medical attention was sought and from whom.

**ANSWER:** Yes.  In general, the targeting information given by Towery to RIG5 allowed WSP, Olympia PD, Thurston County Sheriff, and others to target specific organizers for harassment, inspection, rumor and surveillance, thus damaging their ability to organize, associate, and protest. Not only did Towery and Rudd, especially Rudd himself, take regulatory or proscriptive action, but they deliberately created, relayed, or gathered and transmitted information and intelligence directly calculated to ensure that others took such action and that action directly followed.  I incorporate herein by reference my response to Interrogatory No. 10 above.

Claims associated with mental/psychological health are difficult to quantify. As a result of my encounters with law enforcement and the campaign of harassment and surveillance against my friends, comrades and me personally, I experienced pain and suffering, and ongoing anguish. It was especially grievous for me to discover that I had been surveilled and profiled by someone I had thought to be a friend (Towery), I have experienced bouts of anxiety, depression, and profound frustration. That said, I make no specific claims that are clinically or medically diagnosed.

**REQUEST FOR PRODUCTION NO. 11:** Produce all documents relating to the physical and/or psychological injuries identified in your response to Interrogatory No. 12.

**RESPONSE:** All documents provided by me or on my behalf previously in this litigation and with these responses "relate" to my damages. Additionally, the uncategorized, unindexed

*Berryhill Responses to Rudd's First Set of Interrogatories and Requests for Production*
*Case No. 3:10-cv-5018 RBL*                    -11-

Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 255-7552

documents provided by the U.S. Department of the Army on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff reserves the right to seasonably disclose.

**REQUEST FOR PRODUCTION NO. 12:** Produce all statements made by you or on your behalf relating to your claims against Rudd.

**RESPONSE:** I incorporate by reference herein all of my above interrogatory responses. Apart from those, I have not produced any audio, visual or written statements or declarations pertaining to the case.

**REQUEST FOR PRODUCTION NO. 13:** Produce all non-privileged documents that you have created regarding or relating to your claims against Rudd. This request is intended to encompass, but is not limited to, letters, emails, blog postings, and any other kind of writing. This request for production does not request documents protected by bona fide invocation of the attorney-client privilege or work product protections.

**RESPONSE:** I have not created documents, other than confidential attorney-client communications, or attorney work-product, regarding or relating to my claims against Defendant Rudd.

**REQUEST FOR PRODUCTION NO. 14:** Produce all documents identified in your initial disclosures.

**RESPONSE:** I produced all such items digitally and via emailed disk on or about May 15, 2013.

**REQUEST FOR PRODUCTION NO. 15:** To the extent not already produced, pro-duce all documents that in any way support or relate to Your Answers and Responses to the preceding Interrogatories and Requests for Production.

**RESPONSE:** Plaintiff has identified all documents which in any way support or relate to these responses. With the exception of reserving the right to produce documents from the Department of the Army provision of documents in December 2013, all identified items have previously been produced.

## ATTORNEY'S Fed. R. Civ. P. 26 CERTIFICATION

The undersigned certifies pursuant to Fed. R. Civ. P. 26(g) that he has read each request, answer, response, and objection to these requests, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry, each is (1) consistent with the Civil

*Berryhill Responses to Rudd's First Set*
*of Interrogatories and Requests for*
*Production*
Case No. 3:10-cv-5018 RBL                    -12-

Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 255-7552

Rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

DATED at Toledo, Ohio this 20th day of January, 2014.

/s/ Terry J. Lodge
Terry J. Lodge (Ohio S. Ct. No. 0029271)
Co-counsel for Plaintiffs

Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 255-7552

## VERIFICATION

Jeffrey Berryhill, under the penalties of perjury of the State of Washington, hereby declares that he is the responding Plaintiff in the above-captioned cause of action, that he has read the foregoing answers to interrogatories and responses to requests for production and that he believes his responses to be true.


DATED: _____          _____
                               Jeffery Berryhill


*Berryhill Responses to Rudd's First Set*
*of Interrogatories and Requests for*
*Production*
Case No. 3:10-cv-5018 RBL                    -14-

Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 255-7552

# EXHIBIT B

THE HONORABLE RONALD B. LEIGHTON

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

JULIANNE PANAGACOS, *et al.,*

    Plaintiffs,

    v.

JOHN J. TOWERY, *et al.,*

    Defendants.

CASE NO.  3:10-cv-5018 RBL

**PLAINTIFF GRANDE'S RESPONSES TO DEFENDANT THOMAS R. RUDD'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**

Now comes Plaintiff Christopher Grande, and sets forth his responses to "Defendant Thomas R. Rudd's First Set of Interrogatories and Requests for Production to Christopher Grande."

.Plaintiff objects to the discovery requests insofar as Defendants have exceeded the limits for this type of discovery, or have used subparts and definitions to facilitate exceeding the limits.

Plaintiff also objects to these discovery requests to the extent they are vague, overbroad, unduly burdensome, unduly intrusive or otherwise objectionable and/or privileged.

*Grande Responses to Rudd's First Set*
*of Interrogatories and Requests for*
*Production*
Case No. 3:10-cv-5018 RBL                    Page 1 of 16

**Terry J. Lodge, Esq.**
**316 N. Michigan St., Suite 520**
**Toledo, OH 43604-5627**
**(419) 255-7552**

tial" under the Protection Order.

**INTERROGATORY NO. 1:** Identify any lawsuits (other than the instant case) in which you have been a party, including in your answer the court in which each such lawsuit was filed and the cause number under which each was filed, identification of all parties to each such lawsuit, the basis for your claims, and the resolution of your claims, including all jury awards and settlements.

**ANSWER:** No other civil actions.

**INTERROGATORY NO. 2:** State each fact upon which you base your contention that Rudd "lordered" or "directed" actions, whether taken by Defendant John Towery or others, that you allege violated your constitutional rights and identify each witness with knowledge of such facts. This Interrogatory does not seek the type of general assertions alleged in the Third Amended Complaint, such as that contained at Paragraphs 1.16, 1.17, 1.28, and 2.3, but rather the Interrogatory asks you to explain the specific instances of conduct and other facts on which you based your allegations and on which you will rely to support your claims that Rudd personally acted in a way that abridged your constitutional rights.

**ANSWER:** The Army's investigative reports acknowledge that Rudd approved the plan for Towery to infiltrate PMR and related groups, and disseminated the information Towery gathered by doing so in the Form of Force Protection Memoranda and Threat Assessments. Plaintiffs have seen no document wherein Rudd told Towery to cease such conduct, or to limit his investigation, infiltration and/or actions. In addition, Defendant Towery produced a series of e-mails between Rudd and Towery wherein Rudd informed Towery that he had succeeded in obtaining overtime pay for Towery to attend a conference in July of 2008 at the Evergreen State College in Olympia concerning potential protests at the Republican and Democratic National Conventions to take place later that year.

Furthermore, Rudd arranged for himself and Towery to jointly attend meetings with law enforcement leading up to military shipments where protests were anticipated, and where Towery gave the information he had obtained by his spying, and strategies were devised to neutralize the protests based thereon. These Plaintiffs know that such meetings occurred in Seattle, Tacoma, and Aberdeen, and may have occurred in other places at other times. The Army's investigative reports made clear that Rudd had actually lied to cover up his role, knowledge, and involvement, in Towery's spying.

With respect to Olympia, there is evidence that the information Towery and Rudd directly fed the Olympia Police information and influenced the actions of the police (See after-action report from OPD Commander Tor Bjornstad). There is also clear evidence that Rudd met with Bjornstad and spoke with hum on the phone about his threat assessments for the November '07 Port of Olympia protests number of times resulting in the harm that occurred to me and others (See Bjornstad Answers and Responses to Set one of Discovery Requests. Answer to

*Grande Responses to Rudd's First Set*
*of Interrogatories and Requests for*
*Production*
Case No. 3:10-cv-5018 RBL                    Page 3 of 16

Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 255-7552

spy on activists, the intent was to harm lawful efforts to organize, and those organizing efforts were deliberately harmed. Rudd used his position as a US Army official to undermine the 1st and 4th Amendment rights and treated US civilians as enemies of the state are treated, and then bragged about how successful these efforts were and how they prevented PMR from ending up on the front page of the newspaper.

Additionally, I know that Towery, Rudd, the Tacoma Police Department, Chris Adamson, the Tacoma Homeland Security Committee (a sub-agency of TPD) the Olympia Police Department, and other individuals and agencies met in Seattle, Tacoma, and at least twice in Aberdeen where a list of individuals and license plates to be targeted was circulated. I know that I, Plaintiff Dunn, Plaintiff Crespo, Brian Smith, and Phil Chinn, and numerous others, including attorney Larry Hildes and his wife Karen Weill were on those lists and were followed, harassed, stopped, cited, detained, and or arrested as a result. In Tacoma, Towery and Rudd met with the Tacoma Police Department at least as early as February of 2007 to devise a strategy to prevent this Plaintiff and PMR in general from effectively lawfully demonstrating, resulting in many arrests and complete disruption of our First Amendment activity, including an arrest of Brendan Dunn for the protected act of supposedly speaking into a bullhorn that was claimed to be illegal without justification and that those meetings continued and resulting in a complete prevention of PMR and this Plaintiff and others from being able to engage in First Amendment activity at all at or near the Port of Tacoma in 2008 and 2009.

In the course of Towery's facilitation of workshops on the relevance and utility of military methods, tactics, and strategy in relation to street demonstrations and protests, It is reasonable to conclude that larger, more sinister motives were at play (*i.e*, potential for introducing actions or activities that could be described as provocative).

**REQUEST FOR PRODUCTION NO. 6:** Produce all documents upon which you rely to support your answer to Interrogatory No. 7.

**RESPONSE:** Plaintiff incorporates by reference into this response all documents identified and provided in Requests for Production 1 through 5.

Additionally, the uncategorized, unindexed documents provided by the U.S. Department of the Army on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff reserves the right to seasonably disclose..

**INTERROGATORY NO. 8:** State each fact upon which you base your *Bivens* claim against Rudd for an alleged violation of your First Amendment rights. Your answer should include, but is not limited to, the following:

a. Describe, as that term is defined herein, all incidents upon which this claim in based;

b. Describe, as that term is defined herein, all acts and conduct by Rudd that you assert violated your First Amendment rights;

c. Identify all persons with knowledge of Rudd's acts and conduct that you assert

*Grande Responses to Rudd's First Set
of Interrogatories and Requests for
Production*
Case No. 3:10-cv-5018 RBL                    Page 9 of 16

violated your First Amended Rights.

ANSWER: *See* answers to Interrogatories No. 2, 3, 5, 6 and 7, which are incorporated herein by reference. While discovery is not yet complete, to my knowledge Army investigators who identified certain of Rudd's activities mentioned hereinabove in their report(s) have knowledge, as does John Towery.

As demonstrated in interrogatory responses 4 through 6, Rudd was directly responsible for Towery in the chain of command at Fort Lewis. During the relevant time periods January 1, 2007 to July 29, 2009, Towery had infiltrated multiple meetings and forced his way on to internet listserves without disclosing his employment with the military. For no apparent reason, on or about November 13, 2007 at an antiwar demonstration in Olympia, I was sprayed in the face with pepper spray by an officer of that city. Because of the increase in harassment directed at me, personally, and of the people with whom I was working in the antiwar movement, my fears were boosted that PMR and other antiwar organizations that I was a part of were infiltrated, and that anyone I associated with could be a potential spy. As a result, I became paranoid, depressed, and unable to fully trust others despite having known them for some time. My involvement with similar organizations has since ceased upon uncovering the public records request.

Furthermore, by giving information to multiple law enforcement agencies across the Puget Sound, these agencies (in particular, Tacoma Police Department) became aware of PMR's movements and began predicting where our demonstrations would take place. As such, our ability to demonstrate was hampered by both Towery and Rudd. In one such occasion, a group of 8 to 10 or so protesters, myself included, went to the Port of Tacoma to demonstrate. Upon our arrival, Tacoma Police were in full force, with a barricaded 'free speech zone' located on the southern half of the street. Despite the street being public, the northern, *i.e.* west bound side of the street was blocked off from public usage. After spending a small amount of time there, all protesters, myself included, walked away from the port to head home. On our way south to where our vehicles were located, we were harassed by Tacoma Police Department, who flashed bright lights at us from their squad cars and used loud sirens to make hearing very difficult. This instance made it impossible to demonstrate at the Port of Tacoma and was a violation of our 1st amendment rights.

REQUEST FOR PRODUCTION NO. 7: Produce all documents upon which you rely to support your answer to Interrogatory 8.

RESPONSE: Plaintiff relies on all documents identified in Requests for Production 1 through 6 herein.

Additionally, the uncategorized, unindexed documents provided by the U.S. Department of the Army on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff reserves the right to seasonably disclose..

INTERROGATORY NO. 9: State each fact upon which you base your *Bivens* claim

*Grande Responses to Rudd's First Set*
*of Interrogatories and Requests for*
*Production*
Case No. 3:10-cv-5018 RBL                    Page 10 of 16

Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 255-7552

**REQUEST FOR PRODUCTION NO. 15:** To the extent not already produced, produce all documents that in any way support or relate to Your Answers and Responses to the preceding Interrogatories and Requests for Production.

**RESPONSE:** Plaintiff has identified all documents which in any way support or relate to these responses. With the exception of reserving the right to produce documents from the Department of the Army provision of documents in December 2013, all identified items have previously been produced.

### ATTORNEY'S FED. R. CIV. P. 26 CERTIFICATION

The undersigned certifies pursuant to Fed. R. Civ. P. 26(g) that he has read each request, answer, response, and objection to these requests, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry, each is (1) consistent with the Civil Rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

DATED at Toledo, Ohio this 14th day of February, 2014.

/s/ Terry J. Lodge
Terry J. Lodge (Ohio S. Ct. No. 0029271)
Co-counsel for Plaintiffs

*Grande Responses to Rudd's First Set of Interrogatories and Requests for Production*
Case No. 3:10-cv-5018 RBL                    Page 15 of 16

Terry J. Lodge, Esq.
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 255-7552

## VERIFICATION

Christopher Grande, under the penalties of perjury of the State of Washington, hereby declares that he is the responding Plaintiff in the above-captioned cause of action, that he has read the foregoing answers to interrogatories and responses to requests for production and that he believes his responses to be true as to those responses based upon his own direct experience or observation, and as to responses based on facts gained or experienced indirectly, that those responses are true to the best of his knowledge and belief.

DATED: _____          _____
                                 Christopher Grande

*Grande Responses to Rudd's First Set*
*of Interrogatories and Requests for*
*Production*
Case No. 3:10-cv-5018 RBL              Page 16 of 16

**Terry J. Lodge, Esq.**
**316 N. Michigan St., Suite 520**
**Toledo, OH 43604-5627**
**(419) 255-7552**

# EXHIBIT C

**JUDGE RONALD B. LEIGHTON**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

JULIANE PANAGACOS, *et al.*,

                    Plaintiffs,

          vs.

JOHN J. TOWERY, *et al.*,

                    Defendants.

**NO. 3:10-cv-05018 RBL**

**DEFENDANT CITY OF OLYMPIA'S 1ST INTERROGATORIES TO PLAINTIFF CHRIS GRANDE**

TO:      PLAINTIFF CHRIS GRANDE

AND TO:    LARRY HILDES, PLAINTIFFS' ATTORNEY

In accordance with FRCP 33, you are hereby required to answer, in writing, the following interrogatories separately and fully under oath, within the time prescribed. These interrogatories are deemed continuing in nature and you must supplement your answers pursuant to FRCP 26(e).

In answering these interrogatories, you are required to furnish such information as is available to you, not merely the information which you know of your personal knowledge. This is intended to include any information in the possession of the agents or attorneys or any investigators for the answering party.

DEFENDANT CITY OF OLYMPIA'S 1ST
INTERROGATORIES TO PLAINTIFF
CHRIS GRANDE - 1
U.S.D.C. No. 3:10-cv-05018 RBL

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
ATTORNEYS AT LAW
2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512
P.O. BOX 11880, OLYMPIA, WA 98508-1880
(360) 754-3480   FAX: (360) 357-3511

**Question No. 1. Civil rights violations.**

For each incident in which you claim to be the victim of conduct by a City of Olympia employee that violated your civil rights under 42 U.S.C. § 1983, please identify the employee, date, place, time, specific circumstances of the conduct, and any witnesses. See Third Amended Complaint, Count One.

**ANSWER:**

On November 10th, 2007, before noon, on Plum Street before the entrance ramp to Highway I-5, I was sitting in the street, locked together with other protestors who were peacefully protesting against a convoy of military equipment for use in the Iraq war. I was shot with pepper balls twice, once just below the jaw on the left side of my neck which ricocheted onto my throat, and the second time, in my chest. I believe Officer Chris Maynard was the one who shot the pepper balls. He shot directly at me and the other peaceful, non-violent protestors participating in the demonstration. He did not skip the pepper balls off the ground. In addition, we were sitting down and locked together, there was absolutely no reason to shoot pepper balls at us. It would accomplish no purpose other than to punish us and attempt to discourage our First Amendment expressions. A second officer pushed my head down and locked my arm, put enormous pressure on my shoulder and causing me a great deal of unnecessary pain while the pvc pipe was removed from my arm. All of this violated my 1st Amendment Right to Free Expression and my 4th Amendment Right to be free from excessive and unnecessary force as well as my 14th Amendment right to Equal Protection as I was singled out because of the content of my free expression.

Earlier, the Olympia Police Department behaved violently toward protestors at the Port of Olympia, pushing, grabbing, dragging and excessively, viciously and unnecessarily pepper-spraying the non-violent and peaceful demonstrations at the Port. I was on the sidewalk, and was not assaulted or pepper sprayed directly, but did witness this and received some "over spray" which caused me to cough.

Witnesses include Phan Nguyen, Jeff Alexander Berryhill, Davi Rios, James Steele, Kyle Ludowitz, Joji Kojima, Amory Balatine and Peter Vashon.

On November 13th, 2007, military equipment was moving from the back door of the Port of Olympia. I ran to the sidewalk and joined other protestors, some of whom were on the street. I began to photograph the scene. I did not want to put myself into a position of being arrested, so I remained on the sidewalk. While taking photographs, I noticed a police officer point at me,

DEFENDANT CITY OF OLYMPIA'S 1ST
INTERROGATORIES TO PLAINTIFF
CHRIS GRANDE - 2
U.S.D.C. No. 3:10-cv-05018 RBL

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512*
*P.O. BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480  FAX: (360) 357-3511*

remove his pepper-spray canister, and spray directly at me. It was night time and I was blinded by the pepper-spray so I did not obtain the name of the officer. This again violated my 1st Amendment Right to Free Expression and my 4th Amendment Right to be free from excessive and unnecessary force as well as my 14th Amendment right to Equal Protection as I was singled out because of the content of my free expression.

Witnesses include Phan Nguyen, Josh Simpson, James Bracken, James Steele, Kyle Ludowitz, Katherine Olenick and Julianne Panagacos (spoke to about my experience directly afterward).

**Question No. 2.  False arrests.**

With respect to any arrest by the Olympia Police Department that you claim was illegal and that is a subject of this lawsuit, please identify the date, place, time and any witnesses.

**ANSWER:**

None.

**Question No. 3.  Excessive force during arrests.**

If you claim you were subjected to excessive force for any arrest identified in answer to Question 1, please identify for that arrest any specific means of force utilized that you claim was excessive and any witnesses.

**ANSWER:**

See my answer to Question No. 1.  On November 10th, 2007, everyone in the non-violent protest was shot at with pepper-ball rounds.  I was hit just below the jaw, which ricocheted into my throat, and chest.  I was then placed in a head/arm lock that caused painful pressure in my shoulder, even though I did not resist arrest and stayed peaceful and non-violent.  This violated my 1st Amendment Right to Free Expression and my 4th Amendment Right to be free from excessive and unnecessary force as well as my 14th Amendment right to Equal Protection as I was singled out because of the content of my free expression.

Despite this, I cooperated with officers in walking to the arrest van.

Witnesses include Phan Nguyen, Jeff Alexander Berryhill, Davi Rios, James Steele, Kyle Ludowitz, Joji Kojima, Amory Balatine and Peter Vashon.

DEFENDANT CITY OF OLYMPIA'S 1ST
INTERROGATORIES TO PLAINTIFF
CHRIS GRANDE - 3
U.S.D.C. No. 3:10-cv-05018 RBL

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512*
*P.O. BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480   FAX: (360) 357-3511*

sleep over this and I fell behind in my studies at Evergreen State College; I lost one credit that quarter, which was the only credit I ever lost while attending TESC. During the period of the 10th through the 13th, I was very cautious about my participation in the protests at the Port, as I was extremely apprehensive about what the police might do again. I had watched the police behave violently at the Port, including unnecessarily and excessively pepper-spraying protestors at the Port on November 10th, before I was shot directly with the pepper ball rounds, and I watched my roommate, James Steele, completely fall apart, with crying and shaking. It put a whole perspective on the day for me.

**Question No. 6.  Assault.**

For each incident in which you claim "to reasonably fear additional imminent harm to [your] health and safety and additional tortious use of force" by the Olympia Police Department, please identify the date, place, time, specific circumstances, and any witnesses. See Third Amended Complaint, paragraph 4.34.

**ANSWER:**

I was afraid to join in on the protest on November 13th, 2007, because of what they did to me and other protestors on the 10th, the violent reaction and pepper spraying at the Port, shooting me with a pepper ball and twisting my shoulder painfully and unnecessarily. On November 13th, I purposely stayed on the sidewalk because I thought that I would not be harmed there. An officer purposely sprayed directly at me as I was photographing the scene from the sidewalk. All of this made me afraid of further imminent harmful and offensive contact by the officers, since the police repeatedly demonstrated that they would attack me no matter what I did.

**Question No. 7.  Intentional infliction of emotional distress.**

For each incident in which you claim to be the victim of conduct by a City of Olympia employee that was "willful, malicious, oppressive, extreme and outrageous and/or reckless, and of such a nature as to shock the conscience, and was of such a nature that punitive damages should be imposed," please identify the employee, date, place, time, specific circumstances of the conduct, and any witnesses. See Third Amended Complaint, paragraph 4.42.

DEFENDANT CITY OF OLYMPIA'S 1ST
INTERROGATORIES TO PLAINTIFF
CHRIS GRANDE - 5
U.S.D.C. No. 3:10-cv-05018 RBL

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512*
*P.O. BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480  FAX: (360) 357-3511*

**ANSWER:**

On November 10th, 2007, the actions of the officers in shooting pepper ball rounds directly at the people sitting in the street who were locked together, and therefore even unable to bring their hands up to their faces to protect themselves, such that one of the balls hit me in the face and chest, was definitely "willful, malicious, oppressive, extreme and outrageous and/or reckless, and of such a nature as to shock the conscience, and was of such a nature that punitive damages should be imposed." I am aware that the pepper ball has the potential to kill, as it did to a person in Boston at a sporting event, who was hit in the temple. The pepper balls could have hit me in the face, head, temple, eye, or more directly in the throat, if it had been even another inch or less off. I believe Officer Chris Maynard was the officer who shot me in the face and chest. I do not know the name of the officer who twisted my head and arm in the lock that caused the pain on my shoulder. Witnesses include Phan Nguyen, Jeff Alexander Berryhill, Davi Rios, James Steele, Kyle Ludowitz, Joji Kojima, Amory Balatine and Peter Vashon.

On November 13th, 2007, the actions of the officer who shot pepper spray directly at me and the other officers who pepper sprayed the demonstrators liberally and excessively also met the standard of definitely "willful, malicious, oppressive, extreme and outrageous and/or reckless, and of such a nature as to shock the conscience, and was of such a nature that punitive damages should be imposed." Witnesses include Phan Nguyen, Josh Simpson, James Bracken, James Steele, Kyle Ludowitz, Katherine Olenick and Julianne Panagacos (spoke to about my experience directly afterward).

## Question No. 8.  Malicious prosecution.

For each incident in which you claim a City of Olympia employee "gave false information to the City of Olympia and Thurston County's Prosecutors' Offices," please identify the employee, the information you claim was false, the person to whom it was communicated and any document involved. See Third Amended Complaint, paragraph 4.44.

**ANSWER:**

No charges were ever filed against me.

## Question No. 9.  Medical care.

DEFENDANT CITY OF OLYMPIA'S 1ST
INTERROGATORIES TO PLAINTIFF
CHRIS GRANDE - 6
U.S.D.C. No. 3:10-cv-05018 RBL

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512*
*P.O. BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480  FAX: (360) 357-3511*

DATED this _____ day of _____, 2011.

LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.

_____

Donald L. Law, WSBA #6122
Attorney for Defendants City of Olympia
Bjornstad, Lower, Herbig, Nelson, Johnson,
Costa, Butler, Hall, Michel

Answered and responded to and/or objected to this 25th day of November, 2011.

_____/S/ Lawrence A. Hildes_____
Lawrence A. Hildes, WSBA#35035
Attorney for Plaintiffs

Pursuant to 28 U.S.C. _ 17.46, I, Chris Grande, a plaintiff in the above entitled cause, declare that I have read the foregoing Defendant City of Olympia's 1st Interrogatories to Plaintiff Chris Grande and answers thereto, know the contents thereof, and believe the same to be true. I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this 25th day of November, 2011, at Olympia, WA_____.

_____
Chris Grande

DEFENDANT CITY OF OLYMPIA'S 1ST
INTERROGATORIES TO PLAINTIFF
CHRIS GRANDE - 8
U.S.D.C. No. 3:10-cv-05018 RBL

LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.
ATTORNEYS AT LAW
2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512
P.O. BOX 11880, OLYMPIA, WA 98508-1880
(360) 754-3480  FAX: (360) 357-3511

1
2      DATED this _____ day of _____, 2011.

3                              LAW, LYMAN, DANIEL,
                          KAMERRER & BOGDANOVICH, P.S.
4

5                          _____
6                          Donald L. Law, WSBA #6122
                           Attorney for Defendants City of Olympia Bjornstad,
7                          Lower, Herbig, Nelson, Johnson, Costa, Butler,
                           Hall, Michel
8
        Answered and responded to and/or objected to this 25th day of
9    November, 2011.

10

11                                _____/S/ Lawrence A. Hildes_____
12                          Lawrence A. Hildes, WSBA#35035
                           Attorney for Plaintiffs
13
        Pursuant to 28 U.S.C. 17.46, I, Chris Grande, a plaintiff in the above
14   entitled cause, declare that I have read the foregoing Defendant City of Olympia's
     1st Interrogatories to Plaintiff Chris Grande and answers thereto, know the contents
15   thereof, and believe the same to be true. I declare under penalty of perjury under
     the laws of the State of Washington and the United States that the foregoing is
16   true and correct.

17
        DATED this 25th day of November, 2011, at _Olympia, WA_____
18   .

19

20                          _____
                           Chris Grande
21

22

23

24

25

26

LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.
ATTORNEYS AT LAW
2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512
P.O. BOX 11880, OLYMPIA, WA 98508-1880
(360) 754-3480  FAX: (360) 357-3511

# EXHIBIT D

THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JULIANNE PANAGACOS, MALLORY
HAGEL, STEPHANIE SNYDER, EMILY COX,
et al.,

              Plaintiffs,

     v.

JOHN J. TOWERY, THOMAS R. RUDD, CLINT
COLVIN, CITY OF OLYMPIA, TOR
BJORNSTAD, et al.,

              Defendants.

No. CV10-5018 RBL

**DEFENDANT JOHN
TOWERY'S FIRST SET OF
INTERROGATORIES AND
REQUESTS FOR
PRODUCTION PROPOUNDED
ON PLAINTIFF BRENDAN
DUNN AND RESPONSES
THERETO**

    Plaintiff Hereby Responds as Follows to this set of discovery. Plaintiff objects to the extent that Defendants have exceeded the limits for this type of discovery, or have used subparts and definitions to facilitate exceeding the limits.

    Plaintiff also objects to these discovery requests to the extent they are vague, overbroad, unduly burdensome, unduly intrusive or otherwise objectionable and/or privileged.

TOWERY'S FIRST SET OF DISCOVERY TO DUNN (AND RESPONSES
THERETO) - 1
CV10-5018 RBL
C:\Users\Owner\Documents\Documents\Port of Olympia\Port of Olympia
2\Civil\Women's Action\Towery DIscovery Requests\Dunn Responses to
Towery-Set 1.odt

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
Fax: (360) 714-1791
Of Attorneys for Plaintiffs

The Government for Redress of Grievances thus violating again his First Amendment Rights.

INTERROGATORY NO. 2: Please identify all individuals, associates and organizations you worked with in relation to any of the activities allegedly abridged by a government policy or action.

ANSWER: Plaintiff objects to this interrogatory based on his First Amendment privileges of Freedom of Speech and particularly Freedom of Association.    This is strictly privileged communications.  Defendant has made no argument as to why they are entitled to such extraordinarily broad personal information and political information, particularly in a case involving spying on Plaintiffs' political activities and seeking to disrupt and destroy those activities and associations.  This request specifically infringes upon Plaintiffs' First and Fourteenth Amendment rights of anonymous association. Louisiana ex rel. Gremillion v. NAACP 366 U.S. 293, 296 (1961); NAACP v. Alabama 357 U.S. 449, 459 (1958); Bates v. Little Rock 361 U.S. 516, 523 (1960).  See also NAACP v. Claiborne Hardware Co., 458 U.S. 886, 928 (1982).


INTERROGATORY NO. 3: Please identify the date and location of every time you have been arrested by campus, local, county, state or federal law enforcement (including military police) in the past ten years.  Please describe the code violation cited as the basis for each arrest.

TOWERY'S FIRST SET OF DISCOVERY TO DUNN (AND RESPONSES
HERETO) - 4
CV10-5018 RBL
C:\Users\Owner\Documents\Documents\Port of Olympia\Port of Olympia
2\Civil\Women's Action\Towery DIscovery Requests\Dunn Responses to
Towery-Set 1.odt

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
Fax: (360) 714-1791
Of Attorneys for Plaintiffs

ANSWER:

2004 – Kirkland, NY. Public disturbance.

2005 - Oswego, NY. SUNY Oswego. Petit larceny.

May 2006 – Olympia, WA. Port of Olympia. Pedestrian interference.

May 2006 – Olympia, WA. Port of Olympia. Trespass on public property.

October 5, 2006 – Seattle, WA. Cal Anderson Park. Felony Assault 3.

2008 – Tacoma, WA. Public disturbance.

2010 – Utica, NY. Stanley Theater. Public disturbance.

INTERROGATORY NO. 4:  Please explain the extent of your education by listing all schools attended from high school to the present.  Please identify any degree and/or certification earned from any academic institution and the dates that you attended each institution.

ANSWER:

Clinton High School, Clinton, NY. September 1999 – June 2003. Regents Diploma.

SUNY Oswego, August 2003 – June 2005

Mohawk Valley Community College, August – December 2005

The Evergreen State College, January 2006 – June 2008, BA in History, Political Science

SUNY Cortland, August 2012 – Present. Completing Masters of Arts in History

TOWERY'S FIRST SET OF DISCOVERY TO DUNN (AND RESPONSES THERETO) - 5
CV10-5018 RBL
C:\Users\Owner\Documents\Documents\Port of Olympia\Port of Olympia 2\Civil\Women's Action\Towery DIscovery Requests\Dunn Responses to Towery-Set 1.odt

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
Fax: (360) 714-1791
Of Attorneys for Plaintiffs

REQUEST FOR PRODUCTION NO. 11:  Please produce all audio or video recordings or photographs of Towery in your possession or subject to your control.

RESPONSE:

PLAINTIFF does not have any such information or documents.

DATED October 3, 2013.

**LAWRENCE A. HILDES**

_____/s/LAWRENCE A. HILDES_____
Lawrence A. Hildes, WSBA No. 35035
Of Attorneys for Plaintiffs including Brendan Dunn

**ATTORNEY'S Fed. R. Civ. P. 26 CERTIFICATION**

The undersigned certifies pursuant to Fed. R. Civ. P. 26(g) that he has read each request, answer, response, and objection to these requests, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry, each is (1) consistent with the Civil Rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

      DATED at Bellingham, Washington, this 3d_ day of October, 2013.

**LAWRENCE A. HILDES**

/s/ LAWRENCE A. HILDES_____
Lawrence A. Hildes, WSBA No. 35035
Of Attorneys for Plaintiffs including Brendan Dunn

TOWERY'S FIRST SET OF DISCOVERY TO DUNN (AND RESPONSES
HERETO) - 41
CV10-5018 RBL
C:\Users\Owner\Documents\Documents\Port of Olympia\Port of Olympia
2\Civil\Women's Action\Towery DIscovery Requests\Dunn Responses to
Towery-Set 1.odt

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
Fax: (360) 714-1791
Of Attorneys for Plaintiffs

1
2
3
**<u>VERIFICATION</u>**
4
Brendan Dunn makes the foregoing answers and responses in his individual capacity.
5
DATED: _____
6
7
_____
8
Brendan Dunn
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27  TOWERY'S FIRST SET OF DISCOVERY TO DUNN (AND RESPONSES THERETO) - 42
28  CV10-5018 RBL
C:\Users\Owner\Documents\Documents\Port of Olympia\Port of Olympia 2\Civil\Women's Action\Towery DIscovery Requests\Dunn Responses to Towery-Set 1.odt

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
Fax: (360) 714-1791
Of Attorneys for Plaintiffs

# EXHIBIT E

Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JULIANNE PANAGACOS, et al.,

                           Plaintiffs,

    v.

JOHN J. TOWERY et al.,

                           Defendants.

No. C10-05018-RBL

DEFENDANT THOMAS R. RUDD'S
FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION
TO PLAINTIFF BRENDAN DUNN
(and responses thereto)

FROM: BRENDAN DUNN, AND HIS COUNSEL OF RECORD

TO:  DEFENDANT RUDD'S COUNSEL OF RECORD

       This Plaintiff Hereby Responds as Follows to this set of discovery.  Plaintiff objects to

the extent that Defendants have exceeded the limits for this type of discovery, or have used

subparts and definitions to facilitate exceeding the limits.

       Plaintiff also objects to these discovery requests to the extent they are vague,

overbroad, unduly burdensome, unduly intrusive or otherwise objectionable and/or privileged.

These responses are only as to the personal knowledge of this Plaintiff and may or may not

reflect the recollection, opinions, and or statements of the other Plaintiffs and can only be

used as evidence as to the responding Plaintiff.

RUDD'S FIRST SET OF DISCOVERY
REQUESTS TO PLAINTIFF
DUNN (and responses thereto)- 1
Case No. C10-05018-RBL
PANAGACOS  V. TOWERY

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
lhildes@earthlink.net
Of Attorneys for Plaintiffs

**REQUEST FOR PRODUCTION NO. 7:** Produce all documents upon which you rely to support your answer to Interrogatory 7.

**RESPONSE:** DT Index (redacted). Also, D-B Resp 27 Grays Harbor Miltry Mvmt 2007; D-B Resp 28 Threat assessment, and any and all other threat assessment documents disclosed by Defendants previously in this litigation. Also, D-B Resp 17 Towery RFP_061413 second disclosure Whole File; D-B Resp 25 Tactical Ops Intel lic plates; D-B Resp 26 Grays Harbor license logs; D-B Resp 27 Grays Harbor Miltry Mvmt 2007.

Also, Army docs # 1526, #1528, #1531, #1895, #2656, #2809, #2815, #3235, #3242, #3245, #3255, #3259, #3264, #3698.

Additionally, other of the uncategorized, unindexed documents provided by the U.S. Department of the Army on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff reserves the right to seasonably disclose.

**INTERROGATORY NO. 8:** State each fact upon which you base your *Bivens* claim against Rudd for an alleged violation of your Fourth Amendment rights. Your answer should include, but is not limited to, the following:

a. Describe, as that term is defined herein, all incidents upon which this claim in based;

b. Describe, as that term is defined herein, all acts and conduct by Rudd that you assert violated your Fourth Amendment rights;

c. Identify all persons with knowledge of Rudd's acts and conduct that you assert violated your Fourth Amendment Rights.

RUDD'S FIRST SET OF DISCOVERY
REQUESTS TO PLAINTIFF
DUNN (and responses thereto)- 17
Case No. C10-05018-RBL
PANAGACOS V. TOWERY

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
lhildes@earthlink.net
Of Attorneys for Plaintiffs

**ANSWER:** See responses to Interrogatory Nos. 6 and 7 above, which are incorporated herein by reference.

Between March 28-29, 2007 a mistrial was declared against the defense, of which I was a pro se defendant, in the Olympia 22 case. The mistrial was declared after a secure attorney-client riseup.net listserve was jeopardized by edmond.bob@gmail.com and jaamt004@gmail.com (later discovered to be Towery's email). The Army sabotaged this highly politicized trial. Detective Michael Hirte was also involved in this process.

During the port protests in Aberdeen, at which Towery was present, I was constantly followed by law enforcement, even when I went into stores and the town library. The car I was driving was tracked by law enforcement and I was pulled over for absolutely no reason and given a ticket. The Aberdeen Police also threatened to send their officers in the Polish Hall where other activists and I had been invited to speak at to youth at a punk rock show about the port protests. The manager of the building informed me that if he let us speak, then the police would come in and shut down the show. We left the building and were followed closely by the police and K-9 units everywhere we walked.

Unknown email addresses frequently attempted to join our means of communication by way of the listserves.

SDS was also a major target of Towery, Rudd and their surveillance network. Towery was on Tacoma SDS, Olympia SDS and Northwest SDS listserves, Thomas Glapion of the US Air Force at McGuire AFB in New Jersey had also requested information on SDS and PMR from local law enforcement, and the DNC/RNC conference SDS organized was infiltrated by Towery.

RUDD'S FIRST SET OF DISCOVERY
REQUESTS TO PLAINTIFF
DUNN (and responses thereto)- 18
Case No. C10-05018-RBL
PANAGACOS V. TOWERY

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
lhildes@earthlink.net
Of Attorneys for Plaintiffs

**INTERROGATORY NO. 11:** Identify with specificity each and every category or type of damage that you claim to have sustained as set forth in your Initial Disclosures, including the dollar value attributable to each category of damages. For purposes of this Interrogatory, categories of damages include the cost of any required medical treatment, property damage or loss, lost wages, impairment of earning capacity, lost employment opportunities, general damages and any other expense incurred.

For any wage loss, impairment of earning capacity, and lost employment opportunities you are claiming, your answer should include an itemization of all such damages and the basis upon which you calculate those damages.

For any other type of damages claimed, including general damages, your answer should include a specific itemization for each element of damage claimed.

**ANSWER:**

I suffered compensatory damages for pain and suffering, public humiliation, and anguish arising from the above described violations of my rights to privacy, free speech, free association, and freedom to petition my government absent interference. In other words, my right to demonstrate and demand the government change unjust policies (the wars in Iraq and Afghanistan and the use of the public ports to send equipment to maintain them was systematically disrupted and destroyed, and I was constantly persecuted for my attempts to exercise those rights.

I trusted "John Jacob" (Towery) and presented him as an ally to other activists, to friends, and possibly even to my family. When the truth came out, I had to answer to others on why I let a spy into our organizations. My reputation as an organizer and my political activism is now routinely questioned because of the close relationship I had with "John Jacob."

I've been physically harmed at the hands of the police (who often received "information" that encouraged their violence toward me from Rudd and Towery).

RUDD'S FIRST SET OF DISCOVERY
REQUESTS TO PLAINTIFF
DUNN (and responses thereto)- 25
Case No. C10-05018-RBL
PANAGACOS V. TOWERY

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
lhildes@earthlink.net
Of Attorneys for Plaintiffs

1     I have also suffered emotionally.  It became normal for those of us who were leaders

2  in PMR to be routinely followed by police, stopped by police, and targeted through other

3  forms of surveillance.  I feel a profound lack of privacy in my communications.  I canceled

4  my facebook account due to the actions of Rudd, Towery, and the other Defendants who were

5  involved in spying.  I know that I am personally targeted by government surveillance, which

6  is very different than just being another IP address in the NSA's database like everyone else.

7  At any point in time, as soon as my political organizing activities get enough attention, I fear

8  someone in law enforcement, military, or government intelligence could wreck my life again.

9  I think about who from the government is watching me every time I send an e-mail.  And I

10  believe, based on the experience described above, that they don't care if what I am doing is

11  protected by the First Amendment.  If they don't like what I'm saying, they will attack

12  m(us).e

13     Damages were incurred to IWW union property after the union's newspaper boxes

14  were stolen by the City of Olympia.

15     I have also lost wages and work because of my court cases and legal proceedings that

16  stem from law enforcement and military infiltration and harassment.

17     I don't know if I am allowed into Canada, as I have been both rejected and

18  subsequently accepted at the border.  I have friends and family in Canada.  Although I have

19  not been questioned at the border recently, every time I cross causes a considerable amount of

20  anxiety, stress and uncertainty about whether or not I will actually be able to cross.  This has

21  also deterred me from wanting to travel overseas or to other countries.

22     I was also forced to move out of Olympia to New York.  I couldn't live with the stress

23  of the police state that I had become a target of.  I feared that any encounter with the police,

24  even a traffic stop, would result in a more severe response due to the "information" my name

25  would run up in their databases.  Because I am being monitored and punished for the ideas in

26  my head and my political organizing and activism, not any actual criminal acts, this situation

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
lhildes@earthlink.net
Of Attorneys for Plaintiffs

1   is profoundly unjust.  It strikes me as antithetical to the principles of the Bill of Rights.

2          **REQUEST FOR PRODUCTION NO. 10:** Produce all documents relating to the

3   damages that you have identified in response to Interrogatory No. 11.

4          **RESPONSE:**

5          Many documents from the above Interrogatory responses and Requests for Production

6   illustrate the scope of damages, and are incorporated here by reference.  Additional

7   documents may be identified through ongoing Plaintiff review of the Army disclosures or

8   other discovery.

9

10

11         **INTERROGATORY NO. 12:**  Are you claiming to have sustained any physical or

12  psychological injuries as a result of the acts, incidents, and/or conduct that you attribute to

13  Rudd?  If so, identify with specificity each such injury you claim to have sustained and

14  attribute to Rudd.

15         Your answer should include all complaints and symptoms experienced, whether such

16  injury or disability was aggravating of a prior condition, the particular parts of the body

17  involved, the time period during which each symptom persisted, what medical attention was

18  sought, and when such medical attention was sought and from whom.

19         **ANSWER:**

20

21         I am claiming psychological injuries from the spying and intimidation conducted by

22  Rudd, Towery and others. I experience a number of issues since the outing of Towery,

23  including

24  (1) regular nightmares about the military and police,

25  (2) mistrust of people (including friends, family, partners, coworkers, and activists),

26  (3) heightened states of emotion (crying when I am triggered by things that remind me of the

RUDD'S FIRST SET OF DISCOVERY
REQUESTS TO PLAINTIFF
DUNN (and responses thereto)- 27
Case No. C10-05018-RBL
PANAGACOS V. TOWERY

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
lhildes@earthlink.net
Of Attorneys for Plaintiffs

1  Army, 1024,  Army 1026,Army 1093, Army 1131, Army 1208,  Army 001251, Army

2  001251,  Army 001269, Army 001294 ,  Army 001251,   Army 001269,  Army 001294,

3  Army 001297,  Army 001295,  Army 001526,  Army 001507,  Army 002853,  Army

4  001526, Army 001507,  Army 001593,  Army 001594,   Army 001895,  Army 002382,

5  Army 002484,  Army 002747,  Army 002753,  Army 002749,  Army 002809,  Army

6  002853,  Army 003235

7

8

9

10

11        DATED this 26th day of January 2014.

12        /S/    LAWRENCE A. HILDES
          LAWRENCE A. HILDES, WSBA #35035
13        P. O. Box 5405, Bellingham, WA 98227
          Telephone: (360) 715-9788
14        e-mail: lhildes@earthlink.net
          Attorney for Plaintiffs
15

16

17

18

19

20

21

22

23

24

25

26

RUDD'S FIRST SET OF DISCOVERY                          LAWRENCE A. HILDES
REQUESTS TO PLAINTIFF                                  P.O. BOX 5405
DUNN (and responses thereto)- 31                       Bellingham, WA 98227
Case No. C10-05018-RBL                                 (360) 715-9788
PANAGACOS  V. TOWERY                                   lhildes@earthlink.net
                                                       Of Attorneys for Plaintiffs

## CERTIFICATION OF COUNSEL

The undersigned attorney for Plaintiff Brendan Dunn has read the within and foregoing answers and objections to Defendant Thomas R. Rudd's First Set of Interrogatories and Requests for Production of Documents to Plaintiff Brendan Dunn and certifies that they are in compliance with Federal Rule of Civil Procedure 26(g).

Dated this 26th day of January, 2014.

/s/ Lawrence A. Hildes

RUDD'S FIRST SET OF DISCOVERY
REQUESTS TO PLAINTIFF
DUNN (and responses thereto)- 32
Case No. C10-05018-RBL
PANAGACOS V. TOWERY

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
lhildes@earthlink.net
Of Attorneys for Plaintiffs

## **VERIFICATION**

1

2      I declare under penalty of perjury under the laws of the State of Washington that I

3   have read the foregoing answers and responses to Defendant Thomas R. Rudd's First Set of

4   Interrogatories and Requests for Production, know the contents thereof, and believe the same

5   to be true and correct.

6

7      Dated this _____ of _____, 20___.

8

9                                        _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

RUDD'S FIRST SET OF DISCOVERY
REQUESTS TO PLAINTIFF
DUNN (and responses thereto)- 33
Case No. C10-05018-RBL
PANAGACOS V. TOWERY

LAWRENCE A. HILDES
P.O. BOX 5405
Bellingham, WA 98227
(360) 715-9788
lhildes@earthlink.net
Of Attorneys for Plaintiffs

# EXHIBIT F

Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE



JULIANNE PANAGACOS, et al.,

                                    Plaintiffs,

        v.

JOHN J. TOWERY et al.,

                                    Defendants.

No. C10-05018-RBL

DEFENDANT THOMAS R. RUDD'S
FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION
TO PLAINTIFF GLENN CRESPO

**PLAINTIFF CRESPO'S RESPONSES TO DEFENDANT THOMAS R. RUDD'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**

        Now comes Plaintiff Glenn Crespo, and sets forth his responses to "Defendant Thomas

R. Rudd's First Set of Interrogatories and Requests for Production to Glenn Crespo" as

follows:

INTERROGATORY NO. 1: State each fact upon which you base your contention that Rudd "lordered"

or "directed" actions, whether taken by Defendant John Towery or others, that you allege violated your

constitutional rights and identify each witness with knowledge of such facts. This Interrogatory does

not seek the type of general assertions alleged in the Third Amended Complaint, such as that contained

at Paragraphs 1.16, 1.17, 1.28, and 2.3, but rather the Interrogatory asks you to explain the specific

1

instances of conduct and other facts on which you based your allegations and on which you will rely to

support your claims that Rudd personally acted in a way that abridged your constitutional rights.

ANSWER: As noted above, in the "Definitions" section, ""Rudd" means Thomas R. Rudd, Officer and

Protection Division Chief, Joint Base Lewis-McChord, a defendant in this action, as well as his *agents,*

*representatives, or any persons acting or purporting to act for or on his behalf.*"" (Emphasis added).

John Towery was acting on behalf of Rudd as his agent, when he infiltrated PMR and related groups.

The Army has acknowledged that Rudd approved the infiltration and surveillance plan involving

Towery. Rudd received and disseminated reports from Towery. Nothing produced by Defendants has

indicated that Rudd never ordered Towery to limit his infiltration and surveillance of PMR and related

organizations. Rather, Defendant Towery produced emails between Rudd and Towery regarding

Towery's attendance at a July 2008 conference at Evergreen State College concerning protests at the

national conventions that year, in which Rudd indicates that he had gotten Towery overtime pay for his

attendance. Acting on behalf of Rudd, Towery attended meetings to which he would not have been

invited if his true identity was known, as well as attending gatherings of my family and friends in my

personal residence. In Towery's capacity as information/intelligence committee member in PMR during

our mobilization in 2009, he provided erroneous information concerning the size and frequency of

the military convoys destined for the Port of Tacoma. This information served to complicate our

ability to effectively protest. ( I do not think attended any PMR actions in 2009. I did not go because of

what had occurred and my ongoing fear of arrest, of harassment and so on.)

     In addition, the Army's own investigative reports made clear that Rudd lied to cover up

his role, knowledge, and involvement in Towery's spying.

REQUEST FOR PRODUCTION NO. 1: Produce all documents upon which you

rely to support your answer to Interrogatory No. 1.

RESPONSE: Threat assessment and license logs documents previously disclosed by Defendants in this

litigation. In addition, the uncategorized, unindexed documents provided by the U.S. Department of the

Army on or about December 21, 2013 may contain documents pertinent to this response, which

Plaintiff reserves the right to seasonably disclose.

INTERROGATORY NO. 2: State each fact upon which you base your contention, as

stated in paragraph 2.6 of your Third Amended Complaint, that Rudd "influenced and directed

tactics that were employed by the Tacoma Police Department and other agencies to disrupt the

protests [against the use of the Port of Tacoma for military shipments] without cause or

justification," and identify each witness with knowledge of such facts. Your answer should

include, but is not limited to, each and every action allegedly taken by Rudd on which you

based your allegation.

ANSWER: As noted above, Towery was an agent of Rudd, directed by Rudd, and he reported to Rudd.

In mid-2009, after I became aware of Towery's involvement in spying and intelligence gathering, we

spoke one last time. In that conversation, he admitted to working with law enforcement as an

informant, including, but not limited to, the Tacoma Police Department (TPD). Towery stated that he

gave the TPD information that would cause them to come out in full force to the Anti-I.C.E.

demonstration that happened on November 9, 2007. His conversations with TPD were the moving

force that effectively hindered my freedom of speech and caused a chilling effect on me, and that is

also attributable to his supervisor, Rudd.

In addition, Rudd made sure Towery was paid overtime for spying on meetings and private

events to gain information to disrupt my, and my fellow plaintiffs', first amendment activities as well as

destroy their relationships, home life and housing situations.

REQUEST FOR PRODUCTION NO. 2: Produce all documents upon which you

rely to support your answer to Interrogatory No. 2.

RESPONSE: Threat assessment and license logs documents disclosed by Defendants previously in this

3

litigation. Additionally, the uncategorized, unindexed documents provided by the U.S. Department of

the Army on or about December 21, 2013 may contain documents pertinent to this response.

INTERROGATORY NO. 3: State each fact upon which you base your contention, as stated in paragraph

2.6 of your Third Amended Complaint, that Rudd "covertly br[oke] the security of and join[ed] a

confidential Privileged Attorney-client listserv[] for the Defense team of a related criminal case dating

from June of 2006." Your answer should include each and every alleged action of Rudd on which you

based your allegation, including the date of each action and the identity of each witness with

knowledge of such facts.

ANSWER: I was not a member of, nor did I have any involvement with, the referenced listserv.

REQUEST FOR PRODUCTION NO. 3: Produce all documents upon which you

rely to support your answer to Interrogatory No. 3.

RESPONSE: Not applicable.

INTERROGATORY NO. 4: State each fact upon which you rely to show that Rudd

was motivated by a desire to deter, chill, or disrupt your political speech, and identify each

witness with knowledge of such facts.

ANSWER: The motivation of Rudd in sending Towery, his agent, to infiltrate PMR and other groups,

attend private meetings and befriend political activists, was to disrupt Plaintiffs' political speech and

cause a chilling effect.

There was a casual conversation in my home in late 2007, at which time Towery produced, our

of his jacket pocket, a loaded firearm. He removed the magazine, then removed the bullet that was in

the chamber, then handed the gun to me. It was a small pistol. He talked about how he carried it

everywhere, and asked if I was interested in firearms, and that he could share his knowledge with me.

He also brought up the topic of using firearms at various meetings and was, it appeared, an *agent*

*provocateur.*

4

REQUEST FOR PRODUCTION NO. 4: Produce all documents upon which you

rely to support your answer to Interrogatory No. 4.

RESPONSE: All documents previously produced by Defendants in this litigation.

INTERROGATORY NO. 5: State each fact upon which you rely to show that Rudd

was not motivated by the desire to protect military shipments, and identify each witness with

knowledge of such facts.

ANSWER: I am aware of the meetings between Rudd, Towery, the Tacoma Police Department, Chris

Adamson, the Tacoma Homeland Security Committee, the Olympia Police Department, and other

individuals and agencies, taking place in Seattle, Tacoma and Aberdeen. At these meetings, a list of

individuals and license plates to be targeted by law enforcement was circulated, and I was on that list.

I was stopped and detained a number of times, obviously for being on this list. In general, I was

prevented from lawfully exercising my first amendment rights during the years 2008 and 2009 at or

near the Port of Tacoma.

In addition, there was a casual conversation in my home in late 2007, at which time Towery

produced, our of his jacket pocket, a loaded firearm. He removed the magazine, then removed the

bullet that was in the chamber, then handed the gun to me. It was a small pistol. He talked about how

he carried it everywhere, and asked if I was interested in firearms, and that he could share his

knowledge with me. He also brought up the topic of using firearms at various meetings and was, it

appeared, an *agent provocateur.*

REQUEST FOR PRODUCTION NO. 5: Produce all documents upon which you rely to support your

answer to Interrogatory No. 5.

RESPONSE: All documents previously disclosed by Defendants during the course of this litigation.

Additionally, the uncategorized, unindexed documents provided by the U.S. Department of the

Army on or about December 21, 2013 may contain documents pertinent to this response, which

Plaintiff reserves the right to seasonably disclose.

INTERROGATORY NO. 6: State each fact upon which you base your contention, as stated in paragraph 4.53 of your Third Amended Complaint, that Rudd acted in a willful, malicious, oppressive, and/or reckless manner, and identify each witness with knowledge of such facts.

ANSWER: I am aware of the meetings between Rudd, Towery, the Tacoma Police Department, Chris Adamson, the Tacoma Homeland Security Committee, the Olympia Police Department, and other individuals and agencies, taking place in Seattle, Tacoma and Aberdeen. At these meetings, a list of individuals and license plates to be targeted by law enforcement was circulated, and I was on that list. I was stopped and detained a number of times, obviously for being on this list. In general, I was prevented from lawfully exercising my first amendment rights during the years 2008 and 2009 at or near the Port of Tacoma.

In addition, there was the casual conversation in my home in late 2007, at which time Towery produced, our of his jacket pocket, a loaded firearm. That we discussed above.

REQUEST FOR PRODUCTION NO. 6: Produce all documents upon which you rely to support your answer to Interrogatory No. 6.

RESPONSE: All documents disclosed by Plaintiffs during the course of this litigation. Additionally, the uncategorized, unindexed documents provided by the U.S. Department of the Army on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff reserves the right to seasonably disclose.

INTERROGATORY NO. 7: State each fact upon which you base your Bivens claim against Rudd for an alleged violation of your First Amendment rights. Your answer should include, but is not limited to, the following:

a. Describe, as that term is defined herein, all incidents upon which this claim is based;

6

b. Describe, as that term is defined herein, all acts and conduct by Rudd that you assert violated your

First Amendment rights;

c. Identify all persons with knowledge of Rudd's acts and conduct that you assert violated your First

Amended Rights.

ANSWER: Plaintiff objects to this interrogatory as calling for a legal conclusion and legal knowledge

on the part of the Plaintiff. That objection notwithstanding, Plaintiff answers as follows. See answers

to Interrogatories No. 1 and 2 above, which are incorporated herein by reference. While discovery is

not yet complete, to my knowledge Army investigators who identified certain of Rudd's activities

mentioned hereinabove in their report(s) have knowledge, as does John Towery.

Also, I incorporate herein by reference all responses I've previously given in this

litigation in the "Crespo Responses to Defendant Towery's First Discovery Requests," and "Crespo

Responses to Defendant City of Tacoma's First Discovery Requests."

I am aware of the meetings between Rudd, Towery, the Tacoma Police Department, Chris

Adamson, the Tacoma Homeland Security Committee, the Olympia Police Department, and other

individuals and agencies, taking place in Seattle, Tacoma and Aberdeen. At these meetings, a list of

individuals and license plates to be targeted by law enforcement was circulated, and I was on that list.

I was stopped and detained a number of times, obviously for being on this list. In general, I was

prevented from lawfully exercising my first amendment rights during the years 2008 and 2009 at or

near the Port of Tacoma.

REQUEST FOR PRODUCTION NO. 7: Produce all documents upon which you

rely to support your answer to Interrogatory 7.

RESPONSE: All documents previously disclosed by Plaintiffs during the course of this litigation.

Additionally, the uncategorized, unindexed documents provided by the U.S. Department of the Army

on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff

7

reserves the right to seasonably disclose.

INTERROGATORY NO. 8: State each fact upon which you base your Bivens claim against Rudd for

an alleged violation of your Fourth Amendment rights. Your answer should include, but is not limited

to, the following:

a. Describe, as that term is defined herein, all incidents upon which this claim is based;

b. Describe, as that term is defined herein, all acts and conduct by Rudd that you assert violated your

Fourth Amendment rights;

c. Identify all persons with knowledge of Rudd's acts and conduct that you assert

violated your Fourth Amended Rights.

ANSWER: Plaintiff objects to this interrogatory as calling for a legal conclusion and legal knowledge

on the part of the Plaintiff. That objection notwithstanding, Plaintiff answers as follows. See answers

to Interrogatories No. 1 and 2 above, which are incorporated

herein by reference. While discovery is not yet complete, to my knowledge Army investigators

who identified certain of Rudd's activities mentioned hereinabove in their report(s) have knowledge, as

does John Towery.

    Also, I incorporate herein by reference all responses I've previously given in this litigation in

the "Crespo Responses to Defendant Towery's First Discovery Requests," and "Crespo Responses to

Defendant City of Tacoma's First Discovery Requests."

    I am aware of the meetings between Rudd, Towery, the Tacoma Police Department, Chris

Adamson, the Tacoma Homeland Security Committee, the Olympia Police Department, and other

individuals and agencies, taking place in Seattle, Tacoma and Aberdeen. At these meetings, a list of

individuals and license plates to be targeted by law enforcement was circulated, and I was on that list.

I was stopped and detained a number of times, obviously for being on this list. In general, I was

prevented from lawfully exercising my first amendment rights during the years 2008 and 2009 at or

8

near the Port of Tacoma.

REQUEST FOR PRODUCTION NO. 8: Produce all documents upon which you

rely to support your answer to Interrogatory 8.

RESPONSE: All documents previously disclosed by Plaintiffs during the course of this litigation.

Additionally, the uncategorized, unindexed documents provided by the U.S. Department of the Army

on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff

reserves the right to seasonably disclose.

INTERROGATORY NO. 9: State all facts, if any, upon which you rely in support of

your contention that Rudd may be liable for any acts of Towery and/or others, and identify each

witness with knowledge of such facts.

ANSWER: Plaintiff objects to this interrogatory as calling for a legal conclusion and legal knowledge

on the part of the Plaintiff.  That objection notwithstanding, Plaintiff answers as follows.  See answers

to Interrogatories No. 1 and 2 above, which are incorporated

herein by reference, and in which it is noted that Towery was, by definition, an agent or Rudd and

acting on his behalf. While discovery is not yet complete, to my knowledge Army investigators

who identified certain of Rudd's activities mentioned hereinabove in their report(s) have

knowledge, as does John Towery.

Also, I incorporate herein by reference all responses I've previously given in this litigation

in the "Crespo Responses to Defendant Towery's First Discovery Requests,"and "Crespo Responses to

the City of Tacoma's First Discovery Requests."

    I am aware of the meetings between Rudd, Towery, the Tacoma Police Department, Chris

Adamson, the Tacoma Homeland Security Committee, the Olympia Police Department, and other

individuals and agencies, taking place in Seattle, Tacoma and Aberdeen.  At these meetings, a list of

individuals and license plates to be targeted by law enforcement was circulated, and I was on that list.

9

I was stopped and detained a number of times, obviously for being on this list. In general, I was

prevented from lawfully exercising my first amendment rights during the years 2008 and 2009 at or

near the Port of Tacoma.

REQUEST FOR PRODUCTION NO. 9: Produce all documents upon which you

rely to support your answer to Interrogatory 9.

RESPONSE: All documents previously disclosed by Plaintiffs in the course of this litigation.

Additionally, the uncategorized, unindexed documents provided by the U.S. Department of the Army

on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff

reserves the right to seasonably disclose.

INTERROGATORY NO. 10: Explain in detail every instance, by date, in which

your exercise of rights protected by the First Amendment was chilled or deterred, the cause

for such chill or deterrence, and each witness with knowledge of each instance of chill or

deterrence. You answer should include, but is not limited to, the basis for your allegation that

Rudd's conduct chilled or deterred your exercise of rights protected by the First Amendment.

ANSWER: I incorporate herein by reference all responses I've previously given in this

litigation in the "Crespo Responses to Defendant Towery's First Discovery Requests," and "Crespo

Responses to Defendant City of Tacoma's First Discovery Requests." I further incorporate by reference

all answers previously given in response to Rudd's interrogatories.

In addition, in late November 2007, an officer with the Tacoma Police Department, whose name

I cannot recall, called the landlord of my apartment in Tacoma, and said that my friends and I were

terrorists and were having terrorist events at the location. The consequences were a deterioration of the

relationship with the landlord and being forced to move to a new home. This disrupted my life and my

personal relationships and caused extreme emotional distress.

Additionally, as was pointed out to me by Towery himself, my home during the time Towery

10

was infiltrating our group, was surveilled by a camera on an electric pole outside the house.

Because of Towery and Rudd, my life was destroyed, I became paranoid, had to move out of state and needed counseling and other supports.

INTERROGATORY NO. 11: Identify with specificity each and every category or type of damage that you claim to have sustained as set forth in your Initial Disclosures, including the dollar value attributable to each category of damages. For purposes of this Interrogatory, categories of damages include the cost of any required medical treatment, property damage or loss, lost wages, impairment of earning capacity, lost employment opportunities, general damages and any other expense incurred. For any wage loss, impairment of earning capacity, and lost employment opportunities you are claiming, your answer should include an itemization of all such damages and the basis upon which you calculate those damages. For any other type of damages claimed, including general damages, your answer should include a specific itemization for each element of damage claimed.

ANSWER: Compensatory damages for pain and suffering, public humiliation, loss of housing and anguish arising from serial violations of my rights to privacy, free speech, free association and freedom to petition my government absent interference.

REQUEST FOR PRODUCTION NO. 10: Produce all documents relating to the damages that you have identified in response to Interrogatory No. 11.

RESPONSE: All documents provided by me or on my behalf previously in this litigation and with these responses "relate" to my damages. Additionally, the uncategorized, unindexed documents provided by the U.S. Department of the Army on or about December 21, 2013 may contain documents pertinent to this response, which Plaintiff reserves the right to seasonably disclose.

INTERROGATORY NO. 12: Are you claiming to have sustained any physical or

11

psychological injuries as a result of the acts, incidents, and/or conduct that you attribute to

Rudd? If so, identify with specificity each such injury you claim to have sustained and

attribute to Rudd. Your answer should include all complaints and symptoms experienced,

whether such injury or disability was aggravating of a prior condition, the particular parts of the

body involved, the time period during which each symptom persisted, what medical attention

was sought, and when such medical attention was sought and from whom.

ANSWER: Yes. In general, information supplied by Towery to law enforcement and to Rudd,

to target specific organizers for harassment, inspection, rumor and surveillance, thus damaging their

ability to organize, associate, and protest. Not only did Towery and Rudd, especially Rudd himself,

deliberately create, gather and transmit information and intelligence directly calculated to ensure that

others took such action and that action directly followed. I incorporate herein by reference my response

to Interrogatory No. 10 above.

     Claims associated with mental/psychological health are difficult to quantify. As a result

of my encounters with law enforcement and the campaign of harassment and surveillance against

my friends and me personally, I experienced pain and suffering, and ongoing anguish.

It was especially grievous for me to discover that I had been surveilled and profiled by someone I

had thought to be a friend, who I had introduced to my family and had to my home (Towery), I have

experienced bouts of depression, anxiety and fear. That said, I make no specific claims that are

clinically or medically diagnosed. It is my intention to seek psychological counseling, and I reserve the

right to supplement this response with further information as appropriate.

REQUEST FOR PRODUCTION NO. 11: Produce all documents relating to the

physical and/or psychological injuries identified in your response to Interrogatory No. 12.

RESPONSE: All documents provided by me or on my behalf previously in this litigation

and with these responses "relate" to my damages. Additionally, the uncategorized, unindexed

documents provided by the U.S. Department of the Army on or about December 21, 2013 may

contain documents pertinent to this response, which Plaintiff reserves the right to seasonably

disclose.

REQUEST FOR PRODUCTION NO. 12: Produce all statements made by you or on

your behalf relating to your claims against Rudd.

RESPONSE: I incorporate by reference herein all of my above interrogatory responses.

Apart from those, I have not produced any audio, visual or written statements or declarations

pertaining to the case.

REQUEST FOR PRODUCTION NO. 13: Produce all non-privileged documents

that you have created regarding or relating to your claims against Rudd. This request is

intended to encompass, but is not limited to, letters, emails, blog postings, and any other kind

of writing. This request for production does not request documents protected by bona fide

invocation of the attorney-client privilege or work product protections.

RESPONSE: I have not created documents, other than confidential attorney-client

communications, or attorney work-product, regarding or relating to my claims against Defendant

Rudd.

REQUEST FOR PRODUCTION NO. 14: Produce all documents identified in your

initial disclosures.

**RESPONSE:** See documents produced by Plaintiffs Berryhill and Dunn previously.

REQUEST FOR PRODUCTION NO. 15: To the extent not already produced,

produce all documents that in any way support or relate to Your Answers and Responses to the

preceding Interrogatories and Requests for Production.

RESPONSE: Plaintiff has identified all documents which in any way support or relate to

these responses. With the exception of reserving the right to produce documents from the

13

Department of the Army provision of documents in December 2013, all identified items have previously been produced.

ATTORNEY'S Fed. R. Civ. P. 26 CERTIFICATION

The undersigned certifies pursuant to Fed. R. Civ. P. 26(g) that he has read each request, answer, response, and objection to these requests, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry, each is (1) consistent with the Civil Rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

DATED at Bar Harbor, Maine this 21st day of January, 2014.

/s/ Lynne Williams

Lynne Williams (Maine Bar No. 9247)

Co-counsel for Plaintiffs

VERIFICATION

Glenn Crespo, under the penalties of perjury of the State of Washington, hereby declares that he is the responding Plaintiff in the above-captioned cause of action, that he has read the foregoing answers to interrogatories and responses to requests for production and that he believes his responses to be true.

DATED: ___1/23/2014___ at Tacoma Washington

GLENN CRESPO

14

# EXHIBIT G

Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JULIANNE PANAGACOS, et al.,

                    Plaintiffs,

    v.

JOHN J. TOWERY et al.,

                    Defendants.

No. C10-05018-RBL

PLAINTIFF ANDREA ROBBINS'
ANSWERS TO DEFENDANT
THOMAS R. RUDD'S FIRST SET OF
INTERROGATORIES

Plaintiff Andrea Robbins responds as follows to Thomas Rudd's first set of

discovery. Plaintiff objects to the extent that Defendants have exceeded the limits for

this type of discovery, or have used subparts and definitions to facilitate exceeding

the limits.

Plaintiff also objects to these discovery requests to the extent they are vague,

overbroad, unduly burdensome, unduly intrusive or otherwise objectionable and/or

privileged.

These responses are only as to the personal knowledge of this Plaintiff and may or

may not reflect the recollection, opinions, and or statements of the other Plaintiffs and can

only be used as evidence as to the responding Plaintiff.

ROBBINS' RESPONSE TO
RUDD'S FIRST SET OF
DISCOVERY REQUESTS - 1
Case No. C10-05018-RBL

including all jury awards and settlements.

**ANSWER:**

None.


**INTERROGATORY NO. 2:**  State each fact upon which you base your

contention that Rudd "ordered" or "directed" actions, whether taken by Defendant John

Towery or others, that you allege violated your constitutional rights and identify each

witness with knowledge of such facts.  This Interrogatory does not seek the type of

general assertions alleged in the Third Amended Complaint, such as that contained at

Paragraphs 1.16, 1.17, 1.28, and 2.3, but rather the Interrogatory asks you to explain the

specific instances of conduct and other facts on which you based your allegations and on

which you will rely to support your claims that Rudd personally acted in a way that

abridged your constitutional rights.

**ANSWER:**

In April 2007 I wrote a paper about Fort Lewis for my class: Peoples' Geography

of American Empire. Here is the Syllabus

http://academic.evergreen.edu/curricular/empire/

I needed to interview someone for this paper and I wanted to work with someone who

was either current or former military from Fort Lewis who was anti-war.   Caitlin

Esworthy introduced me to "John Jacobs" who I interviewed via phone after making

initial contact through e-mail.  I interviewed someone who pretended to be someone he is

not, and I submitted that to my professors as legitimate academic work.

ROBBINS' RESPONSE TO
RUDD'S FIRST SET OF
DISCOVERY REQUESTS - 3
Case No. C10-05018-RBL

According to John Towery's statement he got involved by merely walking around amongst crowds at protests. "Towery 2nd Statement 8-8-09" previously disclosed by Towery. He says that he overheard perhaps or read about a protest meeting to take place at the Special Ops Expo. In June 2007, however, he already was presenting as an organizer of the protests, as illustrated by the article he sent immediately after attending the protest to OMJP as well as individually to Caitlin Esworthy. *See* jjacob June 4 2007-drewhend98513-Yahoo! Mail, produced herein. Not to mention emails as early as May 15, 2007. *See* jjacob may 15 2007 – drewhend98513 – Yahoo! Mail, produced herein.

I was introduced directly and in person to Towery about 3 weeks following my interview with him, I believe at Traditions Café.

I went to PMR meetings early in November 2007 when we found out Stryker vehicles were returning from Iraq. I attended at least 3 meetings between November 1st and 13th, 2007 and 1 leading up to the port protests in Tacoma in August of 2008. This includes the initial meeting where we decided to have a presence at the port of Olympia in 2007.

Colvin states in his reports to being present and providing a false name at PMR meetings. Colvin s 12 b 6 or MSJ, previously disclosed by Defendant Colvin.

Towery disclosed he was present at 15-20 meetings PMR between 2006 and 2009. Towery's Answers and Responses to Crespo, previously disclosed by Defendant Towery.

I was present at a meeting of 45 people at 8 on November 4, 2007. This meeting was reported by Rudd in his e-mails. See "Open Scanned Emails.pdf" pg. 2, disclosed herein.

ROBBINS' RESPONSE TO
RUDD'S FIRST SET OF
DISCOVERY REQUESTS - 4
Case No. C10-05018-RBL

Rudd received reports from Towery of activities I was involved with around the port protests in Olympia in early November 2007. Specifically he sent information to his supervisors about a meeting that I was present for on November 4th in Olympia as well as a march I was present at on November 6th. He sent a document called a "threat assessment" to his higher ups that contained specific information on the events that I had attended including an outright statement of acknowledgment of my First Amendment right being chilled and that my First Amendment right being chilled will hinder my decision to become visible to whom I'm protesting against which is another violation of my First Amendment right. Rudd said "believing they would be shot, protestors will not conduct any activity which puts them in a direct confrontations with USCG personnel. This belief should deter them from attempts to enter Port property until the Ship/USCG assets have departed." Rudd, Dept. of the Army, Directorate of Emergency Services, Threat Assessment Update 3/2 SBCT Redeployment Port of Olympia – Fort Lewis) NOV 07 (5 Nov. 2007). The intel in the "threat assessment" document expresses a desire and strategies to block my First Amendment right to protest and see and be seen by, and have an opportunity to try and influence and those I am protesting.

I was present at the Port of Tacoma port protests for over a week or so beginning November 5th 2007. I was protesting the occupation of Iraq by the U.S. and I was directly protesting the role of my local Military Base, Fort Lewis and their shipments of Stryker vehicles to Iraq and Afghanistan.

I was present at the March to the Port from Percival Landing on November 6. Reported by Rudd in his e-mails. "Open Scanned E-mails"-pg. 2.

ROBBINS' RESPONSE TO
RUDD'S FIRST SET OF
DISCOVERY REQUESTS - 5
Case No. C10-05018-RBL

After establishing a presence at the port, smaller groups decided to set up camp in an empty lot between the two roads that led straight up to the port. The purpose of this was to keep an eye on any movement of stryker vehicles so that they could see us protest.

On November 10th I was part of a peaceful action where my First Amendment rights were violated as I was blocked from entering an area on a public road where I could even be seen expressing my dissent or see the ship containing the stryker vehicles which I was protesting at the Port of Olympia. I was aggressively pepper sprayed while my handkerchief was forcibly removed by police. Rudd states in his "threat assessments" to "prevent attempts to block port gates," therefore he is culpable in my expression of my First Amendment right to protest.

On November 9th or 10th in the afternoon around 2pm. A group of about 12 of us linked arms and walked in front of a fence that had been set up to block the main entrance for the port of Olympia so that we could get nowhere near where Stryker vehicles may be off loading, implicating my First Amendment rights. We sat down. We were soon pepper sprayed at extremely close range. At one point an officer came walking down the line of protestors, removing our handkerchiefs and goggles to spray pepper spray directly into our eyes, implicating my Fourth Amendment rights.

This incident is exactly what Rudd signed off on and in fact suggested by implication. "Open Scanned E-mails"-pg. 4.

The morning after being sprayed in the face and physically moved from where I was literally sitting in front of a fence there was an unmarked police vehicle, a black sedan, sitting in front of my house at 211 Puget Street on the east side of Olympia. The

ROBBINS' RESPONSE TO
RUDD'S FIRST SET OF
DISCOVERY REQUESTS - 6
Case No. C10-05018-RBL

vehicle was there for approximately 2 hours and it was between the hours of 12-3pm. I believe this was an attempt to chill my First Amendment rights. The cars are something that Rudd requested to "sustain" in his e-mails to his higher up about 8 days after I saw them. "Towery RFP_061413 Emails 21 Pages"-pg.19, previously disclosed by Defendant Towery.

On the night of November 13 around 6pm, after holding a very large presence at the port a small group of women decided to plan a specific women's blockade on the main entrance from the port where we were told vehicles may be leaving from. We had 2 small private meetings for this event, and relied on information from other folks including, I'm told, John Towery, who let us know the timing for which we should sit down to block the strykers. I was told this information by Patty Imani and Kim after the fact. I did see Towery this evening and multiple times during the November Port protests.

After 39 women including myself were arrested, the stryker vehicles were unloaded out of the other side of the port, from where we had been informed by Towery) vehicles would not be leaving from. When I was arrested the officers were extremely aggressive, although I was just sitting down. I heard the officers say to each other that they should have grabbed me by the hair and they should do that "for the next one". (4th amendment right violation)

Towery outlines PMR activities including the women's action, tent encampment and the other instances I've stated involvement with in e-mail reports to Thomas Rudd.

I attended a PMR meeting immediately before the actions at the Port of Aberdeen around May 7th and before the 2008 actions at the Port of Tacoma in August. During this

ROBBINS' RESPONSE TO
RUDD'S FIRST SET OF
DISCOVERY REQUESTS - 7
Case No. C10-05018-RBL

time I attended 2 SDS meetings. One was at a private apartment in Tacoma during the port protests in Tacoma. Another was at a truck stop in Tacoma during the protests, where we decided to protest immediately outside of Fort Lewis as we had been completely prevented from protesting anywhere near the port.

I attended a meeting in July of 2008 in Olympia before the port protests in Tacoma; I'm not sure if it was an SDS meeting or a PMR meeting.

Mr. Rudd approved Towery's overtime to attend meeting in Olympia in July of 2008 this was leading up to the second Tacoma Port protests. "Towery RFP_061413 Army Overtime for Oly Meet", previously disclosed by Defendant Towery.

In reference to all of this in "Towery RFP_061413 Emails 21 Pages" pg. 2, previously disclosed by Defendant Towery, Rudd states in 2009 "My element has been providing threat assessment for deployment and redeployments" implicating his knowledge and leadership of the army's activities around port protests.

In reference to all of this in "Tom Knight intends to avoid confrontation"-pg.1, previously disclosed by Defendant Towery, Tom Knight sent an e-mail to Tom Rudd telling him to "preclude giving [activists] opportunities to embarrass us or make news of a confrontation." Specifically to avoid "confrontations with soldiers". This violate my first amendment rights as I sought to communicate my anti-war message to soldiers.

Based on Rudd's knowledge of Port Militarization Resistance as an organization he directly recommended these tactics in an e-mail to Olympia police. In "Off Post Event Threat Analysis and Update 9 NOV 07" he identified one of the "targets, risks, & vulnerabilities" as the protestors "Garner[ing] adverse publicity against the military /

ROBBINS' RESPONSE TO
RUDD'S FIRST SET OF
DISCOVERY REQUESTS -  8
Case No. C10-05018-RBL

war." He is calling for police suppression of my First Amendment rights.

I incorporate my responses to Defendant Olympia's 1st set of Interrogatories, where I provide additional details on the above events.

In addition to these events in Olympia, Rudd had a hand in violating my rights in Tacoma. I incorporate my answer to Interrogatory 3, below, in my answer here.

**REQUEST FOR PRODUCTION NO. 1:** Produce all documents upon which you rely to support your answer to Interrogatory No. 2.

**RESPONSE:**

Produced documents are referenced in the body of the above interrogatory. Plaintiff may supplement based on ongoing review of discovery materials.


**INTERROGATORY NO. 3:** State each fact upon which you base your contention, as stated in paragraph 2.6 of your Third Amended Complaint, that Rudd "influenced and directed tactics that were employed by the Tacoma Police Department and other agencies to disrupt the protests [against the use of the Port of Tacoma for military shipments] without cause or justification," and identify each witness with knowledge of such facts. Your answer should include, but is not limited to, each and every action allegedly taken by Rudd on which you based your allegation.

**ANSWER:**

I was present at the Port of Tacoma port protests between March 6th 2007 and March 13th. I was protesting the occupation of Iraq by the US and I was directly protesting the role of my local Military Base fort Lewis and their shipments of Stryker

ROBBINS' RESPONSE TO
RUDD'S FIRST SET OF
DISCOVERY REQUESTS - 9
Case No. C10-05018-RBL

**<u>CERTIFICATION OF COUNSEL</u>**

The undersigned attorney for Plaintiff Andrea Robbins has read the within and

foregoing answers and objections to Defendant Thomas R. Rudd's First Set of

Interrogatories and Requests for Production of Documents to Plaintiff Andrea Robbins

and certifies that they are in compliance with Federal Rule of Civil Procedure 26(g).


Dated this _____ day of _____, 20____.


_____

ROBBINS' RESPONSE TO
RUDD'S FIRST SET OF
DISCOVERY REQUESTS -  24
Case No. C10-05018-RBL

## **VERIFICATION**

I declare under penalty of perjury under the laws of the State of Washington that I have read the foregoing answers and responses to Defendant Thomas R. Rudd's First Set of Interrogatories and Requests for Production, know the contents thereof, and believe the same to be true and correct.

Dated this _____ of _____, 20___.

_____

ROBBINS' RESPONSE TO
RUDD'S FIRST SET OF
DISCOVERY REQUESTS -  25
Case No. C10-05018-RBL

# EXHIBIT H

Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

JULIANNE PANAGACOS, et al.,

                       Plaintiffs,

        v.

JOHN J. TOWERY et al.,

No. C10-05018-RBL

PANAGACOS' RESPONSE TO
RUDD'S FIRST SET OF
INTERROGATORIES AND
REQUESTS FOR PRODUCTION

(Protection Order Materials Possibly
Referenced Herein)

PANAGACOS RESPONSE TO RUDD FIRST SET OF INTERROGATORIES

Page 1 of 24

**INTERROGATORY NO. 2:** State each fact upon which you base your contention that Rudd "ordered" or "directed" actions, whether taken by Defendant John Towery or others, that you allege violated your constitutional rights and identify each witness with knowledge of such facts. This Interrogatory does not seek the type of general assertions alleged in the Third Amended Complaint, such as that contained at Paragraphs 1.16, 1.17, 1.28, and 2.3, but rather the Interrogatory asks you to explain the specific instances of conduct and other facts on which you based your allegations and on which you will rely to support your claims that Rudd personally acted in a way that abridged your constitutional rights.

**ANSWER:**

The Army's investigative reports acknowledge that Rudd approved the plan for Towery to infiltrate PMR and related groups, and disseminated the information Towery gathered by doing so in the Form of Force Protection Memoranda and Threat Assessments. Plaintiffs have seen no document wherein Rudd told Towery to cease such conduct, or to limit his investigation, infiltration and/or actions. In addition, Defendant Towery produced a series of e-mails between Rudd and Towery wherein Rudd informed Towery that he had succeeded in obtaining overtime pay for Towery to attend a conference in July of 2008 at the Evergreen State College in Olympia concerning potential protests at the Republican and Democratic National Conventions to take place later that year.

Furthermore, Rudd arranged for himself and Towery to jointly attend meetings with law enforcement leading up to military shipments where protests were anticipated, and where Towery gave the information he had obtained by his spying, and strategies were devised to neutralize the protests based thereon. These Plaintiffs know that such meetings occurred in

PANAGACOS RESPONSE TO RUDD FIRST SET OF INTERROGATORIES

Page 4 of 24

Seattle, Tacoma, and Aberdeen, and may have occurred in other places at other times. The

Army's investigative reports made clear that Rudd had actually lied to cover-up his role,

knowledge, and involvement, in Towery's spying.

In regards to Olympia, there is evidence that the information Towery and Rudd directly

fed the Olympia Police influenced the actions of the police (See after-action report from OPD

Commander Tor Bjornstad). There is also clear evidence that Rudd met with Bjornstad and

spoke with him on the phone about his threat assessments for the November '07 Port of Olympia

protests number of times resulting in the harm that occurred to me and others (See Bjornstad

Answers and Responses to Set one of Discovery Requests, Answer to Interrogs. 3 and 7). A lot

of the coordination efforts between local law enforcement and US Army were coordinated

through fusion centers, one of the many places that Rudd sent information collected by Towery.

I moved to Olympia in September 2007. In November 2007, I knew that there were port

protests happening, though I was not part of groups like SDS or PMR. On November 10, 2007, I

got a call to go down to the highway to bring medical supplies to my friends that had been

pepper sprayed and were being denied medical attention. I went to Walgreen's with two of my

roommates to get bottled water and Maalox and rushed down to bring supplies to street medics to

treat protesters who had been pepper sprayed in the eyes. When I was at the highway I saw the

lock box action at the entrance at Plum Street. I saw many of my friends (Chris Grande, Davi

Rios, Amory Ballentine, and others) experience intense police violence, pepper spray and

physical force.

The next day, November 11, 2007, I attended a planning meeting at the Olympia

Farmer's Market pavilion with about 30 people, many of whom I do not know, and I was part of

PANAGACOS RESPONSE TO RUDD FIRST SET OF INTERROGATORIES

Page 5 of 24

a break out group for women. There was an action planned for the night of November 13th based on information that others had. Towery told other protestors what time the shipments were trying to leave the port (see Andrea Robbin's deposition).

On November 13, 2007, I went to the Port of Olympia around 5pm and met with other women from the previous meeting. Anti-war songs and chants were taught, signs were made. Later in the night I sat in the street with 39 other women as a symbolic action against the war. The street into the port was blocked by a gate, and when police arrived, they blocked where I was sitting from the other direction as well. There was no traffic or possible traffic in the blocked off street. ***** I did not move and was arrested after 4 or 5 other people that did not move from the roadway that was blocked from both directions. I was taken to jail in a police van with 10-15 other people. I was booked at the jailhouse, put in a cell with 8 other women, and released at 4am the next morning. The jail conditions were crowded, and I believe they violated my Fourth Amendment Rights. Towery outlines PMR activities including the women's action, tent encampment and the other instances I've stated involvement with in e-mail reports to Thomas Rudd.

Between December 2007 and October 2008, I went to a number of vigils and debriefs and also really tried to block out my memories of the police violence I saw in November 2007. I was turned off from going to protests and PMR meetings because of the violence I had witnessed and experienced. I lived in the same apartment building with many people that were being prosecuted and targeted by police.

Almost a year after my women's action arrest, on October 30, 2008, I received notice to appear in Thurston County Court. I was arraigned, then prosecuted for attempted disorderly

PANAGACOS RESPONSE TO RUDD FIRST SET OF INTERROGATORIES

Page 6 of 24

conduct, and (disobeying?) a police officer. (email from Rudd saying that PMR activities may increase as they have sent out prosecution letters)

I decided soon after to defend myself pro-se. There were 26 people that were prosecuted, many of whom ended up taking a plea-bargain, I did not because I did not and do not believe that the arrest was lawful.

On November 10, 2008, I (as *pro se* counsel) requested discovery of the prosecutor a long list of documents from any law enforcement agency in the region. (date filed in State v Panagacos)

On December 15, 2008, I received response from the prosecutor indicating that there were no documents produced related to my request, only a written narrative that did not mention any of the threat assessments that later surfaced after Towery was outed. (date filed in v State Panagacos)

I now know that Rudd was in communication with Powers (the prosecutor for my criminal case), and Rudd did not produce all documents related to the case that existed (there are emails in the discovery from that case that show Rudd working with Powers, no information about Towery was revealed in any documents that Rudd sent).

I became heavily involved as a defendant and appeared in court many times. I lived with a person that was traumatized from her experience as part of the Oly 22, I dated a person whose parents were being called at their home by the FBI, I was scared to exercise my 1st and 4th Amendment rights in many ways. I avoided participating in direct actions and protest; I worked on my criminal case as pro-se counsel and worked to open the Flaming Eggplant Cafe at The Evergreen State College. I was suspicious and nervous that my phone was being tapped. I was

PANAGACOS RESPONSE TO RUDD FIRST SET OF INTERROGATORIES

Page 7 of 24

consistently stopped by security when I flew, and mail that I sent and was sent to me did not

consistently get there when sent through the USPS.

**REQUEST FOR PRODUCTION NO. 1:** Produce all documents upon which you rely

to support your answer to Interrogatory No. 2.

**RESPONSE:**

E-mails in which Powers was included were previously disclosed by Olympia.

**INTERROGATORY NO. 3:** State each fact upon which you base your contention, as stated in

paragraph 2.6 of your Third Amended Complaint, that Rudd "influenced and directed tactics that

were employed by the Tacoma Police Department and other agencies to disrupt the protests

[against the use of the Port of Tacoma for military shipments] without cause or justification," and

identify each witness with knowledge of such facts. Your answer should include, but is not

limited to, each and every action allegedly taken by Rudd on which you based your allegation.

**ANSWER:**

Rudd attended meetings with local law enforcement in Tacoma, Aberdeen, and in Seattle,

and other locations wherein he and Towery briefed local law enforcement on what the likely

tactics of PMR were at upcoming demonstrations, devised methods to neutralize those tactics

and the demonstrations, circulated a joint list of license plates on individuals who were to be

followed and stopped, and arrested whenever a pretext could be devised for doing so; worked

with the Tacoma Police Department Homeland Security Committee to make it impossible for

PMR to stage lawful demonstrations at or near the Port of Tacoma in public areas, and helped

PANAGACOS RESPONSE TO RUDD FIRST SET OF INTERROGATORIES

Page 8 of 24

## CERTIFICATION OF COUNSEL

The undersigned attorney for Plaintiff Julianne Panagacos has read the within and foregoing answers and objections to Defendant Thomas R. Rudd's First Set of Interrogatories and Requests for Production of Documents to Plaintiff Julianne Panagacos and certifies that they are in compliance with Federal Rule of Civil Procedure 26(g).


Dated this _____ day of _____, 20___.


_____


PANAGACOS RESPONSE TO RUDD FIRST SET OF INTERROGATORIES

Page 22 of 24

## VERIFICATION

I declare under penalty of perjury under the laws of the State of Washington that I have read the foregoing answers and responses to Defendant Thomas R. Rudd's First Set of Interrogatories and Requests for Production, know the contents thereof, and believe the same to be true and correct.

Dated this 13th of February , 20 14

Julianne Panagacos
4035 11th Ave NW
Olympia WA 98502

ANSWERS TO RUDD FIRST SET OF DISCOVERY

# EXHIBIT I

1

2                                    **JUDGE RONALD B. LEIGHTON**

3

4

5

6              **UNITED STATES DISTRICT COURT**
7       **WESTERN DISTRICT OF WASHINGTON AT TACOMA**

JULIANE PANAGACOS, et al.,              **NO.  3:10-cv-05018 RBL**

9                    Plaintiffs,
                                        **DEFENDANT CITY OF**
10        vs.                           **OLYMPIA'S 1ST**
                                        **INTERROGATORIES TO**
JOHN J. TOWERY, et al.,                 **PLAINTIFF JULIA GARFIELD**
                                        **(and Revised Responses**
12                   Defendants.        **Thereto)**

13

14   TO:      PLAINTIFF JULIA GARFIELD

15   AND TO:    LARRY HILDES, PLAINTIFFS' ATTORNEY

16   In accordance with FRCP 33, you are hereby required to answer, in

writing, the following interrogatories separately and fully under oath, within the

time prescribed.  These interrogatories are deemed continuing in nature and you

must supplement your answers pursuant to FRCP 26(e).

20   In answering these interrogatories, you are required to furnish such

information as is available to you, not merely the information which you know of

your personal knowledge.  This is intended to include any information in the

possession of the agents or attorneys or any investigators for the answering

party24

25         *Plaintiff Hereby Responds as Follows to this set of discovery.  Plaintiff*

*objects to the extent that Defendants have exceeded the limits for this type of*

**DEFENDANT CITY OF OLYMPIA'S 1ST**          *LAW, LYMAN, DANIEL,*
**INTERROGATORIES TO PLAINTIFF**          *KAMERRER & BOGDANOVICH, P.S.*
**JULIA GARFIELD (and responses Thereto)- 1**          *ATTORNEYS AT LAW*
**U.S.D.C. No. 3:10-cv-05018 RBL**          *2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512*
                                        *P.O. BOX 11880, OLYMPIA, WA 98508-1880*
                                        *(360) 754-3480  FAX: (360) 357-3511*

*discovery, or have used subparts and definitions to facilitate exceeding the limits.*

*Plaintiff also objects to these discovery requests to the extent they are vague, overbroad, unduly burdensome, unduly intrusive or otherwise objectionable and/or privileged.*

*These responses are only as to the personal knowledge of this Plaintiff and may not reflect the recollection, opinions, and or statements of the other Plaintiffs and can only be used as evidence as to the responding Plaintiff.*

*Discovery is ongoing, and Plaintiff reserves the right to correct, amend, supplement or change her answers and responses to this set of discovery as further information is revealed during the course of discovery.*

## Question No. 1.  Civil rights violations.

For each incident in which you claim to be the victim of conduct by a City of Olympia employee that violated your civil rights under 42 U.S.C. § 1983, please identify the employee, date, place, time, specific circumstances of the conduct, and any witnesses. See Third Amended Complaint, Count One.

## ANSWER:

I was attacked twice.  The first time, I was standing on a sidewalk near the entrance to the Port of Olympia, and the police pepper-sprayed the crowd.  I was not doing anything at the time, I was simply standing on the sidewalk as part of the protest.  There was so much spray, it became painful to breath.  I have asthma, and the amount of pepper-spray definitely made it worse.  There was a huge amount of pepper-spray, which was totally uncalled for.  I do not recall the date of the incident but I believe it occurred before the following incident.

The second incident occurred in the crosswalk at Plum and 4th, I believe on November 10, 2007.  I do not remember what time it was, although I do know

DEFENDANT CITY OF OLYMPIA'S 1ST
INTERROGATORIES TO PLAINTIFF
JULIA GARFIELD (and responses Thereto)- 2
U.S.D.C. No. 3:10-cv-05018 RBL

*LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512*
*P.O. BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480  FAX: (360) 357-3511*

it was day time and the sun was not setting. I saw a fellow protestor, Sarah, in the street. A police officer began running toward her. She had her back to the officer, I ran into the street and tried to stand between her and the officer. Sarah was either partially crouched down, or pushed down by the officer, who yelled, "Get out of the street." I felt a blow to my body, I believe that the officer kicked me. In addition, I know that the officer kicked Sarah, as I could see the movement of his foot. I was trying to move to the sidewalk as the police officer physically assaulted us. In the next instant, we were pepper-sprayed. I was pepper-sprayed in the face. I don't know how many officers were with the first officer I saw. I remember screaming, something along the lines of, my eyes are burning, my eyes are burning, I can't breath, someone help me. Luckily, there were people who came within a few minutes, and led me away. I couldn't see. So I just trusted them that they were leading me away to some place that was OK. I don't know what happened to Sarah or the cops, because I couldn't see. I was in shock and I couldn't see. I was in shock and I couldn't breath.

I do know that the police did not offer to help me. When I could see, the police were not there.

All of this chilled and violated my 1st Amendment Right to Free Expression, and my 4th Amendment Right to be free from Excessive and unreasonable force, as well as my 14th Amendment Right to Equal Protection, since the attacks on me were in retaliation for my exercise of my 1st Amendment Right to Free Expression and Freedom of Association.

I do not remember Sarah's last name; I believe her last name is Warren, but I will attempt to conform this and amend these responses in order to provide her last name. I know that two of the people who came to help me were Shawn and Andrew. I will try to find out their last names as well.

Witnesses include Julianne Panagacos, Eran Rhodes, Melia _____,

**Question No. 2. Excessive force not during arrests.**

If you claim you were subjected to excessive force when you were not being arrested, please identify the date, place, time, means of force that you claim was excessive, and any witnesses.

**ANSWER:**

I was not arrested during the protests at the Port of Olympia, therefore my answer to Question No. 1 would be the same. There was no reason for the excessive pepper spraying in the first incident. An officer would have no cause to have kicked Sarah or me in the second incident. I was attempting to get both

LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.
ATTORNEYS AT LAW
2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512
P.O. BOX 11880, OLYMPIA, WA 98508-1880
(360) 754-3480  FAX: (360) 357-3511

1  DATED this _____ day of _____, 2011.

2                          LAW, LYMAN, DANIEL,
3                  KAMERRER & BOGDANOVICH, P.S.

4

5                          Donald L. Law, WSBA #6122
                           Attorney for Defendants City of Olympia
6                          Bjornstad, Lower, Herbig, Nelson, Johnson,
                           Costa, Butler, Hall, Michel
7

8
   Answered and responded to and/or objected to this 6th day of October,
2011. 9

10                          ___ /S/ Lawrence A. Hildes
                           Lawrence A. Hildes, WSBA#35035
11                          P.O. Box 5405, Bellingham, WA 98227
                           (360) 715-9788
12                          (360) 714-1791
                           lhildes@earthlink.net
13                          Attorney for Plaintiffs

14

15  Pursuant to 28 U.S.C. _ 17.46, I, Julia Garfield, a plaintiff in the above
entitled cause, declare that I have read the foregoing Defendant City of
Olympia's 1st Interrogatories to Plaintiff Julia Garfield and answers thereto, know
the contents thereof, and believe the same to be true. I declare under penalty of
perjury under the laws of the State of Washington and the United States that the
foregoing is true and correct.

19
   DATED this _____ day of _____, 2011, at _____.
20

21

22                          Julia Garfield

23

24

25

26

DEFENDANT CITY OF OLYMPIA'S 1ST                    LAW, LYMAN, DANIEL,
INTERROGATORIES TO PLAINTIFF                  KAMERRER & BOGDANOVICH, P.S.
JULIA GARFIELD (and responses Thereto)- 7         ATTORNEYS AT LAW
                                              2674 RW JOHNSON BLVD S.W., TUMWATER, WA 98512
U.S.D.C. No. 3:10-cv-05018 RBL                    P.O. BOX 11880, OLYMPIA, WA 98508-1880
                                                  (360) 754-3480  FAX: (360) 357-3511

DATED this _____ day of _____, 2011.

                    LAW, LYMAN, DANIEL,
                KAMERRER & BOGDANOVICH, P.S.


                _____
                Donald L. Law, WSBA #6122
                Attorney for Defendants City of Olympia Bjornstad,
                Lower, Herbig, Nelson, Johnson, Costa, Butler, Hall,
                Michel


Answered and responded to and/or objected to this 6th day of October, 2011.

                _____
                /S/ Lawrence A. Hildes
                Lawrence A. Hildes, WSBA#35035
                P.O. Box 5405, Bellingham, WA 98227
                (360) 715-9788
                (360) 714-1791
                lhildes@earthlink.net
                Attorney for Plaintiffs


       Pursuant to 28 U.S.C. _ 17.46, I, Julia Garfield, a plaintiff in the above entitled
cause, declare that I have read the foregoing Defendant City of Olympia's 1st
Interrogatories to Plaintiff Julia Garfield and answers thereto, know the contents thereof,
and believe the same to be true. I declare under penalty of perjury under the laws of the
State of Washington and the United States that the foregoing is true and correct.

       DATED this 25 day of November, 2011, at 9:13 PM _____.


                _____
                Julia Garfield

# EXHIBIT J

1

THE HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9         FOR THE WESTERN DISTRICT OF WASHINGTON

10   JULIANNE PANAGACOS, et al.,
                                          NO.  3:10-cv-5018 RBL
11              Plaintiffs,
                                          PLAINTIFF GLENN CRESPO'S SET
12        v.                              1 OF DISCOVERY REQUESTS TO
                                          DEFENDANT CITY OF TACOMA
13   JOHN J. TOWERY, et al.,              **WITH ANSWERS AND RESPONSES
                                          THERETO**
14              Defendants.               FRCP 26, 33 AND 34

15

16   **PROPOUNDING PARTY: PLAINTIFF GLEN CRESPO**

17   **RESPONDING PARTY: DEFENDANT CITY OF TACOMA**

     **SET NO: 1**
18
              **COMES NOW** Plaintiff GLEN CRESPO, in the above-named
19   action, and, pursuant to FRCP Rules 26, 33, and 34 and the Local Civil Rules
     of the Western District of Washington, submits the following REQUESTS FOR
20   PRODUCTION OF DOCUMENTS AND THINGS to be answered by you,
     under oath, and request that a copy of said answers and said documents be
21   served upon the attorney for the above said Plaintiff within thirty (30) days
     after the service of these Requests for Production upon you.
22

23                           <u>DEFINITIONS</u>

24            In answering these interrogatories, DEFENDANT shall include all
     information known to them, their attorneys, agents, servants, employees,
25   representatives, insurers, private investigators and all others who are in

26
     CRESPO'S SET 1 OF DISCOVERY REQUESTS TO
     CITY OF TACOMA WITH **ANSWERS AND RESPONSES THERETO** - 1

                                          Tacoma City Attorney
                                          Civil Division
                                          747 Market Street, Room 1120
                                          Tacoma, WA  98402-3767
                                          (253-591-5885 / 591-5755

## INTERROGATORY NO. 12:

List and Fully describe all activities Defendant City of Tacoma, .and its agents, employees, attorneys, any or anyone else associated with or assisting or operating for the City of Tacoma in any way engaged in in investigating, and taking action with or against the residents of the Olympia collective house known as "HQ", including all events, meetings, and socializing you attended or engaged in there, and all intelligence/information you relayed about "HQ", and/or its residents or guests, and who you relayed that information/intelligence to..

## ANSWER:

The defendants are unaware of any such information or contact.

## INTERROGATORY NO. 13:

List and fully describe all parties and/or social events Defendant City of Tacoma, and/or its agents, employees, attorneys, any or anyone else associated with or assisting or operating for the City of Tacoma in any way attended or gained information on in any location as part of their investigative/undercover activities, who was there, where and what the event was, and what you reported about it and to whom.

## ANSWER:

This interrogatory is the subject of the Court's Protective Order.

## INTERROGATORY NO. 14:

List all agents, employees, attorneys, any or anyone else associated with or assisting or operating for the City of Tacoma in any way that gained access in any way to any e-mail listserve that included anyone allegedly associated with Port Militarization Resistance, SDS, the Olympia Movement for Justice and Peace through Riseup.net, how that access was obtained, who helped that person or persons obtain that access, the purpose of obtaining that access, what information was gathered, and what was done with that information.

## ANSWER:

John Towery provided RIG with a document he had obtained from an undisclosed, unsecure website. It is unknown whether the document came

Tacoma City Attorney
Civil Division
747 Market Street, Room 1120
Tacoma, WA  98402-3767
(253-591-5885 / 591-5755

from any such listserve.  The document was a spreadsheet containing the names and other information of prospective jurors for an upcoming trial in Olympia.  This information appeared to be from the court.  Because PCSD Sgt Adamson was unavailable, Gary Smith brought the information to TPD Det. Jeff Shipp.   Det. Shipp subsequently contacted TPD Legal Advisor Mike Smith with the information just received.  The Thurston County Sheriff's Office and Prosecutors Office were notified shortly thereafter.

On information and belief, no one from the Tacoma Police Department or the RIG joined any list-servs related to PMR, SDS, or the Olympia MJPR.


INTERROGATORY NO. 15:

List and fully explain GARY SMITH's role in the Homeland Security Committee, "RIG 5", the Washington Joint Analytical Center (Washington Fusion Center), and the Ft Lewis Fusion Center at any time.

ANSWER:

Gary Smith is an analyst assigned to the RIG.  The analyst's duties include the following:
1) Create a weekly intelligence summary to include specific events, threats and trend data.
2) Strategic Analysis of ongoing major organized criminal and terrorism related activity as it affects the Region.
3) Tactical Analysis of specific or suspected terrorist and criminal actions or incidents.
4) Maintaining the intelligence databases.
5) Preparing and teaching classified and non-classified briefings to appropriate regional audiences.
6) Monitor open source internet and other forms of public media for potential terrorist actions/activity or potential targets in the Region.
7) Maintain liaisons with all appropriate intelligence units to include State, Federal & Local.
8) Produce a Bi-annual activity report for the unit

CRESPO'S SET 1 OF DISCOVERY REQUESTS TO
CITY OF TACOMA WITH ANSWERS AND RESPONSES THERETO - 10

Tacoma City Attorney
Civil Division
747 Market Street, Room 1120
Tacoma, WA  98402-3767
(253-591-5865 / 591-5755

DATED: June 3, 2013

/S/  LAWRENCE A. HILDES
LAWRENCE A. HILDES, WSBA #35035
Attorney for Plaintiffs
P. O. Box 5405
Bellingham, WA 98227
Telephone: (360) 715-9788
Fax (360) 714-1791
e-mail: lhildes@earthlink.net


## CERTIFICATION

The undersigned attorney for Defendant City of Tacoma has read the foregoing Plaintiff Glen Crespo's Set 1 of Discovery Requests to Defendant City of Tacoma With Answers and Responses Thereto and states they are in compliance with CR 26(g).

DATED this _22ND_ day of November, 2013.

ELIZABETH A. PAULI, City Attorney


By:  _____
JEAN P. HOMAN
WSBA#27084
Deputy City Attorney
Attorney for Defendant City of Tacoma


CRESPO'S SET 1 OF DISCOVERY REQUESTS TO
CITY OF TACOMA WITH ANSWERS AND RESPONSES THERETO - 21

Tacoma City Attorney
Civil Division
747 Market Street, Room 1120
Tacoma, WA 98402-3767
(253-591-5885 / 591-5755

# EXHIBIT K

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

---------------------------------------------------------

JULIANNE PANAGACOS; et al.,           )
                                      )
                Plaintiffs,           )
                                      )
        vs.                           )    No. C10-5018 RBL
                                      )
JOHN J. TOWERY; et al.,               )
                                      )
                Defendants.           )

---------------------------------------------------------


VIDEO DEPOSITION UPON ORAL EXAMINATION

OF

BRENDAN M. DUNN


---------------------------------------------------------


9:30 a.m.

January 28, 2014

747 Market Street, Room 1120

Tacoma, Washington

BRENDAN M. DUNN    January 28, 2014

Page 72

1    A.    I do.

2    Q.    Do you recognize this document?

3    A.    I do.

4    Q.    It's entitled Throwing a Wrench in the War Machine,

5   Olympia SDS is Born of the Struggle at the Port of Olympia,

6   By Brendan Dunn.  Is that you?

7    A.    That is.

8    Q.    You are the author of this article?

9    A.    Yes, I am.

10    Q.    Did anybody else help you write this article?

11    A.    No.

12    Q.    Please look at the second paragraph below the

13   photograph.  Towards the bottom of the paragraph, there is a

14   sentence that starts, When I spotted a convoy coming towards

15   the Port I walked in front of it forcing the entire convey

16   of over ten vehicles to stop if only momentarily.  I was

17   arrested and brought to jail.

18         Does that reference a specific arrest that you have

19   identified today?

20    A.    Yes, it does.

21    Q.    About what date was that?

22    A.    Well, it was in May 2006.  It was in late May.

23   I don't recall the specific date.

24    Q.    What compelled you to walk in front of the convoy?

25    A.    The combination of things really.  You know, I

BRENDAN M. DUNN     January 28, 2014

Page 73

1   believe in helping assisting in creating a world rooted in

2   peace and nonviolence, and, no, I know people that have been

3   overseas that were in the military that were injured, that

4   were shot at over there.  I mean the wars in Iraq and

5   Afghanistan for me is not something that happens halfway

6   around the world.  It's something that's very realistic and

7   has a very direct impact on the people I love and the people

8   I know.  You know, not just speaking of all the US soldiers

9   that have been killed in these brutal wars, but the hundreds

10  and hundreds and hundreds of thousands of Iraqi and Afghani

11  civilians that were killed also.  I'm deeply bothered by

12  that.  I felt like something had to be done to address these

13  war crimes.  You know, politicians in general simply, in my

14  opinion, did not care about the safety of these soldiers.

15  They are sending them to their graves.

16      Q.   Did you have a concern that you might be violating

17  the law by walking into the roadway?

18           MR. HILDES:  Objection.  Calls for a legal

19  conclusion.

20           THE WITNESS:  At that moment I didn't.

21      Q.   (BY MR. BRENNAN)  The next paragraph down, the

22  second line from the bottom, it says, The city government

23  and city jail were momentarily shut down for security

24  reasons when Port resisters came to demand the release of

25  their comrades.

BRENDAN M. DUNN    January 28, 2014

Page 74

1          What does that mean?

2          MR. HILDES:  Note that security reasons is in

3    quotes.

4          You may answer.

5          THE WITNESS:  I recall being told by someone that

6    works for the City of Olympia, someone that was working at

7    the desk there, that it was -- that it was closed down for,

8    quote, security reasons.  That was something that often

9    happened whenever demonstrators were arrested, singled out,

10   brought to the jail.  When anyone went down there just to

11   show support in a nonconfrontational, peaceful, nonviolent

12   passive manner, just pretty much hanging out on the

13   sidewalks.  I mean, it's also where the city council meets

14   and that kind of building complex.  There are several

15   occasions during the Port protest in 2006 but also during

16   the Port protest in November 2007 where everything would be

17   shut down.  At least that's how it was explained to us. They

18   wouldn't let people come in and ask questions.  They

19   wouldn't let people come in and go out of the building.  I

20   thought it was an excessive and heavy- handed approach for a

21   peaceful -- for peaceful demonstrators.

22   Q.    (BY MR. BRENNAN)  If you turn to the next page,

23   the paragraph below the photograph, the last sentence says,

24   Some of the tactics of protest included flyering, banner

25   dropping, critical mass, establishing tent cities and

BRENDAN M. DUNN    January 28, 2014

Page 75

1    rendezvous points, vigils, blockades, marches, community

2    outreach and maintaining a 24/7 watch on the Port.

3         Do you see that sentence?

4    A.   I do.

5    Q.   What do you mean when you say blockades?

6    A.   It -- well, it depends.  It could mean a number of

7    things.  But, for example, there was a blockade that was set

8    up, kind of a lighthearted theatrical approach where a line

9    of stuffed animals were placed in the road, teddy bears and

10   such, that is an example of a blockade.

11   Q.   Were placed where?

12   A.   In the road.  There was a line of them.

13   Q.   Which road?

14   A.   I believe it was Marine Drive, which eventually

15   leads to the Port of Olympia entrance.

16   Q.   What are other examples of blockades?

17   A.   Another example -- another example would be people

18   linking arms, standing, sitting, and it's basic civil

19   disobedience and direct action as was practiced during the

20   Civil Rights Movement, you know, against unjust laws and

21   violence during that time period.

22   Q.   Would that be referred to as a human chain?

23   A.   I'm sorry.  Is that listed in the paragraph there?

24   Q.   The next paragraph down, second paragraph says,

25   Human chains were propped up.  Is that what you mean when

BRENDAN M. DUNN    January 28, 2014

Page 76

1   you say linking arms?

2       A.    Yes, I do.  I recall that human chain.

3       Q.    Would that be the same thing as a sleeping dragon?

4       A.    No.

5             MR. HILDES:  Objection.  Lack of foundation.

6             THE WITNESS:  No, it's not the same thing as

7   a sleeping dragon.

8       Q.    (BY MR. BRENNAN)  What is a sleeping dragon?

9       A.    The longest time I didn't know what a sleeping

10  dragon was.  I first heard of what it was by some of the

11  PRA, the public records requests, that were made available

12  to the public, and the Olympia Police Department in

13  particular were discussing in their e-mails and their

14  documents seemed like they had some kind of obsession with

15  sleeping dragon, whatever that it was.  I only learned very

16  recently what a sleeping dragon is.

17      Q.    What is it?

18            MR. HILDES:  You know, object to the extent that

19  this may call for material from an attorney/client privilege

20  conversation.

21            To the extent that it doesn't, you can answer.

22            THE WITNESS:  Recently I had a discussion

23  with my attorney about it, so I don't know if I could

24  say --

25            MR. HILDES:  You can't.

GINA M. CLARKE, CCR
(253)279-3465

BRENDAN M. DUNN    January 28, 2014

1    in a cold sweat and panting and trouble sleeping.  You know,

2    sometimes because of these dreams, I just wake up in the

3    morning to go to work, for example, with, you know, just a

4    sense of absolute fear and I cry.  I cry a lot.

5         You know, there's things I can't really explain

6    that somehow trigger memories of what I went through,

7    through the spying and surveillance and everything.  I just

8    start balling.  I just start crying, and it's -- I mean, the

9    first couple of weeks that Towery was outed -- who worked

10   with the Tacoma police -- I was working in a lumber mill,

11   and every 20 minutes I had to hide in a closet or hide in a

12   corner someplace because I started crying uncontrollably.

13        I've lost any sense of trust with anyone because of

14   the spying and surveillance.  Activists, friends,

15   girlfriends, the first thing that comes into my head -- I

16   feel like before that outing of Towery as a spy and when all

17   these revelations came to light about the surveillance

18   program, I was more welcoming; I was more accessible; I was

19   more inviting to people that wanted to get involved with

20   activism, First Amendment activities.  I am much more

21   guarded now.  Any time I meet someone, the first thought

22   that's going through my head is, who is this person?  Who

23   sent them here?

24   Q.   I do understand what you're saying about your

25   feelings of distrust.  I'd like to stick with the physical

BRENDAN M. DUNN    January 28, 2014

Page 247

1   not sure.  That's an example.

2       Q.   (BY MS. GARCIA)  To your knowledge, have you ever

3   met my client Thomas Rudd?

4       A.   I'd have to see a picture of him --

5       Q.   To your knowledge --

6       A.   -- to verify that.

7       Q.   -- have you ever met my client Thomas Rudd?

8            MR. HILDES:  I'd ask that you let him finish his

9   answer before you reask the question.

10      A.   No, not to -- not to my knowledge.

11      Q.   (BY MS. GARCIA)  To your knowledge, have you ever

12  spoken with my client Thomas Rudd?

13      A.   Not to my knowledge.

14      Q.   To your knowledge, have you ever corresponded with

15  Thomas Rudd, whether by e-mail or letter?

16      A.   Unless he's intercepted e-mails and sabotaged

17  listservs, no.

18      Q.   You have never sent a message to Mr. Thomas Rudd;

19  is that correct?

20      A.   I certainly hope not, no.

21      Q.   To your knowledge, have you ever had any contact of

22  any kind with Mr. Rudd?

23           MR. HILDES:  Objection.  Vague.

24      A.   By "contact," you mean --

25      Q.   (BY MS. GARCIA)  Any interaction.

BRENDAN M. DUNN    January 28, 2014

Page 248

1    A.    I mean, I'm not aware of any two-way communication
2    between him and myself.
3    Q.    Are you aware of any one-way communication between
4    you and him, you and Mr. Rudd?
5    A.    Well, surveillance and spying on me could be
6    considered that.
7    Q.    Okay.  Did John Towery -- or John Jacob as you may
8    have known him at some point -- ever mention the name Thomas
9    Rudd to you?
10    A.    No.  He actually continued to lie to me when I met
11    him in person after he was outed for spying on us and hiding
12    his identity, which he did for a number of years, and he
13    didn't have to do that with a mask.
14    Q.    Did John Towery ever mention the name Chris Adamson
15    to you?
16    A.    No, I don't believe so.  I know I've been targeted
17    by Rudd.
18    Q.    Just a moment.  I'm just reviewing and seeing if I
19    have any other questions.
20          How much have you incurred in out-of-pocket
21    expenses for mental health care since these events in the
22    2006 -- beginning in the 2006 period?
23    A.    I don't know offhand right now.
24    Q.    Can you give me an approximation?
25    A.    No, I can't.  I don't know offhand.

BRENDAN M. DUNN    January 28, 2014

Page 318

1                          CERTIFICATE

2

3    STATE OF WASHINGTON )
                          )
4    COUNTY OF PIERCE     )

5

6         I, ERIC L. NUTT, a Certified Shorthand Reporter and

7    Notary Public in and for Pierce County, Washington, do

8    hereby certify there came before me the deponent herein,

9    namely BRENDAN M. DUNN, who was by me duly sworn to testify

10   to the truth concerning the matters in this cause.    I

11   further certify that the subscribing of the completed

12   deposition by the witness was reserved; that the foregoing

13   transcript was prepared under my personal supervision and

14   constitutes a true record of the testimony of the said

15   witness.

16        I further certify that I am not an attorney or

17   counsel of any parties, nor a relative or employee of any

18   attorney or counsel connected with the action, nor

19   financially interested in the action.

20        WITNESS my hand and seal in Gig Harbor, County of

21   Pierce, State of Washington, this 10th day of February,

22   2014.

23

24                    _____
                      Notary Public in and for the
                      State of Washington, residing
25                    at Puyallup.

GINA M. CLARKE, CCR
(253)279-3465

# EXHIBIT L

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

JULIANNE PANAGACOS; et al.,          )
                                     )
                Plaintiffs,          )
                                     )
        vs.                          )    No. C10-5018 RBL
                                     )
JOHN J. TOWERY; et al.,              )
                                     )
                Defendants.          )


DEPOSITION OF JEFFERY A. BERRYHILL


January 22, 2014

9:40 a.m.

Tacoma, Washington


GINA M. CLARKE, CCR

9115 - 171st Street Court East
Puyallup, WA 98375
(253)279-3465

JEFFERY A. BERRYHILL      January 22, 2014

Page 29

1     A.    I don't recall.

2     Q.    Outside of your conversation with Mr. Dunn, given

3  your recollection today, was there any specific act of

4  government repression that caused you to lose your desire to

5  be active in Oly PMR?

6     A.    We were living in an address at 910 4th Avenue in

7  Olympia.  We regularly observed police squad cars driving

8  through the back alley of where we lived.  We regularly

9  noticed them parked back at a rental facility across the way

10 pointed towards our house.  We pretty regularly observed

11 police officers in our midst there, like following, or it

12 seemed like there was a pretty concerted and sustained

13 amount of presence around our home.

14    Q.    This was an address in Olympia, Washington?

15    A.    Uh-huh.

16          MS. HOMAN:  Yes?

17    A.    Yes.

18    Q.    (BY MR. BRENNAN)  And do you recall, were these

19 Olympia police officers?

20    A.    Yes.

21    Q.    These would be Olympia police officers?

22    A.    Yes.

23    Q.    What time frame are you thinking about right now?

24    A.    We moved out of that house December 2008, but from

25 2000 and -- and I lived there from 2006, I think July of

JEFFERY A. BERRYHILL       January 22, 2014

Page 30

1    2006, to December of 2008 is when I moved out.

2        Q.    Was there any -- after 2008, where did you move to?

3        A.    I moved to a new home on the west side of Olympia

4    on 5th Avenue.

5        Q.    Do you recall the address?

6        A.    I can't remember the number.

7        Q.    Okay.  Did you experience the same type of police

8    presence at that location?

9        A.    I can't recall.

10       Q.    Do you remember, in 2009 at the new address,

11   witnessing police cruisers passing your residence?

12       A.    Not -- no, not at -- or at least not at the level.

13       Q.    At the 910 4th Avenue residence, did you live with

14   any other -- well, name your roommates at that time, please.

15       A.    Okay --

16             MR. HILDES:  Objection.  Vague as to time.

17       Q.    (BY MR. BRENNAN)  Well, let's do this:  You've

18   identified the time frame July 2006 to December 2008.

19       A.    Uh-huh.

20       Q.    Over the course of that time, please list all of

21   your roommates.

22       A.    Okay.

23             MR. HILDES:  To the best of your recollection.

24       A.    Josh Elliott and Brendan Dunn and I signed the

25   lease in 2006.  We signed a one-year lease.  After that,

JEFFERY A. BERRYHILL        January 22, 2014

Page 50

1    decided to express that dissent in a way, and that's why --
2    so I don't know where to go beyond that.
3        Q.    I understand, and we'll get to that theme, that
4    issue later, but I'm talking about this particular -- was
5    there something about this particular arrest that was a
6    constitutional violation?
7        A.    I don't -- I don't know.
8        Q.    Okay.
9             MR. HILDES:  Same objections.
10       Q.    (BY MR. BRENNAN)  What about the --
11            MR. HILDES:  Legal conclusions.
12       Q.    (BY MR. BRENNAN)  Can you tell us about the 2007
13   arrest for disorderly conduct?
14       A.    Yeah.  That sentence, the last sentence of that
15   paragraph and the fourth paragraph, those are the same
16   incident.
17            MR. LAW:  I'm sorry.  Would you repeat that,
18   please?
19       A.    The last sentence of the second paragraph -- okay,
20   the last sentence of -- the last sentence of the second
21   paragraph in Interrogatory 3 is explaining what happened in
22   the fourth paragraph of Interrogatory No. 3.
23       Q.    (BY MR. BRENNAN)  So the sentence reads, "Also in
24   2007 I was arrested for disorderly conduct when I had been
25   drinking, and the charge was dismissed."

JEFFERY A. BERRYHILL        January 22, 2014

Page 51

1          The next paragraph reads, "I was detained for about
2    one half hour and placed in the back of police cruiser in
3    July of 2008 near the Port of Tacoma..."
4          You're suggesting those two are related?
5    A.   No.
6          MR. HILDES:  Objection.  Misstates testimony.
7    A.   The fourth.  I said the fourth.  One, two, three,
8    four.
9    Q.   (BY MR. BRENNAN)  "I was charged and arrested on
10   July 27, 2007, in front of my home..."?
11   A.   Yes.
12   Q.   Thank you.
13   A.   Yes.
14   Q.   Okay.  Can you describe what happened that day?
15   A.   I was hanging out by myself in the evening in
16   Olympia on 4th Avenue, smoking a cigarette, sitting on the
17   sidewalk, like against a pillar.  And I was approached by
18   four police officers, surrounded, and was like aggressively
19   told to get down, put my hands on my knees -- or get down on
20   my knees, put my hands on my head, and was then told that I
21   fit the description of someone who had -- one, I was
22   questioned what I had done that night.  Two, I said I -- I
23   was told I fit the description of someone who had broken
24   into a building along Capitol Way eight blocks away or
25   whatever and was -- you know, was held there, was detained,

JEFFERY A. BERRYHILL       January 22, 2014

Page 52

1   submitted my license or identification.  A couple other

2   cars, cop cars, drove by and flashed lights in my direction,

3   and then I was let -- and then I was released.

4        Q.   Okay.

5        A.   I was then released, frustrated, irritated,

6   frightened a bit.  It was the most aggressive, like, police

7   interaction I had ever had.  I was alone.  I walked home and

8   had a cigarette with one of my housemates.  Saw a police

9   cruiser roll by our house five minutes after I had arrived

10  and yelled something in their direction.  I yelled a

11  profanity.  The police cruiser screeched to a halt and

12  approached us, and another cruiser came by too, and so my

13  friend and I, like, we began -- it was a debate with the

14  police officers.

15       At one point I go to -- I reach over to the friend

16  that I was with.  Touched him on the shoulder like, hey, we

17  should go.  At that point the officer who arrested me said,

18  You just struck my -- you just struck my partner.  He threw

19  me in an armbar, slammed me to the ground, placed me under

20  arrest.

21       While he was -- while he had me under arrest and

22  while he had me in the armbar, he asked me, quote, "Where's

23  your boyfriend T. J.?  Where's your boyfriend T. J.,"

24  referring to T. J. Johnson, a member of the city council who

25  had been active in the Port protest.

JEFFERY A. BERRYHILL      January 22, 2014

Page 53

1      We arrived -- we were arrested.  We arrived at --
2   we arrived at the jail in Olympia.  We were cited for
3   disorderly conduct.  We appeared before the court on the 8th
4   of August, which just happened to be my birthday, and the
5   charges were dismissed.
6      Q.   Okay.  The Port of Tacoma, you mentioned the Port
7   of Tacoma in February 2007?
8      A.   Uh-huh.
9           MR. HILDES:  Was that a yes?
10     A.   Yes.
11     Q.   (BY MR. BRENNAN)  Describe what happened on that
12  arrest, please.
13     A.   I was a participant in the protest that we had
14  organized at the Port of Tacoma.  In that circumstance --
15          MS. HOMAN:  It's not appropriate for you to confer
16  with your attorney while there is a question pending, Mr.
17  Berryhill.
18          MR. HILDES:  I think he's confused about --
19          THE WITNESS:  Can I -- yeah, I'm just uncertain how
20  to answer that.
21          MR. HILDES:  Take your time.
22          MS. HOMAN:  Let him know what your confusion is.
23  Maybe he can rephrase until you're clear.
24          THE WITNESS:  Can you -- can you restate the
25  question?

JEFFERY A. BERRYHILL        January 22, 2014

Page 54

1      Q.    (BY MR. BRENNAN)   Well, you identified --

2            MR. HILDES:   Jean, thank you.

3      Q.    (BY MR. BRENNAN)   You identified the February 2007

4  Port of Tacoma protest as an arrest incident and I just want

5  to know the nature of that.

6      A.    So I was arrested while participating in a PMR

7  organized protest against military shipments being sent

8  through the Port of Tacoma.   When I was arrested, I was

9  holding a sign that read, "Courage to Resist."   It's an

10 organization based out of the Bay devoted to providing

11 support for soldiers who deemed, for whatever reason, that

12 they in good conscious couldn't participate in the war in

13 Iraq.

14          I, in an attempt to visibly demonstrate that sign

15 to show the solders who are responsible for shipping

16 equipment in and out of the port, tried to get in a position

17 where my sign could be read by the soldiers who were --

18 because there was a series of buses that the soldiers were

19 being bused in and out on so that, like, they could continue

20 to perform these movements.   I was arrested for trying to

21 position myself in a way that I could be -- that I could be

22 made visible.

23          When I was arrested -- prior to my arrest, I had --

24 I had a -- they had an assembly of Tacoma police officers in

25 riot gear with arms, arms-bearing, like shotguns, paint ball

JEFFERY A. BERRYHILL        January 22, 2014

Page 55

1    guns, et cetera.  I had one pointed at me.  I had one

2    pointed at me directly a few moments, then, prior to being

3    arrested.

4           Once the officers had kind of retreated back into

5    the entrance and I tried to move into a position where I

6    could be made seen -- where my sign could be seen by the

7    officers -- could be seen by the soldiers moving -- the

8    solders seated in the bus.  I was shot in the leg with

9    either a rubber bullet or a bean bag gun and was immediately

10   like tackled to the ground and placed under arrest.

11       Q.    Do you recall the street?

12       A.    I don't remember the name of the street.

13       Q.    Were you in the road?

14       A.    I had -- I had moved just across the white line.

15   There was a white fog line, and I had moved just across.

16       Q.    Were you on the sidewalk?

17       A.    There was no sidewalk there.

18       Q.    So you were in the roadway?

19       A.    Yes.

20       Q.    Okay.  Were you instructed not to be in the

21   roadway?

22       A.    We were instructed -- I interpreted it as we were

23   instructed not to be in the roadway while the military

24   equipment was moving in.  When had happened is the officers

25   had retreated and I sought to make myself -- position myself

JEFFERY A. BERRYHILL        January 22, 2014

Page 56

1   in a way that I could have been visible to the soldiers.

2       Q.   And you were instructed not to go into the road?

3       A.   We were instructed not to be -- not to cross the

4   fog line, but I interpreted that as being while the -- while

5   the movements were taking place, while the equipment was

6   coming in.

7       Q.   So the instruction was subject to your

8   interpretation of it; is that correct?

9            MR. HILDES:  Objection.  Argumentative.

10           You don't have to answer that question.

11           MR. ANGELIS:  Yes, he does.

12           MR. HILDES:  No.  It's argumentative.  It's not an

13   actual question.

14           MS. BUSH:  Are you instructing the witness not to

15   answer, for the record?

16           MR. HILDES:  I'm saying it's not a question.  It's

17   a statement.  You can't answer a statement.

18       Q.   (BY MR. BRENNAN)  Mr. Berryhill, you understood,

19   did you not, that you were probably -- you understood that

20   you were violating the instruction?

21           MR. HILDES:  Objection.  Misstates testimony.

22   Objection.  Argumentative.

23       Q.   (BY MR. BRENNAN)  Answer the question.

24       A.   I understood -- can you restate the question?

25       Q.   You were instructed not to cross the fog line;

JEFFERY A. BERRYHILL     January 22, 2014

Page 57

1   correct?

2          MR. HILDES:  Objection.  Asked and answered three

3   times.

4          MR. BRENNAN:  He hasn't answered, Mr. Hildes.  You

5   have.

6          MR. HILDES:  He has answered.

7     A.   We were given instructions not to cross the fog

8   line.

9     Q.   (BY MR. BRENNAN)  Okay.  And what was your

10  understanding when you crossed the fog line?

11    A.   My understanding was I was trying to be in a

12  position where I could increase and enhance my visibility.

13    Q.   You didn't care about the instruction; is that

14  correct?

15         MR. HILDES:  Objection.  Argumentative.  That's not

16  a question.  Don't answer that.  That's an editorial

17  comment.

18    Q.   (BY MR. BRENNAN)  Did you care about the

19  instruction?

20         MR. HILDES:  Same objection.  Same instruction.

21  It's still -- okay, did you care about the instruction?  You

22  can answer that one.  Same objections, but you can answer

23  that.

24    A.   I abided by the instruction.

25    Q.   (BY MR. BRENNAN)  How did you abide by the

JEFFERY A. BERRYHILL      January 22, 2014

Page 58

1    instruction?

2          MR. HILDES:  Objection.  Argumentative.

3          MR. BRENNAN:  I don't know how that can be any

4    simpler, Larry.

5          MR. HILDES:  I'm not saying it's complex.

6    Q.    (BY MR. BRENNAN)  How did you abide by the

7    instruction?

8    A.    I abided by --

9          MR. HILDES:  I'm objecting to your tone, Tom, not

10   the question.  Go ahead.

11         MR. BRENNAN:  I knew you would, Mr. Hildes.

12         MR. HILDES:  I'm happy not to disappoint you.

13         You may answer.

14   Q.    (BY MR. BRENNAN)  Mr. Berryhill, please answer.

15   A.    Can you restate it?

16         MR. BRENNAN:  Will you restate the question,

17   please.

18         (Whereupon, the record was read as requested.)

19   A.    Abide by the instruction?

20         Well, while -- while the -- while the police were

21   assembled on the line, I made no attempt.

22         THE REPORTER:  I'm sorry.  "I made --"

23   A.    While the police were assembled at the fog line in

24   riot gear with weapons, I did not cross the line.

25   Q.    (BY MR. BRENNAN)  Okay.

JEFFERY A. BERRYHILL      January 22, 2014

Page 59

1     A.    And we -- I honored that instruction.  Once -- once

2  they had retreated --

3          MR. HILDES:  (Inaudible.)

4          THE REPORTER:  What did you say?

5          MR. HILDES:  I'm sorry.  I'm asking Mr. Law to keep

6  his voice down because he's much more audible than he thinks

7  he is, I think.

8     A.    Once they had retreated, I moved to a different

9  position and I did cross the line.

10    Q.    (BY MR. BRENNAN)  Okay.  How far were you from the

11  officers at the time you crossed the line?

12    A.    I can't remember specifically.  I think -- I can't

13  remember.

14          MR. HILDES:  Don't guess.

15    A.    I can't remember specifically.

16    Q.    (BY MR. BRENNAN) Well, can you estimate, please?

17    A.    I'd say from here like maybe to the wall.

18    Q.    Okay, and I was never very good at math, but I'm

19  thinking about 30 feet.  Does that seem about right to you?

20    A.    That seems about right.

21          MR. HILDES:  I'll concur as to the distance to the

22  wall.

23    Q.    (BY MR. BRENNAN)  So did you have any apprehension

24  when you crossed the line?

25    A.    Did I have any --

JEFFERY A. BERRYHILL        January 22, 2014

Page 94

1       Q.    (BY MR. BRENNAN)   I asked you to identify times
2    when nonviolent direct action --
3       A.    But I felt like you characterized it -- that you
4    mischaracterized.
5       Q.    Okay.   But each of the dates you just listed were
6    dates where Oly PMR engaged in nonviolent direct action;
7    correct?
8            MR. HILDES:   Objection.   Misstates testimony.
9            MR. BRENNAN:   I'm trying to clarify.
10           MR. HILDES:   It's the same question and the same
11   answer.   The same objection.   I know you're trying to get
12   out of it.
13      Q.    (BY MR. BRENNAN)   Please answer the question, Mr.
14   Berryhill.
15      A.    Can you restate the question?
16      Q.    You just listed for us a series of dates where Oly
17   PMR engaged in nonviolent direct action; is that not
18   correct?
19      A.    I -- I listed -- yeah, I listed dates where there
20   were active campaigns and mobilizations taking place that
21   involved a multiplicity of things, including nonviolent
22   direct action.
23      Q.    Including.   Thank you.   And does that mean
24   individuals blocking streets?
25      A.    That was one of the tactics used, yes.

JEFFERY A. BERRYHILL        January 22, 2014

Page 247

1    told by others?

2        A.    Well, and what we've seen, what we've seen through

3    public records so far or what we've seen in the documentary

4    record.

5        Q.    But as you sit here today, you can't identify a

6    specific document to which you are referring?

7        A.    No.

8        Q.    Is that correct?

9        A.    Yes.

10       Q.    Okay.  And we've already talked about why you moved

11   to Minnesota, so we don't need to go over that again.

12             There's a number of times in here where it says,

13   "Plaintiff will seasonably produce such documents which are

14   within his command, control, and/or possession."

15             Without revealing the content of any privileged

16   communication, Mr. Berryhill, have you given your lawyers

17   all the documents that you think relate to your answers to

18   these discovery requests?

19       A.    As far as I'm aware.

20       Q.    Okay.  So you haven't deliberately held anything

21   back?

22       A.    No, not that I'm aware of.  Nothing deliberate

23   certainly.

24       Q.    And you're not claiming false arrest based on your

25   arrest in March of 2007, are you?

JEFFERY A. BERRYHILL      January 22, 2014

Page 249

1   where we are?  Go off the record.

2            MS. HOMAN:  Okay.

3            (Whereupon a recess was taken from 5:37 p.m. to

4   5:59 p.m.)

5            MR. ANGELIS:  We're back on the record.

6

7                        EXAMINATION

8   BY MR. ANGELIS:

9     Q.   Mr. Berryhill, my name is Theo Angelis, and I

10  represent Thomas Rudd and I will be your questioner for the

11  next hour or so.

12           My first question is this:  Have you ever met

13  Thomas Rudd?

14    A.   Not that I'm aware of.

15    Q.   Have you ever attended meetings at which Mr. Rudd

16  was present?

17    A.   Not that I'm aware of.

18    Q.   Have you ever corresponded or communicated with

19  Mr. Rudd in any way as broadly defined as Ms. Homan has said

20  before:  by Facebook, social media of any kind?  Are you

21  aware of any communications with Mr. Rudd?

22    A.   Not that I'm aware of.

23    Q.   Prior to learning that John Jacob was John Towery,

24  had you ever heard the name Tom Rudd?

25    A.   Not that I'm aware of.

JEFFERY A. BERRYHILL     January 22, 2014

Page 261

1    they'd leave out of another, if I recall.

2            MR. BRENNAN:  Is that due to Towery's direction?

3            THE WITNESS:  No.  It was probably -- I mean, it

4    probably has to do with the people protesting.

5            MR. BRENNAN:  Okay.

6            THE WITNESS:  I mean, I don't know.  I guess I

7    shouldn't --

8            MR. BRENNAN:  When one group would -- I apologize;

9    I'm almost done, Theo -- when one group would see vehicles

10   going by at a certain point, would they notify the other

11   groups at different points that "We're over here now; come

12   over here"?

13           THE WITNESS:  Yeah.  We would send each other text

14   messages and such.

15           MR. BRENNAN:  And then you would go over to that

16   area?

17           THE WITNESS:  If it was viable.  If it wasn't, we

18   would stay where we were.

19           MR. BRENNAN:  Was it ever viable?

20           THE WITNESS:  I don't -- I mean, I can't recall.

21           MR. BRENNAN:  Do you recall ever getting notified,

22   "Hey, we have movement over here; come join the protest"?

23           THE WITNESS:  Yeah.  Yeah, I guess I do.

24           MR. BRENNAN:  Okay.

25      Q.   (BY MR. ANGELIS)  Just to be clear, some people

JEFFERY A. BERRYHILL      January 22, 2014

Page 262

1    involved in the PMR movement were intending to block the

2    progress of the vehicles at that point?

3          MR. HILDES:  Hold on.  Hold on.

4    A.    There were some people --

5          MR. HILDES:  Wait, wait, wait.

6          MS. WEILL:  He needs to make an objection.

7          MR. HILDES:  I bit off more than I could chew.

8          Speculation.  Calls for conclusion about other

9    people on the part of the deponent.

10         Thank you for waiting for me to finish.

11   Q.    (BY MR. ANGELIS)  Go ahead.

12   A.    There were people who did participate in blockades.

13   Q.    Okay.  So now again we're back on the answer to

14   Interrogatory No. 2 at page 3 of Exhibit L, and I'm going to

15   paraphrase a little bit because there's a very long sentence

16   here with many clauses that begins with --

17         MR. HILDES:  Okay, I'm going to object to the last

18   question -- I'm sorry -- vague as to time.  I'm not clear if

19   that's in general or at the specific time we were talking

20   about.

21   Q.    (BY MR. ANGELIS)  And I think just to be clear,

22   then, in response to that vagueness objection, we were

23   talking about the final paragraph of the answer to

24   Interrogatory No. 1, which is 2009; correct?

25   A.    That was my impression.

JEFFERY A. BERRYHILL      January 22, 2014

Page 274

1     A.    (Witness nods head affirmatively.)

2     Q.    You don't have any independent knowledge?

3     A.    (Witness shakes head negatively.)

4           MS. HOMAN:  Mr. Berryhill, Can you answer verbally?

5     A.    I do not.

6           MS. HOMAN:  Thank you.

7           MR. ANGELIS:  Thank you, Jean.  Thank you,

8     Mr. Berryhill.  I know it's difficult and it's late.

9     Q.    (BY MR. ANGELIS)  You say that Mr. Towery gained

10    information to, quote, "...go after Plaintiffs and other

11    individuals, destroy their relationships, home life,

12    residences, et cetera."

13          Do you see that?

14    A.    Yeah.

15    Q.    Okay.  What evidence do you base that statement on?

16    A.    On a personal level, I saw how an act of betrayal

17    can sow considerable distrust, uncertainty, and uncertainty

18    within the groups.  Like, there were consequences that

19    harmed our ability to function in a similar amount up to,

20    like, the good faith, comradery that we had experienced

21    before.  It was -- it was Towery.  Like, Towery, sort of

22    knowing that someone had betrayed us that bad was a

23    significant element of making that happen.

24          In addition, we -- like, I was -- due to activity

25    initiated by the Olympia Police Department, I was forced to

JEFFERY A. BERRYHILL      January 22, 2014

Page 275

1    capitulate to the demands made by the police, meaning I

2    could let police, the Olympia police, come on my property,

3    remove people and arrest people, or I had to -- I had to

4    move out of that residence that I had lived in for three

5    years.

6        Q.    Okay.  Respectfully, I'm going to move to strike

7    that as nonresponsive.  I thank you for your answer, though.

8            I want to focus you on the statement that --

9            MR. HILDES:  I'm going to disagree.

10           MR. ANGELIS:  That's fine.  Fair enough.  We'll

11   take it up at trial.

12           MR. HILDES:  That's a reasonable answer.

13       Q.    (BY MR. ANGELIS)  The allegation here is that there

14   was an intention to gain information to go after plaintiffs

15   and other individuals, destroy their relationships, home

16   life, residences, et cetera, so I read that as an allegation

17   that the intention of Mr. Rudd and Mr. Towery was to destroy

18   relationships, home life, and residences.  Is that a fair

19   characterization of your allegation?

20       A.    I remember Towery taking notes describing people's

21   activities, describing their tendencies, describing -- I

22   remember Towery keeping notes, yes.  So I think that

23   information was intended to be used to cause harm to us.

24       Q.    So just so I'm clear, the notes -- the fact that

25   Mr. Towery gathered information on relationships, home life,

JEFFERY A. BERRYHILL        January 22, 2014

Page 345

1                          CERTIFICATE

2    STATE OF WASHINGTON )
                         )
3    COUNTY OF PIERCE    )

4

5         I, GINA M. CLARKE, a Certified Shorthand Reporter

6    and Notary Public in and for Pierce County, Washington, do

7    hereby certify there came before me the deponent herein,

8    namely JEFFERY A. BERRYHILL, who was by me duly sworn to

9    testify to the truth concerning the matters in this cause.

10   I further certify that the subscribing of the completed

11   deposition by the witness was reserved; that the foregoing

12   transcript was prepared under my personal supervision and

13   constitutes a true record of the testimony of the said

14   witness.

15        I further certify that I am not an attorney or

16   counsel of any parties, nor a relative or employee of any

17   attorney or counsel connected with the action, nor

18   financially interested in the action.

19        WITNESS my hand and seal in Puyallup, County of

20   Pierce, State of Washington, this 3rd day of February, 2014.

21

22                          _____
                            Notary Public in and for the
                            State of Washington, residing
23                          at Puyallup.

24

25   My Commission expires 4-13-17.

GINA M. CLARKE, CCR
(253)279-3465