# EXHIBIT M

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

---

JULIANNE PANAGACOS; et al.,     )
                                )
           Plaintiffs,     )
                                )
       vs.                  )     No. C10-5018 RBL
                                )
JOHN J. TOWERY; et al.,       )
                                )
           Defendants.     )

---

VIDEOTAPED DEPOSITION OF GLENN A. CRESPO, JR.

---

January 23, 2014

10:14 a.m.

Tacoma, Washington

GINA M. CLARKE, CCR

9115 - 171st Street Court East
Puyallup, WA 98375
(253)279-3465

GLENN A. CRESPO, JR.    January 23, 2014

Page 83

1    Q.    And when you say people were followed home, how do

2    you know that?

3    A.    They had told me that they were followed home.

4    Q.    You weren't present for any of those events?

5    A.    No, I was not.

6    Q.    And the events that these people described to you

7    were officers drove behind them on a public street?

8        MR. HILDES:  Objection.  Misstates testimony.

9    A.    Officers drove -- to the best of my knowledge, what

10   was related to me is officers did follow many people from

11   those demonstrations on a public street exceeding two,

12   three, four miles while following them.

13   Q.    (BY MS. HOMAN)  Okay.  So officers drove two, three

14   four miles behind them on a public street?

15   A.    Yes.

16   Q.    Anything else that prompted you to move out of the

17   G Street address?

18   A.    Not that I can recall right now.

19   Q.    How much did you pay for rent per month at the

20   G Street location?

21   A.    I don't recall an exact number.

22   Q.    How much did you pay for rent at the MLK street

23   residence?

24   A.    All I remember is comparable, maybe a little more.

25   Q.    Do you recall the date of the Smash ICE

GINA M. CLARKE, CCR
(253)279-3465

GLENN A. CRESPO, JR.    January 23, 2014

Page 84

1   demonstration in November 2007?

2      A.   November 9th.

3      Q.   It was a single-day event?

4      A.   Yes.

5      Q.   You identified yourself and others as being the

6   organizer of that event?

7      A.   More or less.  We put it -- you know, we helped

8   kind of make it come together.

9      Q.   What did you do to make help it -- make it help

10  come together?

11         MR. HILDES:   Renew the First Amendment objection.

12         Go ahead.

13     A.   We -- well, we did the research and created

14  educational documents regarding Geo Group, the private

15  corporation that at least at the time maintained that

16  facility, as well as some of the specifics about immigration

17  policies in the United States, namely, Project End Game, and

18  disseminated via trifolds and, you know, pamphlets that

19  information.

20     Q.   (BY MS. HOMAN)  Where did you pass out the trifolds

21  and pamphlets?

22     A.   Around downtown Tacoma in businesses and shops, in

23  front of schools to students, teachers.

24     Q.   Okay.  What else did you all do to pull that event

25  together?

GLENN A. CRESPO, JR.       January 23, 2014

Page 85

1      A.    Other than that and setting a time and date, that

2   was the extent.

3      Q.    Did you -- what was the intended activity for this

4   demonstration?  What did you plan on doing?

5      A.    To simply bring awareness to the Northwest

6   Detention Center in the tideflats of Tacoma.

7      Q.    For the record, do you know the street or the

8   address for the detention center?

9      A.    I do not recall right now.

10     Q.    Did you apply to the City of Tacoma for a permit?

11     A.    There was not an application process to the City of

12  Tacoma for a permit, to the best of my knowledge.

13     Q.    What do you base that on?

14     A.    I don't know.  I don't think -- I don't think

15  anybody did.  I don't remember.

16     Q.    How many people did you expect to attend this

17  event?

18     A.    Perhaps a few dozen at most.

19     Q.    How many people actually attended the event?

20     A.    Likely around a few dozen at most.

21     Q.    So 25?

22     A.    Somewhere between 25 and 35.

23     Q.    Okay.  And what did you intend to do as part of

24  your protest?  Were you just going to stand on the sidewalk

25  in front of the detention facility?

GLENN A. CRESPO, JR.    January 23, 2014

Page 86

1      A.    No.  We focused most of the attention on just going

2   around on the sidewalks, passing out the hundreds of

3   trifolds that we made.

4      Q.    So you were marching on the sidewalks and passing

5   out literature?

6      A.    Yes.

7      Q.    And were there people that had signs?

8      A.    Yes.

9      Q.    People with -- at some of these events, people will

10  have puppets, big puppets.

11     A.    I don't specifically recall seeing puppets.

12     Q.    Okay.  What about musical instruments, drums or

13  things of that nature?

14     A.    I don't recall.

15     Q.    You were arrested during the Smash ICE event in

16  2007?

17     A.    Yes.

18     Q.    You were charged with resistance and resisting

19  arrest and obstruction of a police officer; is that correct?

20     A.    Yes.

21     Q.    And you pled guilty at arraignment to both of those

22  charges?

23     A.    Yes.

24     Q.    You said that the -- why did you plead guilty at

25  arraignment?

GLENN A. CRESPO, JR.    January 23, 2014

Page 87

1     A.    I wanted to put that behind me.  I just wanted to

2   pay the fine and move on with my life.  I actually had not

3   known at that point that I had a bench warrant, so I

4   actually quashed the bench warrant that day.  I had not

5   known that I was actually even being charged for about at

6   least a year.

7     Q.    You were arrested during the event?

8     A.    I was arrested during the event.

9     Q.    Okay.  I am disconnecting somewhere in terms of why

10  you didn't know you were being charged.  Tell me what

11  happened.

12    A.    Because I was released and not charged yet, as

13  sometimes happens.  I think somebody lost mail; the mail got

14  mixed up.  I never got a notice.

15    Q.    Okay, so let me make sure I understand.

16          You were arrested during the event.  Were you

17  actually booked into jail?

18    A.    Yes, I was.

19    Q.    Did you bail out?

20    A.    Yes, I was bailed out.

21    Q.    And then after that, you weren't given a court date

22  and time to show up?

23    A.    I did not receive a court date, nor did the bail

24  bonds person that we go through -- went through, at least,

25  approach me saying, you know, "Where are you?"

GLENN A. CRESPO, JR.       January 23, 2014

1        MR. HILDES:  Asked and answered.

2    A.    I do attribute that to Mr. Towery.

3    Q.    (BY MR. BRENNAN)  Can you provide me some specific

4    details of acts taken by Mr. Towery that compelled you to

5    leave those residences?

6    A.    Namely, that he was spying on us.  He was relaying

7    information -- whether this was information he heard or

8    information that he constructed -- to whomever, a variety of

9    agencies he was working with.  I believe that had strong

10   effects on our residence there.  He was at that house fairly

11   often.  That is the first house that I lived at that he ever

12   came to.

13   Q.    Okay.  I understand the general sense of discomfort

14   with his interaction with you, but I'm trying to identify

15   any specific action taken by Mr. Towery that made it

16   impossible for you to live in those houses.

17        MR. HILDES:  Objection.  Mischaracterization of

18   testimony as "discomfort."

19        You may answer.

20   A.    It became an unlivable environment with all the

21   repression and surveillance and harassment that was

22   occurring.  Unfortunately, that carried over to the next

23   residence as well, also a residence to which John had

24   regular access to as a friend as we understood him at the

25   time.

GLENN A. CRESPO, JR.      January 23, 2014

Page 292

1    Q.    My name's Pete Talevich.  I'm representing -- I'm

2   the attorney for Thomas Rudd, who is a defendant in this

3   case.

4    A.    Yes.

5    Q.    I believe you testified earlier that you've never

6   met Thomas Rudd, who I will call Mr. Rudd.  Is that correct?

7    A.    To the best of my knowledge.

8    Q.    When did you find out who Mr. Rudd was?

9    A.    Through a series of documents that we acquired.

10    Q.    Do you remember when you acquired those documents?

11    A.    I do not have a recollection of exactly when we

12   acquired those documents.  In the last few years.  That

13   probably doesn't help.

14    Q.    Do you know where the documents you relied on came

15   from?

16    A.    What is the correct protocol regarding

17   attorney/client privileged matters that I speak with with

18   counsel regarding documents?  What is --

19    Q.    None of my questions are intended to determine --

20   to get into communications with your counsel.  If you can

21   identify the document -- I understand your testimony to be

22   that you discovered it from a document.  If you can tell me,

23   were those documents Public Records Act requests?  Were

24   they --

25    A.    I don't recall exactly which way we -- that the

GLENN A. CRESPO, JR.        January 23, 2014

Page 293

1    documents were obtained.

2        Q.    Is it safe to say that you found out Mr. Rudd's

3    identity before this lawsuit was filed in 2010?

4        A.    It's safe to say that.

5        Q.    Can you be any more specific about when you

6    personally found out who Mr. Rudd was?

7        A.    It would have to be before or after mid-2009.

8        Q.    You say you -- obviously, you've testified that

9    you've met John Towery and spoken to John Towery several

10    times.

11        A.    Yes.

12        Q.    Did Mr. Towery ever mention Mr. Rudd to you?

13        A.    Towery did not mention Mr. Rudd to me.  But through

14    a series of communications between many of the people we've

15    already spoken about, including Rudd, Towery, Adamson, there

16    were communications relayed between, yes.

17        Q.    Okay.  It would -- it would help us --

18        A.    But he did not say, "I was taking out Rudd

19    yesterday."

20        Q.    Okay.  He did not --

21        A.    I did not know about Rudd until after.

22        Q.    Okay.  Did John Towery ever mention the name Chris

23    Adamson to you?

24            MR. HILDES:  Asked and answered.

25        A.    No, John Towery did not say Chris Adamson to me at

GLENN A. CRESPO, JR.      January 23, 2014

Page 304

1    saying, you know, spy or informant, something like that,

2    except with the nefarious desire to create harm; hence,

3    provoking.

4        Q.    Thank you.  That was my next question.

5              Do you have any facts to support the contention

6    that Rudd ordered this action of Towery?

7        A.    Not to my recollection at this time.

8        Q.    Please turn to Interrogatory No. 5 on page 5.

9        A.    (Witness complies.)

10       Q.    The first sentence of the answer states, "I was

11   aware [sic] -- I am aware of the meetings between Rudd,

12   Towery, the Tacoma Police Department, Chris Adamson, the

13   Tacoma Homeland Security Committee, the Olympia Police

14   Department, and other individuals and agencies, taking place

15   in Seattle, Tacoma, and Aberdeen."

16             How did you become aware of these meetings?

17       A.    The same documentation.

18       Q.    Please turn to Interrogatory No. 8 at page 8.

19       A.    (Witness complies.)

20       Q.    Am I correct that you assert a violation of your

21   Fourth Amendment rights by my client, Mr. Rudd?

22       A.    Yes.

23       Q.    Do you know, sitting here, what the specific

24   incidents were that give rise to Mr. Rudd's liability to you

25   for violation of your Fourth Amendment rights?

GLENN A. CRESPO, JR.        January 23, 2014

Page 308

1      A.    Off the top of my head right now, I can't.

2      Q.    Can you state the factual basis for your allegation

3    that you're entitled to compensatory damages for pain and

4    suffering?

5            MR. HILDES:  Calls for a legal conclusion on the

6    part of the deponent.

7      A.    You're asking what I mean by damages regarding pain

8    and suffering?

9      Q.    (BY MR. TALEVICH)  Yes.  Let me phrase it another

10   way.  I'll strike that question.

11           What facts support your entitlement to compensatory

12   damages for pain and suffering?

13           MR. HILDES:  Same objection.

14           You may answer the question.

15     A.    The anxiety, the stress, the things I have listed

16   before regarding the concerns about my safety, if anybody's

17   watching me, if I trust people.

18     Q.    (BY MR. TALEVICH)  Okay.

19     A.    The fact that I can't feel safe around law

20   enforcement, around anything like that.  I mean, that kind

21   of stuff even affects my job.  If you understand, like, I

22   have to go to evictions and see the sheriffs.  I have to go

23   to police stations and work on hardware, and every single

24   job like that that I have to go on is absolutely terrifying.

25   It affects my work.  It affects the quality of my work.

GLENN A. CRESPO, JR.        January 23, 2014

Page 333

```
 1                       CERTIFICATE

 2    STATE OF WASHINGTON )
                          )
 3    COUNTY OF PIERCE    )

 4

 5         I, GINA M. CLARKE, a Certified Shorthand Reporter

 6    and Notary Public in and for Pierce County, Washington, do

 7    hereby certify there came before me the deponent herein,

 8    namely GLENN A. CRESPO, JR., who was by me duly sworn to

 9    testify to the truth concerning the matters in this cause.

10    I further certify that the subscribing of the completed

11    deposition by the witness was reserved; that the foregoing

12    transcript was prepared under my personal supervision and

13    constitutes a true record of the testimony of the said

14    witness.

15         I further certify that I am not an attorney or

16    counsel of any parties, nor a relative or employee of any

17    attorney or counsel connected with the action, nor

18    financially interested in the action.

19         WITNESS my hand and seal in Puyallup, County of

20    Pierce, State of Washington, this 5th day of February, 2014.

21

22                       _____
                         Notary Public in and for the
23                       State of Washington, residing
                         at Puyallup.
24

25    My Commission expires 4-13-17.
```

GINA M. CLARKE, CCR
(253)279-3465

# EXHIBIT N

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| JULIANNE PANAGACOS, et al., )<br><br>Plaintiffs, )<br><br>vs. )<br><br>JOHN J. TOWERY, et al., )<br><br>Defendants. ) | NO.  3:10-cv-05018 RBL |

DISCOVERY DEPOSITION UPON ORAL EXAMINATION OF

CHRIS T. GRANDE

June 25, 2013

Tacoma, Washington

Taken Before:

PAMELA J. DALTHORP, CCR No. 2948
Certified Court Reporter
Of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court S.W., Suite A-104
Olympia, WA  98502
Phone: 360/352-2054
Fax: 360/705-6539
Toll Free: 1-800-407-0148
E-mail: admin@capitolpacificreporting.com

1

CHRIS T. GRANDE - by Ms. Garcia

1  A    I do not know if it's legal.

2  Q    As I mentioned earlier, I represent one of the defendants,

3       Thomas Rudd.  Have you ever met Mr. Rudd?

4  A    I don't believe so.

5  Q    Have you ever talked to Mr. Rudd?

6  A    No.

7  Q    Have you ever e-mailed with Mr. Rudd?

8  A    I hope not.

9  Q    Have you ever had any contact with Mr. Rudd?

10 A    No.

11 Q    Do you know who he is?

12 A    I have a vague notion.

13 Q    What do you know about Mr. Rudd?

14 A    That he was involved with John Towery in infiltrating PMR and

15      other organizations.

16 Q    And when you say "involved," what do you know about

17      Mr. Rudd's involvement?

18 A    He had communications with Mr. Towery as far as what -- what

19      different movements and stuff were.

20 Q    And how do you know this information?

21 A    It blew up on the Internet some time ago.

22 Q    You mentioned Mr. Towery.  Have you ever met Mr. Towery?

23 A    I have.

24 Q    So I'm guessing you have spoken to him?

25 A    Yes.

                                                            134

CHRIS T. GRANDE - by Ms. Garcia

1  A    No.  I haven't been able to afford it.

2  Q    Nothing for the nightmares?

3  A    No.  I haven't been able to afford it.

4  Q    Putting aside for a minute the clothing that you said you had

5       to replace, I just want to confirm, you weren't deprived of

6       any other property as a result of these events, were you?

7  A    No.

8  Q    And to confirm, none of your other property was damaged or

9       destroyed as a result of these events, was it?

10 A    No, I don't believe so.

11 Q    Who do you think caused the damages that you suffered?

12 A    I'm sorry, could you repeat?

13 Q    Who caused the nightmares that you suffered?

14            MR. HILDES:  I'm going to object to the extent

15       that calls for an expert conclusion.

16          You can answer the question.

17 A    I'd say that the reaction of the police to my own actions

18       were an immediate cause.

19 Q    (BY MS. GARCIA)  Any not immediate cause?

20            MR. HILDES:  Same objection.

21          You can answer.

22 A    I think -- I think another aspect of it was knowing about

23       spying and also hearing just threats from people who didn't

24       agree with my beliefs in regards to the war and other

25       progressive politics.

                                                              150

CHRIS T. GRANDE - by Mr. Hildes

```
 1              C E R T I F I C A T E

 2  I, PAMELA J. DALTHORP, the undersigned Washington Certified Court
    Reporter, pursuant to RCW 5.28.010 authorized to administer oaths
 3  and affirmations in and for the State of Washington, do hereby
    certify:
 4
    That the annexed and foregoing deposition was stenographically
 5  taken before me and thereafter transcribed by me by means of
    computer-aided transcription and is a full, true and correct
 6  transcript of the testimony, and was prepared pursuant to
    Washington Administrative Code 308-14-135, the transcript
 7  preparation format guidelines;

 8  That according to CR30(e) the witness was given the opportunity
    to examine, read and sign the deposition after the same was
 9  transcribed, unless indicated in the record that the review was
    waived;
10
    That the witness, before examination, was by me duly sworn to
11  testify the truth, the whole truth and nothing but the truth;

12  That I am not a relative, employee, attorney or counsel of any
    party to this action or relative or employee of any such attorney
13  or counsel, and I am not financially interested in the said
    action or the outcome thereof;
14
    That I am sealing the deposition in an envelope with the title of
15  the above cause and the name of the witness visible, and I am
    delivering the same upon the appropriate counsel in this matter;
16
    I further advise you that as a matter of firm policy, the
17  stenographic notes of this transcript will be destroyed three
    years from the date appearing on this Certificate unless notice
18  is received otherwise from any party or counsel hereto on or
    before said date;
19
    IN WITNESS HEREOF, I have hereunto set my hand this
20
    15th day of July, 2013.
21

22

23                          PAMELA J. DALTHORP
                            Certified Court Reporter
24                          License No. 2948 in and for
                            the State of Washington,
25                          residing at Olympia, WA
                                                                 233
```

# EXHIBIT O

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| JULIANNE PANAGACOS, et al., | ) |
| | ) |
| Plaintiffs, | ) NO.  3:10-cv-05018 RBL |
| | ) |
| vs. | ) |
| | ) |
| JOHN J. TOWERY, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

DISCOVERY DEPOSITION UPON ORAL EXAMINATION OF

JULIANNE E. PANAGACOS

June 26, 2013

Tacoma, Washington

Taken Before:

PAMELA J. DALTHORP, CCR No. 2948
Certified Court Reporter
Of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court S.W., Suite A-104
Olympia, WA  98502
Phone: 360/352-2054
Fax: 360/705-6539
Toll Free: 1-800-407-0148
E-mail: admin@capitolpacificreporting.com

1

```
 1                        EXAMINATION

 2 BY MS. GARCIA:

 3 Q   Hi, Ms. Panagacos.  How are you?

 4 A   I'm okay.

 5 Q   I'm Heidi Garcia.  I don't know if you recall, but I

 6     represent one of the defendants in this matter, Mr. Tom Rudd.

 7          Have you ever met Mr. Rudd?

 8 A   I have not met Mr. Rudd.

 9 Q   Have you ever spoken to him?

10 A   I have not spoken to him, though I read e-mails he wrote that

11     were released in discovery when I was being prosecuted.

12 Q   Did you ever -- other than those e-mails that you read during

13     discovery, did you have any e-mail correspondence with

14     Mr. Rudd?

15 A   No, I didn't.

16 Q   Did you ever have any other correspondence with Mr. Rudd?

17 A   No.

18 Q   Have you had any contact of any kind with Mr. Rudd?

19 A   Not direct.

20 Q   What kind of indirect contact have you had with Mr. Rudd?

21 A   Like I said, I have read e-mails that he wrote as part of the

22     discovery for my case.  And so the e-mails were in

23     conjunction -- or were sent to Jim Powers, who was the

24     prosecutor in my criminal case, and...  Yeah, so that's what

25     I read.  And I've read -- I've seen other documents in which
```

JULIANNE E. PANAGACOS - by Ms. Garcia

```
 1     he's mentioned.

 2  Q  And what would those other documents be?

 3  A  Well, he -- I know that he's a supervisor to John Towery, who

 4     was on listservs that -- he was on listservs that PMR had.

 5     And so when there were public records requests that were

 6     done, in which it was exposed that John Towery was under  the

 7     supervision of Tom Rudd, spying on non-violent peace

 8     activists, those are some of the documents.

 9  Q  Did Mr. Towery ever tell you that Mr. Rudd was a supervisor?

10  A  I have not talked to Mr. Towery.

11  Q  You never spoke to Mr. Towery.

12         Did you ever have any meetings with Mr. Towery?

13  A  Not that I know of.

14  Q  So you've never met him?

15  A  I've never met him.  I was at meetings -- I was at meetings

16     that there were men at that I didn't know.  I don't know if

17     he was there.

18  Q  Okay.  So just to confirm, Mr. Towery never told you anything

19     about Mr. Rudd?

20  A  Correct.

21  Q  I'd like to follow up on those e-mails that you said you

22     received in discovery.  This was in your criminal

23     prosecution; is that correct?

24  A  Yes.

25  Q  What was the date of the -- dates of the prosecution, like
```

87

JULIANNE E. PANAGACOS - by Ms. Homan

1                    C E R T I F I C A T E

2  I, PAMELA J. DALTHORP, the undersigned Washington Certified Court
   Reporter, pursuant to RCW 5.28.010 authorized to administer oaths

3  and affirmations in and for the State of Washington, do hereby
   certify:

4
   That the annexed and foregoing deposition was stenographically

5  taken before me and thereafter transcribed by me by means of
   computer-aided transcription and is a full, true and correct

6  transcript of the testimony, and was prepared pursuant to
   Washington Administrative Code 308-14-135, the transcript

7  preparation format guidelines;

8  That according to CR30(e) the witness was given the opportunity
   to examine, read and sign the deposition after the same was

9  transcribed, unless indicated in the record that the review was
   waived;

10
   That the witness, before examination, was by me duly sworn to

11 testify the truth, the whole truth and nothing but the truth;

12 That I am not a relative, employee, attorney or counsel of any
   party to this action or relative or employee of any such attorney

13 or counsel, and I am not financially interested in the said
   action or the outcome thereof;

14
   That I am sealing the deposition in an envelope with the title of

15 the above cause and the name of the witness visible, and I am
   delivering the same upon the appropriate counsel in this matter;

16
   I further advise you that as a matter of firm policy, the

17 stenographic notes of this transcript will be destroyed three
   years from the date appearing on this Certificate unless notice

18 is received otherwise from any party or counsel hereto on or
   before said date;

19
   IN WITNESS HEREOF, I have hereunto set my hand this

20
   15th day of July,2013.

21

22

23         PAMELA J. DALTHORP
           Certified Court Reporter

24         License No. 2948 in and for
           the State of Washington,

25         residing at Olympia, WA

                                                          187

CAPITOL PACIFIC REPORTING 1-800-407-0148

# EXHIBIT P

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| JULIANNE PANAGACOS, et al., | ) |
| | ) |
| Plaintiffs, | ) NO.  3:10-cv-05018 RBL |
| | ) |
| vs. | ) |
| | ) |
| JOHN J. TOWERY, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

DISCOVERY DEPOSITION UPON ORAL EXAMINATION OF

JULIA A. ROTH GARFIELD

June 27, 2013

Tacoma, Washington

Taken Before:

PAMELA J. DALTHORP, CCR No. 2948
Certified Court Reporter
Of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court S.W., Suite A-104
Olympia, WA  98502
Phone: 360/352-2054
Fax: 360/705-6539
Toll Free: 1-800-407-0148
E-mail: admin@capitolpacificreporting.com

1

JULIA A. ROTH GARFIELD - by Mr. Law

1  A    I don't remember.

2  Q    (BY MR. LAW)  Let me be specific.  Were you wearing red

3       pants?

4  A    I don't know.

5  Q    Did you have a hat on?

6  A    I don't know.

7  Q    Well, I'll give you some help here.

8                  MR. LAW:  This will be six.

9                           (Exhibit No. 6 marked for

10                               identification.)

11 Q    Now, for the record, let me identify these, where they are.

12       They have a Bates number.  The first one, at least -- I

13      don't know if these are in Bates number order.  Some of them,

14      unfortunately, don't have the number on it, but they are all

15      from the same group.

16          The first photograph has a Bates number of PCK1003.

17      This is part of the rather large package of materials that

18      was put together shortly after the protests occurred and made

19      available for public records requests.

20          P stands for photograph.  C-K stands for Charlie Kirry,

21      K-I-R-R-Y.  He's the photographer there.  Ten means that it

22      was on November 10th, and then you just get down to the

23      basic...  So these were taken, if you look at it, you will

24      see the right rear-view mirror in the lower part of the

25      picture, just to illustrate they were taken from a car.

                                                            38

JULIA A. ROTH GARFIELD - by Mr. Law

```
 1              MR. HILDES:  I'll note that I've never seen these
 2     before.
 3  Q  (BY MR. LAW)  Well, in any event --
 4              MR. HILDES:  Five and a half years since this
 5     incident, I've never seen these pictures before.
 6  Q  (BY MR. LAW)  I'd like you to look at, in particular, the
 7     second-to-the-last photograph.
 8              MR. HILDES:  I'm going to object to these, first
 9     of all, on the basis they weren't produced in response to a
10     set of discovery requests that's two years old; and
11     secondly, lack of foundation.
12  Q  (BY MR. LAW)  Do you see the person on the right-hand side of
13     the photograph?
14  A  Which person?
15  Q  This is the second-from-the-last one.
16              MS. HOMAN:  Page 23?
17              MR. LAW:  This one does not have -- actually, it
18     does.  The staple is right on it.
19              MS. HOMAN:  I think it's 23.
20              MR. LAW:  Yes, it's 23.
21  Q  (BY MR. LAW)  You may have to pull it apart.  Here, why don't
22     you pull the staple out and clip it with that.
23  A  Okay.  Yes, okay, I see the photo you are talking about.
24  Q  Okay.  It has Bates number 23.  Could you just hold it up so
25     we can --
```

                                                          39

JULIA A. ROTH GARFIELD - by Mr. Law

```
 1 A    (Witness complying.)

 2 Q    That's correct.  We are all on the same page.

 3              MR. HILDES:  Literally, I think.

 4 Q    (BY MR. LAW)  There is an individual that takes up a good

 5      part of the right-hand side of that photograph and that

 6      person is wearing red pants.  Is that you?

 7 A    Yes.

 8 Q    So you are wearing the red pants and it looks like some kind

 9      of a winter-type jacket on; am I correct?

10 A    A raincoat, actually.

11 Q    A raincoat?  Okay.

12              And then a green scarf with white designs on it --

13 A    Yes.

14 Q    -- that you have up and over your nose and covering the lower

15      part of your face?

16 A    Yes.

17 Q    And then you have some kind of a hat on?

18 A    Yes.

19 Q    It looks like maybe a beret or something?

20 A    I think it's called a kangol.

21 Q    A what?

22 A    A kangol.

23 Q    You will have to spell that.  I'm sorry.

24 A    K-A-N-G-O-L.

25 Q    Thank you.
```

40

JULIA A. ROTH GARFIELD - by Mr. Law

```
 1              MR. HILDES:  I think they are Australian.

 2 Q   (BY MR. LAW)  Okay.  Now, do you recall being at the

 3     intersection of 4th and Plum when protesters were throwing

 4     rocks out into the roadway and pushing Dipsy dumpsters out

 5     into the roadway, as well as real estate advertising boxes?

 6     How is that?

 7 A   Yes, I remember that.

 8 Q   And in sequence here, if we look at the photographs, the

 9     first one is 03, is that you standing on the right?

10 A   Yes, that's me.

11 Q   Okay.  Same thing in 04?

12 A   Yes, that's me.

13 Q   And same thing in 05?

14 A   Yes.

15 Q   Looks like you are stepping now?

16 A   Yes.

17 Q   In 08 you are at one end of a Dipsy dumpster?

18 A   Yes, that's me.

19 Q   And then 23 we've already talked about.

20          And then if you look at 25, which is the last page, are

21     you on the left-hand side of the photograph, right in front

22     of the guy carrying the very large rock?

23 A   It's hard to tell, but that appears to be me.  I'm not sure

24     that's me.

25 Q   Well, let's look at the photograph.  The person there has red
                                                              41
```

JULIA A. ROTH GARFIELD - by Mr. Law

```
 1     pants; right?

 2 A   Yes.

 3 Q   Has a coat, which looks to be the same coat that's displayed

 4     in the previous photograph.

 5 A   It appears to be me.

 6 Q   You see the white trim on the coat?

 7 A   Yes.

 8 Q   And the green scarf?

 9 A   Yes.

10 Q   Okay.  So you agree that's you right in front of this guy

11     with a big rock?

12 A   As far as I can tell, yes.

13 Q   Okay.  Do you recall -- do you recall being there when all of

14     that was going on that's depicted in the photograph?

15 A   Yes.

16 Q   Did you throw any rocks?

17 A   No.

18 Q   Did you pick up any rocks?

19 A   Not that I remember.

20 Q   Was this shortly before the incident where you were

21     pepper-sprayed?

22              MR. HILDES:  Objection; lack of foundation,

23     assumes facts not in evidence.

24 A   It was within -- within a half hour before I was

25     pepper-sprayed.
```

JULIA A. ROTH GARFIELD - by Mr. Angelis

```
 1    November 13th, 2007."

 2              MR. HILDES:  That's been corrected in the fourth

 3    amended motion we are going to seek leave to refile.

 4 Q  (BY MS. BUSH)  My question is --

 5              MR. HILDES:  Which we are going to seek leave to

 6    refile.  She wasn't arrested.  Terry's mistake, not Cornez

 7    (phonetic).

 8 Q  (BY MS. BUSH)  My question is, that's not correct?

 9 A  It's not true.

10 Q  Then I don't need to ask any further about that.

11           I think that is all I have.  Thank you.

12              MR. ANGELIS:  Okay.

13

14

15                     EXAMINATION

16 BY MR. ANGELIS:

17 Q  Ms. Garfield, my name is Theo Angelis.  We met before.  I

18    represent Thomas R. Rudd, who I will refer to as Mr. Rudd in

19    these proceedings.

20           Is that okay?

21 A  Sure.

22 Q  Okay.  Great.  And I'm going to try not to duplicate

23    questions that have already been asked of you, but I may ask

24    a few short confirmation questions, if that's okay.

25           So just to confirm, you don't know Mr. Rudd; correct?
```

121

JULIA A. ROTH GARFIELD - by Mr. Angelis

```
 1  A   No.

 2  Q   Okay.  And you've never met Mr. Rudd?

 3  A   Not that I know of.

 4  Q   And you've never spoken to Mr. Rudd?

 5  A   No.

 6  Q   And to the best of your knowledge, as broadly construed as

 7      Ms. Homan said, you never communicated with Mr. Rudd?

 8  A   No.

 9  Q   When did you first hear Mr. Rudd's name?

10  A   From my legal counsel.  That I can remember that's when I

11      first heard his name.

12  Q   Do you know when you first heard it?

13  A   Oh.  Somewhere between 2008 and 2013.

14          MS. HOMAN:  Way to narrow that.

15          MR. HILDES:  Well, it wasn't 2007.

16  Q   (BY MR. ANGELIS)  Do you know if you heard of Mr. Rudd's name

17      before this lawsuit was filed?

18  A   I don't know.

19  Q   Earlier when Ms. Homan was asking questions she used a term

20      firsthand knowledge.  Do you recall that?

21  A   Yes.

22  Q   What does firsthand knowledge mean to you?

23  A   To me, firsthand knowledge means -- well, there's a few

24      different ways -- few different examples that could be given.

25      One example could be, okay, let's say someone stole
```

                                                                    122

JULIA A. ROTH GARFIELD - by Mr. Angelis

```
 1    day.
 2 Q  To the best of your knowledge, the two paragraphs in
 3    Exhibit 1, which are the interrogatory answers - and let me
 4    just get the page number here - pages two to three -- and I'm
 5    reading now from page two of Exhibit 1.  The answer begins,
 6    "I was attacked twice."
 7 A  Yes.
 8 Q  And "twice" there refers to two incidents on the same day;
 9    correct?
10 A  Yes.
11 Q  Okay.  So other than those two incidents, what harm occurred
12    to you for which you are seeking damages in this case?
13 A  The harm of infiltration and the exponential effects of that.
14    So that is a more subtle psychological, emotional harm, not
15    only for me but also for friends, people in the community,
16    people in PMR, the relationships that I had with those
17    people.
18        So it stretches out over a long span of time.  It's not
19    like a physical injury necessarily that's immediately
20    bleeding or, you know, you can see it right away.  It's more
21    of an effect of, for example, paranoia or distrust.
22 Q  Well, let me ask you this.  In Exhibit 1, your answer to
23    question number seven on page six , it references visiting a
24    counselor.  Do you see that?
25 A  Yes.
```

132

JULIA A. ROTH GARFIELD - by Ms. Homan

```
 1              C E R T I F I C A T E

 2  I, PAMELA J. DALTHORP, the undersigned Washington Certified Court
    Reporter, pursuant to RCW 5.28.010 authorized to administer oaths
 3  and affirmations in and for the State of Washington, do hereby
    certify:
 4
    That the annexed and foregoing deposition was stenographically
 5  taken before me and thereafter transcribed by me by means of
    computer-aided transcription and is a full, true and correct
 6  transcript of the testimony, and was prepared pursuant to
    Washington Administrative Code 308-14-135, the transcript
 7  preparation format guidelines;

 8  That according to CR30(e) the witness was given the opportunity
    to examine, read and sign the deposition after the same was
 9  transcribed, unless indicated in the record that the review was
    waived;
10
    That the witness, before examination, was by me duly sworn to
11  testify the truth, the whole truth and nothing but the truth;

12  That I am not a relative, employee, attorney or counsel of any
    party to this action or relative or employee of any such attorney
13  or counsel, and I am not financially interested in the said
    action or the outcome thereof;
14
    That I am sealing the deposition in an envelope with the title of
15  the above cause and the name of the witness visible, and I am
    delivering the same upon the appropriate counsel in this matter;
16
    I further advise you that as a matter of firm policy, the
17  stenographic notes of this transcript will be destroyed three
    years from the date appearing on this Certificate unless notice
18  is received otherwise from any party or counsel hereto on or
    before said date;
19
    IN WITNESS HEREOF, I have hereunto set my hand this
20
    15th day of July,2013.
21

22

23              PAMELA J. DALTHORP
                Certified Court Reporter
24              License No. 2948 in and for
                the State of Washington,
25              residing at Olympia, WA
                                                    173
```

# EXHIBIT Q

Deposition of Mark Feddersen, 3/11/2014

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JULIANNE PANAGACOS, et al., | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| vs. | ) 3:10-cv-5018RBL |
| | ) |
| JOHN J. TOWERY; THOMAS R. | ) |
| RUDD; CITY OF OLYMPIA; TOR | ) |
| BJORNSTAD, et al., | ) |
| | ) |
| Defendant(s). | ) |

DEPOSITION UPON ORAL EXAMINATION OF
MARK FEDDERSEN

10:27 A.M.

MARCH 11, 2014

1200 FIFTH AVENUE, SUITE 1820

SEATTLE, WASHINGTON

REPORTED BY:  MARY L. GREEN, CCR 2981

Deposition of Mark Feddersen, 3/11/2014

Page 213

1    Did anyone have any conversations like that with prowar

2    folks about the port protests, anyone at the department

3    that you're aware of?

4        A.   I'm not aware of it.

5        Q.   Were there prowar protests in counter to the

6    antiwar protests that went on?

7        A.   I don't recall, but just for clarification, I

8    don't believe I mentioned anything about contacting the

9    synagogues and things of that nature.  I believe it was

10   written in a document, but I don't know who sponsored

11   that language in that document anymore.  It's been a

12   while.

13       Q.   Fair enough.  No further questions.

14                    EXAMINATION

15   BY MR. BRENNAN:

16       Q.   I have a couple questions.  In the context of

17   Exhibit Number 80 -- just for the record, Lieutenant,

18   my name is Tom Brennan.  I represent a defendant in

19   this case, John Towery.

20            In the context of Exhibit Number 80 and on

21   page 3 of the threat assessment, counsel for the

22   plaintiffs was asking you about bullet number 6 called

23   priority intelligence requirements.  Was there ever a

24   time when Tom Rudd or anybody at the Army ever directed

25   the Tacoma Police Department or you to take any

Deposition of Mark Feddersen, 3/11/2014

Page 214

1    particular action in regards to the movement of
2    equipment from the fort to the port?
3        A.   No.
4        Q.   Was there ever a time when the Tacoma Police
5    Department or you took any particular steps at the
6    advice of Tom Rudd or any employee at the Army?
7        A.   No.  We take all information, this threat
8    assessment, the information that the RIG provides, and
9    the information that Tacoma has, and then develop our
10   own plan and our own action based upon the collection
11   of information.
12       Q.   So this threat assessment document would be an
13   example of many forms of different types of information
14   you would gather to make decisions on how to handle in
15   particular the movement of equipment from fort to port
16   or port to fort?
17       A.   Correct.
18            MR. HILDES:   Objection to the extent
19   that misstates testimony.
20       A.   Correct.
21            MR. BRENNAN:   No more questions.
22            MS. HOMAN:   Counsel?
23            MR. TALEVICH:   No questions.
24            MS. HOMAN:   Nothing.   So he will
25   reserve.

217

```
 1                    REPORTER'S CERTIFICATE

 2

 3         I, MARY L. Green, the undersigned Certified Court

 4    Reporter, pursuant to RCW 5.28.010 authorized to administer

 5    oaths and affirmations in and for the State of Washington, do

 6    hereby certify:

 7         That the sworn testimony and/or proceedings, a transcript

 8    of which is attached, was given before me at the time and

 9    place stated therein; that any and/or all witness(es) were

10    duly sworn to testify to the truth; that the sworn testimony

11    and/or proceedings were by me stenographically recorded and

12    transcribed under my supervision, to the best of my ability;

13    that the foregoing transcript contains a full, true, and

14    accurate record of all the sworn testimony and/or proceedings

15    given and occurring at the time and place stated in the

16    transcript; that I am in no way related to any party to the

17    matter, nor to any counsel, nor do I have any financial

18    interest in the event of the cause.

19         WITNESS MY HAND AND DIGITAL SIGNATURE this 18th day of

20    March, 2014.

21

22

23

24    MARY L. Green
      Washington State Certified Court Reporter, #2981
25    mgreen@yomreporting.com
```

# EXHIBIT R

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

JULIANNE PANAGACOS, et al.,      )

            Plaintiffs,      )

   vs.      ) No. 3:10-cv-5018

JOHN J. TOWERY; THOMAS R.      )      RBL

RUDD; CITY OF OLYMPIA; TOR      )

BJORNSTAD, et al.,      )

            Defendants.      )

DEPOSITION UPON ORAL EXAMINATION

OF

STEVEN R. HALL

10:47 A.M.

March 5, 2014

2674 R.W. Johnson Boulevard Southwest

Tumwater, Washington

Reported by:  CONNIE FARANDA, RPR, CCR 2204

Deposition of Steven Hall, 3/5/2014

1     police department and the Port; is that correct?

2          A.   Yes.   This letter suggests that this is the

3     direct contact for the Port.

4          Q.   How about for other -- how about for the

5     military; who was the direct contact with the City?

6          A.   I don't know at this time who it was.   During

7     the November 2007 shipments, I believe it was Tor as

8     well.

9          Q.   Okay.   Do you know who Tom Rudd is?

10         A.   Tom Rod?

11         Q.   Rudd, R-u-d-d, with the Army?

12         A.   No.

13         Q.   How about John Towery?

14         A.   I've only heard the name from the newspapers

15    and in conversations since that.

16         Q.   Did you meet anybody from the -- either the

17    833rd Transportation Battalion or the Department of

18    Emergency Services at Fort Lewis at any time?

19         A.   That's a pretty broad question.

20         Q.   Yeah.

21         A.   Before the riots, during the riots, after the

22    riots?

23         Q.   Any time.

24         A.   Yes.

25         Q.   Okay.   How about before the demonstrations?

1                        REPORTER'S CERTIFICATE

2

3            I, CONNIE FARANDA, the undersigned Certified Court

4     Reporter, pursuant to RCW 5.28.010 authorized to administer

5     oaths and affirmations in and for the State of Washington, do

6     hereby certify:  That the sworn testimony and/or proceedings,

7     a transcript of which is attached, was given before me at the

8     time and place stated therein; that any and/or all witnesses

9     were duly sworn to testify to the truth; that the sworn

10    testimony and/or proceedings were by me stenographically

11    recorded and transcribed under my supervision, to the best of

12    my ability; that the foregoing transcript contains a full,

13    true, and accurate record of all the sworn testimony and/or

14    proceedings given and occurring at the time and place stated

15    in the transcript; that a review of which was reserved; that I

16    am in no way related to any party to the matter, nor to any

17    counsel, nor do I have any financial interest in the event of

18    the cause.

19            WITNESS MY HAND AND DIGITAL SIGNATURE this 15th day of

20    March 2014.

21

22    _____

23    CONNIE FARANDA, RPR
      Certified Court Reporter, #2204
24    cfaranda@yomreporting.com

25

# EXHIBIT S

Deposition of Steve Nelson, 3/5/2014

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

JULIANNE PANAGACOS, et al.,      )

              Plaintiffs,      )

    vs.                          ) No. 3:10-cv-5018

JOHN J. TOWERY; THOMAS R.        )      RBL

RUDD; CITY OF OLYMPIA; TOR       )

BJORNSTAD, et al.,               )

              Defendants.      )


DEPOSITION UPON ORAL EXAMINATION

OF

STEVEN R. NELSON


4:15 P.M.

March 5, 2014

2674 R.W. Johnson Boulevard Southwest

Tumwater, Washington


Reported by:  CONNIE FARANDA, RPR, CCR 2204

Deposition of Steve Nelson, 3/5/2014

Page 27

1    attended a meeting there.  We all get on addressee
2    lists at times that show up later in your life.
3              No, I have no idea.
4         Q.  So would someone else have put you on a
5    contact list without your knowledge as the contact for
6    the department?
7         A.  I don't know.  I don't know.  I can't imagine
8    that, but I don't know.
9         Q.  Do you ever recall meeting Tom Rudd from the
10   Army?
11        A.  No, sir.
12        Q.  Do you ever recall meeting John Towery from
13   the Army?
14        A.  No, sir.
15        Q.  How about Tom Ciota?
16        A.  Tom Ciota, I have him in events of the day
17   that were on -- my job -- one of the last days of this
18   thing, it was a very trickled down -- was to attend
19   a -- I was in charge of a unit of employees.  And the
20   Port or military couldn't get enough trucks to drag off
21   the rest -- the last of this equipment.
22              And I remember talking to the chief that said,
23   there's no protestors going here, there's nothing
24   going.  Let's get out of here.
25              So I noted in my report that I told this

Deposition of Steve Nelson, 3/5/2014

Page 64

1    **Birmingham.**

2         A.   No.  We know that.  No.  We never asked them.

3         Q.   **Okay.  So let's look at 16 for a second.  Do**

4    **you recall seeing this email and what appears to be an**

5    **off-post event threat analysis and update that would**

6    **have been attached to it?  You are in the email chain**

7    **for this document.**

8         A.   Looking at it, it appears Bjornstad forwarded

9    it to the chief, myself, and -- chief and myself.  I

10   don't remember this particularly, no.

11        Q.   **Do you know who Thomas Rudd is?**

12        A.   No.

13        Q.   **Did you ever read -- did you ever read the**

14   **document that accompanied this email?**

15        A.   I don't recall.

16        Q.   **Do you know why this email was sent to you?**

17        A.   No.

18        Q.   **Could you have read this threat assessment?**

19        A.   Could I have?

20        Q.   **Yes.**

21        A.   Yeah, I could have.  I don't recall it

22   specifically.

23        Q.   **Do you recall the military producing threat**

24   **assessments of the demonstrations and the equipment**

25   **movement for November of '07?**

REPORTER'S CERTIFICATE

I, CONNIE FARANDA, the undersigned Certified Court
Reporter, pursuant to RCW 5.28.010 authorized to administer
oaths and affirmations in and for the State of Washington, do
hereby certify:  That the sworn testimony and/or proceedings,
a transcript of which is attached, was given before me at the
time and place stated therein; that any and/or all witnesses
were duly sworn to testify to the truth; that the sworn
testimony and/or proceedings were by me stenographically
recorded and transcribed under my supervision, to the best of
my ability; that the foregoing transcript contains a full,
true, and accurate record of all the sworn testimony and/or
proceedings given and occurring at the time and place stated
in the transcript; that a review of which was reserved; that I
am in no way related to any party to the matter, nor to any
counsel, nor do I have any financial interest in the event of
the cause.

WITNESS MY HAND AND DIGITAL SIGNATURE this 16th day of
March 2014.

CONNIE FARANDA, RPR
Certified Court Reporter, #2204
cfaranda@yomreporting.com

# EXHIBIT T

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

JULIANNE PANAGACOS, et al.,      )
                Plaintiffs,      )
     vs.                         )  No. 3:10-cv-5018
JOHN J. TOWERY; THOMAS R.        )       RBL
RUDD; CITY OF OLYMPIA; TOR       )
BJORNSTAD, et al.,               )
                Defendants.      )

DEPOSITION UPON ORAL EXAMINATION

OF

TOR BJORNSTAD

10:30 A.M.

March 6, 2014

2674 R.W. Johnson Boulevard Southwest

Tumwater, Washington

Reported by:  CONNIE FARANDA, RPR, CCR 2204

Deposition of Tor Bjornstad, 3/6/2014

Page 35

1           MR. LAW:  Excuse me.

2       You need to answer --

3           MR. HILDES:  Oh, yeah.  I'm sorry.

4   Thank you, Don.

5   A.  I apologize.  Yes, I was.

6           MR. HILDES:  Went right past me.

7           THE WITNESS:  My fault.  I got lazy.

8           MR. HILDES:  That's okay.  It's easy.

9   It's human nature to do that.

10  **Q.  (By Mr. Hildes)  And you disseminated them --**

11  **you just said you disseminated them to the department?**

12  A.  Yes and no.  I think I may have had

13  discussions with, like, Commander Nelson or, you know,

14  occasionally the chief or whatever.

15          The thing about the threat assessments, after

16  the first one -- the first one kind of turned into

17  boilerplate for the rest of them.  And, you know, as

18  well intended as they might have been, they provided

19  nothing that I saw as useful.

20          It was things like, you know, there might be

21  protests, and they might try to block the convoys.  And

22  as I've said all along, it's like a Seattle weatherman

23  telling you it might rain.  It's, okay, gee, thanks a

24  bunch.  So...

25  **Q.  But you refer to the ones during the updates**

Page 89

1    we weren't.  So...

2         Q.  (By Mr. Hildes)  It didn't occur to you that

3    the information on those threat assessments about what

4    they might be planning might be coming from that

5    undercover?

6                   MS. BUSH:  Object to form.

7                   MR. LAW:  Same objection.

8         A.  It didn't concern me.  I guess one of the

9    conclusions that I might have drawn, again way after

10   the fact, was, some of the information on those threat

11   assessments might have come from the source.

12               But again, the information on those threat

13   assessments was very benign and nothing that -- there

14   was nothing on the threat assessments that I ever used

15   to, I guess, affect the way I was planning day to day

16   for those things.  Much of what I did was reactionary

17   to what we experienced day to day.

18        Q.  (By Mr. Hildes)  Then why did you pass them

19   on?

20                   MR. LAW:  Pass -- object to the --

21        Q.  (By Mr. Hildes)  You testified --

22                   MR. LAW:  Excuse me.  Object to the form

23   of the question.

24        Q.  (By Mr. Hildes)  You may answer.  You

25   testified that you passed those threat assessments on

Deposition of Tor Bjornstad, 3/6/2014

Page 139

1      A.  Not that I'm aware of.  And I certainly hope

2   not.

3      **Q.  Did you ever have any conversation with**

4   **Mr. Rudd where he said -- where you said to him**

5   **something like, "This information isn't really useful**

6   **to me"?**

7      A.  You know, I didn't want to offend Mr. Rudd.

8   And, you know, I didn't want to get into a situation

9   where he was going to stop sending stuff because there

10  might have been something.

11      And so I don't think I ever had a conversation

12  with him to say, "You know, Tom," Mr. Rudd, "you know,

13  this doesn't help at all, and stop sending me this

14  junk," because you just never know.  And so I didn't --

15  no.

16      **Q.  Did you ever suggest to him, this is -- maybe**

17  **something else would be more useful and suggest things**

18  **that would have helped you?**

19      A.  No.

20      **Q.  Okay.  But you did ask him for all of the**

21  **threat assessments, again to help you produce the**

22  **after-action report that's listed as document 34;**

23  **right?**

24      A.  That's correct.

25      **Q.  And you did rely on those in producing that**

Deposition of Tor Bjornstad, 3/6/2014

Page 140

1   **report.**

2         A.   I read over --

3                   MR. LAW:   Objection to the form.

4                   MS. BUSH:   Join.

5         **Q.   (By Mr. Hildes)   You may answer.**

6         A.   My recollection is that I read over those

7    documents, as well as daily reports submitted by

8    officers and everything in a way to kind of refresh my

9    memory about, okay, that day I remember this and this

10   and whatnot.

11            So as a reference to complete that report,

12   yes.

13        **Q.   Let me take you to Exhibit 39.**

14        A.   In living color.

15        **Q.   Yes.**

16        A.   Thank you.  Yes.

17        **Q.   What's going on in this picture?**

18        A.   This was toward the end of our basically

19   clearing and the arrests of the sleeping dragon that

20   evolved on Plum Street up near I-5.  I think the

21   devices had been cut, and the people that were going to

22   be arrested were arrested.

23            And again, we took our time with taking all

24   that apart.  And during that time, you know, clearly

25   media arrived.  And this is me answering some brief

Deposition of Tor Bjornstad, 3/6/2014

1      A.   Uh-huh.

2          Q.   So your answer, you say you spoke with someone

3      with Fort Lewis about dealing with vehicle -- serious

4      vehicle-pedestrian accidents after witnessing

5      Mr. Khanna's behavior on November 8th, 2007.

6               What was the nature of the conversation?  Who

7      did you have the conversation with, to your knowledge?

8      A.   You know, I don't recall specifically.  It

9      might very well have been the person in charge of the

10     military escorts, because that would have been probably

11     first contact, should we have had a mishap.  I mean, I

12     witnessed Mr. Khanna or whatever, the pronunciation on

13     that.

14         Q.   "Kaw-naw," I think.

15     A.   Yeah.  That was -- I thought he was a goner.

16     Absolutely.  Because that Stryker driver hit the brakes

17     and turned the wheels, and that thing did something I

18     didn't think a big thing like that could do.  And I

19     mean, it was one of those things where you look at it,

20     and you just start wincing, just figuring, oh, God,

21     here we go.

22               And what that -- you know, again, I see that

23     and I think, what if he had?  Because in the

24     investigation of, say, a fatality accident, we want to

25     have access to the vehicle, access to the driver.  We

222

REPORTER'S CERTIFICATE

I, CONNIE FARANDA, the undersigned Certified Court
Reporter, pursuant to RCW 5.28.010 authorized to administer
oaths and affirmations in and for the State of Washington, do
hereby certify:  That the sworn testimony and/or proceedings,
a transcript of which is attached, was given before me at the
time and place stated therein; that any and/or all witnesses
were duly sworn to testify to the truth; that the sworn
testimony and/or proceedings were by me stenographically
recorded and transcribed under my supervision, to the best of
my ability; that the foregoing transcript contains a full,
true, and accurate record of all the sworn testimony and/or
proceedings given and occurring at the time and place stated
in the transcript; that a review of which was reserved; that I
am in no way related to any party to the matter, nor to any
counsel, nor do I have any financial interest in the event of
the cause.

WITNESS MY HAND AND DIGITAL SIGNATURE this 17th day of
March 2014.

CONNIE FARANDA, RPR
Certified Court Reporter, #2204
cfaranda@yomreporting.com

# EXHIBIT U

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

JULIANNE PANAGACOS, et al.,     )
                            )
                            )
            Plaintiffs,     ) No. 3:10-cv-5018 RBL
     vs.                 )
                            )
JOHN J. TOWERY, et al.,      )
                            )
            Defendants.     )

DEPOSITION UPON ORAL EXAMINATION OF

CLINTON D. COLVIN

MARCH 18, 2014

1201 Third Avenue, Suite 2200
Seattle, Washington  98101

10:54 a.m.

REPORTED BY:  Karen M. Grant, CCR NO. 2155
VAN PELT, CORBETT & BELLOWS
401 Second Ave. S., Suite 700
Seattle, Washington 98104
(206)682-9339

Page 40

1    threat assessments of PMR?

2              MR. ANGELIS:  Object to the form.

3              MR. BARTLETT:  Objection to form.

4    A.    I conducted threat assessments for the Coast Guard

5    involving identification of potential threats to the Coast

6    Guard.

7    Q.    (By Mr. Hildes)  I understand.  I know of at least

8    one, other than PMR.  At some point I had a conversation

9    with Glen Milner, who I believe you arrested once.

10   A.    Is that a question?

11   Q.    It is a -- well, yes, it's a question.  Do you

12   recall that?

13   A.    I've never met Glen Miller -- Milner, nor have I

14   ever arrested him.

15   Q.    Have you personally made arrests involving

16   political activity in Puget Sound, anywhere in the region?

17   A.    If I may answer in a broader sense --

18   Q.    Yes.

19   A.    -- I have never arrested anyone.

20   Q.    Okay.  Were you involved in activities where

21   arrests were made in your immediate vicinity by the Coast

22   Guard involving political activists of any kind --

23             MR. BARTLETT:  Objection as to form.

24             MS. HOMAN:  Join.

25   Q.    (By Mr. Hildes)  -- civil disobedience or anything

Deposition of Clinton Colvin, 3/18/2014

```
 1                  C E R T I F I C A T E
 2
      STATE OF WASHINGTON    )
 3                           )  SS
      COUNTY OF PIERCE       )
 4
 5
                  I, Karen M. Grant, Washington Certified Court
 6    Reporter, pursuant to RCW 5.28.010, authorized to administer
      oaths and affirmations in and for the State of Washington,
 7    do hereby certify:
 8                  That the foregoing deposition was taken
      stenographically before me and thereafter transcribed under
 9    my direction, the transcript prepared pursuant to WAC
      308-14-135 guidelines;
10
                  That the witness before examination was first
11    duly sworn by me to testify truthfully;
12                  That the transcript of the deposition is a
      full, true and correct record, to the best of my ability, of
13    the testimony, including questions and answers and all
      objections, motions, stipulations, and exceptions of counsel
14    made and taken at the time of the foregoing examination;
15                  That I am neither attorney for, nor a
      relative or employee of any of the parties to the
16    action; further, that I am not a relative or
      employee of any attorney or counsel employed by the
17    parties hereto, nor financially interested in its
      outcome.
18
                  IN WITNESS WHEREOF, I have hereunto set my
19
      hand this _____ day of _____, 2014.
20
21
22
                              _____
23                            KAREN M. GRANT, CCR NO. 2155
                              State of Washington, residing
24                            at Edgewood.
                              Certification expires 4/19/14.
25
```

# EXHIBIT V

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

JULIANNE PANAGACOS, et al.,      )
                                 )
                                 )
           Plaintiffs,           ) No. 3:10-cv-5018 RBL
                                 )
     vs.                         )
                                 )
JOHN J. TOWERY, et al.,          )
                                 )
           Defendants.           )

DEPOSITION UPON ORAL EXAMINATION OF

MICHAEL D. KORTJOHN

MARCH 24, 2014

1200 Fifth Avenue, Suite 1820
Seattle, Washington  98101

12:36 p.m.

REPORTED BY:  Karen M. Grant, CCR NO. 2155
VAN PELT, CORBETT & BELLOWS
401 Second Ave. S., Suite 700
Seattle, Washington 98104
(206)682-9339

Deposition of Michael Kortjohn, 3/24/2014

Page 7

1                    MICHAEL D. KORTJOHN,

2    witness herein, having been first duly sworn on oath,

3              was examined and testified as follows:

4

5                         EXAMINATION

6    BY MR. HILDES:

7         **Q.    Please state your full name for the record,**

8    **sir.**

9         A.    Michael David Kortjohn.

10        **Q.    And am I correct that you are a civilian**

11   **employee of Pierce County?**

12        A.    I am an employee of Pierce County at this

13   time, yes.

14        **Q.    Do you have a rank that I should be addressing**

15   **you by?**

16        A.    No.

17        **Q.    And how long have you been employed by Pierce**

18   **County in this capacity?**

19        A.    As a County employee?

20        **Q.    Yes.**

21        A.    Just since February of this year.

22        **Q.    And my understanding is, you were an**

23   **independent contractor prior to that time?**

24        A.    Yeah.

25        **Q.    Who with?**

Deposition of Michael Kortjohn, 3/24/2014

Page 8

1      A.    I was my own business.  I worked for the
2  Regional Intelligence Group.
3      Q.    **What was the name of the business?**
4      A.    Northwest Analysis.
5      Q.    **Still in business or did you --**
6      A.    I still have a license, but I don't need it
7  anymore.
8      Q.    **Was that a PI license, private investigator**
9  **license?**
10     A.    No.  Just a business license.
11     Q.    **Okay.  Have you ever had your deposition taken**
12 **before?**
13     A.    No.
14            MR. HILDES:  Thank you for the reminder.
15     Q.    **(By Mr. Hildes)  I'll go over some of the**
16 **ground rules with you.  I seem to be forgetting to do**
17 **that often.**
18            **I don't think we've been actually introduced,**
19 **even.  My name is Larry Hildes.  I'm one of the**
20 **attorneys for the plaintiffs in the lawsuit, which you**
21 **are not a party.  To my right is my legal assistant**
22 **Karen Weill.  To her right is Julianne Panagacos, who is**
23 **a named plaintiff in this matter, and to her right is**
24 **Drew Hendricks, who is our investigator for this case**
25 **and some other responsibilities.  He's part of our legal**

Deposition of Michael Kortjohn, 3/24/2014

Page 152

```
 1                    C E R T I F I C A T E

 2

     STATE OF WASHINGTON    )
 3                          )  SS
     COUNTY OF PIERCE       )
 4

 5
                    I, Karen M. Grant, Washington Certified
 6   Court Reporter, pursuant to RCW 5.28.010, authorized to
     administer oaths and affirmations in and for the State
 7   of Washington, do hereby certify:

 8                    That the foregoing deposition was taken
     stenographically before me and thereafter transcribed
 9   under my direction, the transcript prepared pursuant to
     WAC 308-14-135 guidelines;
10
                    That the witness before examination was
11   first duly sworn by me to testify truthfully;

12                    That the transcript of the deposition is a
     full, true and correct record, to the best of my
13   ability, of the testimony, including questions and
     answers and all objections, motions, stipulations, and
14   exceptions of counsel made and taken at the time of the
     foregoing examination;
15
                    That I am neither attorney for, nor a
16   relative or employee of any of the parties to the
     action; further, that I am not a relative or
17   employee of any attorney or counsel employed by the
     parties hereto, nor financially interested in its
18   outcome.

19                    IN WITNESS WHEREOF, I have hereunto set my

20   hand this _____ day of _____, 2014.

21

22

23                                 _____
                                   KAREN M. GRANT, CCR NO. 2155
                                   State of Washington, residing
24                                 at Edgewood.
                                   Certification expires 4/19/14.
25
```

# EXHIBIT W

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

JULIANNE PANAGACOS, et al.,           )
                                      )
              Plaintiffs,             ) No. 3:10-cv-5018 RBL
     vs.                              )
                                      )
JOHN J. TOWERY, et al.,               )
                                      )
              Defendants.             )

DEPOSITION UPON ORAL EXAMINATION OF

SANDRA J. KORTJOHN

MARCH 24, 2014

1200 Fifth Avenue, Suite 1820
Seattle, Washington  98101

9:55 a.m.

REPORTED BY:  Karen M. Grant, CCR NO. 2155
VAN PELT, CORBETT & BELLOWS
401 Second Ave. S., Suite 700
Seattle, Washington 98104
(206)682-9339

Deposition of Sandra Kortjohn, 3/24/2014

Page 5

1                        SANDRA J. KORTJOHN,

2      witness herein, having been first duly sworn on oath,

3                was examined and testified as follows:

4

5                            (Plaintiffs' Exhibit No. 134

6                            marked.)

7.

8                            EXAMINATION

9      BY MR. HILDES:

10          **Q.    Please state your full name for the record.**

11          A.    Sandra Joan Kortjohn.

12          **Q.    Ms. Kortjohn, where are you employed at this**

13     **time?**

14          A.    Yelm Community Schools.

15          **Q.    How long have you worked there?**

16          A.    I started teaching in 2000, fall of 2000.

17          **Q.    Okay.   What do you teach?**

18          A.    Currently?

19          **Q.    Yeah.**

20          A.    I am at the K-6 elementary school level.

21          **Q.    Okay.   What grade do you teach at this time?**

22          A.    I'm a Learning Center teacher, so I work this

23     year with fourth through sixth grade.

24          **Q.    And what were you teaching in 2009?**

25          A.    I would assume, kids in the kindergarten

Deposition of Sandra Kortjohn, 3/24/2014

Page 83

```
 1                  C E R T I F I C A T E
 2
      STATE OF WASHINGTON    )
 3                           )  SS
      COUNTY OF PIERCE       )
 4
 5
                     I, Karen M. Grant, Washington Certified
 6     Court Reporter, pursuant to RCW 5.28.010, authorized to
       administer oaths and affirmations in and for the State
 7     of Washington, do hereby certify:
 8                     That the foregoing deposition was taken
       stenographically before me and thereafter transcribed
 9     under my direction, the transcript prepared pursuant to
       WAC 308-14-135 guidelines;
10
                     That the witness before examination was
11     first duly sworn by me to testify truthfully;
12                     That the transcript of the deposition is a
       full, true and correct record, to the best of my
13     ability, of the testimony, including questions and
       answers and all objections, motions, stipulations, and
14     exceptions of counsel made and taken at the time of the
       foregoing examination;
15
                     That I am neither attorney for, nor a
16     relative or employee of any of the parties to the
       action; further, that I am not a relative or
17     employee of any attorney or counsel employed by the
       parties hereto, nor financially interested in its
18     outcome.
19                     IN WITNESS WHEREOF, I have hereunto set my
20     hand this _____ day of _____, 2014.
21
22
                              _____
23                            KAREN M. GRANT, CCR NO. 2155
                              State of Washington, residing
24                            at Edgewood.
                              Certification expires 4/19/14.
25
```

# EXHIBIT X

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

JULIANNE PANAGACOS, et al.,          )
                                     )
                                     )
              Plaintiffs,            ) No. 3:10-cv-5018 RBL
      vs.                            )
                                     )
JOHN J. TOWERY, et al.,              )
                                     )
              Defendants.            )

DEPOSITION UPON ORAL EXAMINATION OF

CHRISTOPHER D. ADAMSON

MARCH 26, 2014

955 Tacoma Avenue South, Suite 301
Tacoma, Washington

10:33 a.m.

REPORTED BY:  Karen M. Grant, CCR NO. 2155
VAN PELT, CORBETT & BELLOWS
401 Second Ave. S., Suite 700
Seattle, Washington 98104
(206)682-9339

Deposition of Christopher Adamson, 3/26/2014

Page 66

1       Q.    Were you passing information on to Mr. Rudd?

2       A.    If I thought there was a threat against the

3  base or its soldiers, I would, yes, sir.

4       Q.    Do you know if Mr. Towery was instructed not

5  to pass information directly on to Mr. Rudd that he

6  gathered, that he was passing on to you?

7            MS. BUSH:  Object to form.

8       Q.    (By Mr. Hildes)  Do you have any reason to

9  believe that that is so?

10      A.    I'm not sure I understand the question or the

11  timing.

12      Q.    Did Mr. Towery ever tell you that he was

13  instructed that you were the one who was to convey

14  information to Mr. Rudd, that Mr. Towery was not

15  directly, information that he gathered when he was

16  working for you?

17      A.    When he was working for me, sir, as a

18  confidential source, I would make the determination of

19  whether or not the information he was collecting, in

20  regards to what I was looking at, impacted the base.

21  And, if so, then either I or he would pass that

22  information to the appropriate source.

23                          (Reporter asking for

24                          clarification.)

25      Q.    (By Mr. Hildes)  Sergeant, you have a tendency

Deposition of Christopher Adamson, 3/26/2014

Page 280

1    A.    Sir, I'd have to go back and look at the dates

2    to confirm.

3        Q.    **Do you have any reason to believe that**

4    **spec-ops occurred earlier than I'm saying it did?**

5            MR. ANGELIS:  Object to form, vague,

6    misstates prior testimony.

7        A.    I'd have to go back and check.

8        Q.    **(By Mr. Hildes)  But you said you believe it**

9    **occurred in the spring?**

10       A.    I believe that's correct.

11       Q.    **Would that be after March?  Around here,**

12   **19 March is not usually spring, is it?**

13           MS. BUSH:  Object to form.

14       A.    Yeah, by definition.

15           Sir, I'd have to go back and check, honestly.

16   It's a long time ago.

17       Q.    **(By Mr. Hildes)  So let me read your**

18   **explanation again and see if I want to ask you anything**

19   **else about this.**

20           MR. ANGELIS:  Off the record for a second.

21                   (Off-the-record discussion.)

22       Q.    **(By Mr. Hildes)  Were you receiving Threat**

23   **Assessments from Mr. Towery or Mr. Rudd at any time?**

24       A.    I believe so, yes, sir.

25       Q.    **And who would they come to you from,**

Deposition of Christopher Adamson, 3/26/2014

Page 281

1    **typically?**

2        A.    It may have been both.  Mr. Rudd, I think,

3    wrote some of the them, the majority of them or some --

4    both, as best I can give you.

5        **Q.    And was Mr. Rudd writing based on information**

6    **that you know him to have been receiving from**

7    **Mr. Towery?**

8                MS. BUSH:  Object to form.

9        A.    He has an entire Fusion Cell that was

10   generating information, sir.

11       **Q.    (By Mr. Hildes)  Was that also information**

12   **that he was giving to you?**

13       A.    Yes, sir, I received the analysis.

14       **Q.    And did that analysis include information that**

15   **was coming from his undercover activities with PMR and**

16   **SDS?**

17                MS. BUSH:  Object to form.

18       A.    Not that I'm aware of, sir.

19       **Q.    (By Mr. Hildes)  You said that you told him --**

20   **that you were giving him -- that you were determining**

21   **when he should do so.  So he was doing so then, correct?**

22                MS. BUSH:  Object to form.

23                MR. ANGELIS:  Misstates prior testimony.

24       **Q.    (By Mr. Hildes)  He was sharing information**

25   **with Mr. Rudd from the undercover activities you had him**

Deposition of Christopher Adamson, 3/26/2014

Page 282

1    out on, correct?

2              MS. BUSH:  Same objection.

3        A.    If it pertained to -- if information he

4    developed when he was working for me pertained to the

5    base or posed a threat, then he would share it with

6    Mr. Rudd.

7                        (Off-the-record discussion.)

8        Q.    (By Mr. Hildes)  Other than Mr. Dunn,

9    Mr. Berryhill, Mr. Cuddeford, were there individuals

10   that you associated with SDS who were engaged or had the

11   potential to engage in criminal activity?

12       A.    People that were arrested were the ones.

13       Q.    So anyone who was arrested?

14       A.    That's the --

15             I'm sorry.  I'm not sure I understand the

16   question.

17       Q.    So anyone who was arrested is presumed to have

18   some -- a potential for further criminal activity?

19             MR. ANGELIS:  Object to form.

20       Q.    (By Mr. Hildes)  Is that correct?

21       A.    Yes, sir.

22       Q.    Even if those arrests were found not to be

23   based on probable cause?

24             MS. BUSH:  Object to form.

25       Q.    (By Mr. Hildes)  Is that correct?

Deposition of Christopher Adamson, 3/26/2014

Page 299

1                C E R T I F I C A T E

2

STATE OF WASHINGTON    )
3                       )  SS
COUNTY OF PIERCE        )

4

5

6          I, Karen M. Grant, Washington Certified
Court Reporter, pursuant to RCW 5.28.010, authorized to
administer oaths and affirmations in and for the State
7  of Washington, do hereby certify:

8          That the foregoing deposition was taken
stenographically before me and thereafter transcribed
9  under my direction, the transcript prepared pursuant to
WAC 308-14-135 guidelines;

10

11          That the witness before examination was
first duly sworn by me to testify truthfully;

12          That the transcript of the deposition is a
full, true and correct record, to the best of my
13  ability, of the testimony, including questions and
answers and all objections, motions, stipulations, and
14  exceptions of counsel made and taken at the time of the
foregoing examination;

15

16          That I am neither attorney for, nor a
relative or employee of any of the parties to the
17  action; further, that I am not a relative or
employee of any attorney or counsel employed by the
18  parties hereto, nor financially interested in its
outcome.

19          IN WITNESS WHEREOF, I have hereunto set my

20  hand this _____ day of _____, 2014.

21

22

23                        _____
                          KAREN M. GRANT, CCR NO. 2155
                          State of Washington, residing
24                        at Edgewood.
                          Certification expires 4/19/14.

25

# EXHIBIT Y



## Olympia Police Department
## Field Operations

## Port of Olympia Port Protests
## November 5th, 2007 – November 17th, 2007

Prepared by:

Tor Bjornstad
Commander, Field Operations
Olympia Police Department

The following is an overview of incidents that occurred in the area of the Port of Olympia and the City of Olympia during protests against the movement of military convoys from the Port of Olympia to Fort Lewis and other locations from November 5, 2007 to November 17, 2007. This document is an overview of the entire operational period from my perspective as the Police Department's Field Operations Commander. Specifics about individual squad actions, arrests, costs and other details are included in supporting documents.

### Initial Notification and Planning

I first became aware of the incoming shipment of military equipment to the Port of Olympia on September 13 at a meeting at the Port of Olympia. At that meeting, I was informed by a member of Coast Guard Security that there were plans underway to bring a ship into the Port of Olympia in the first part of November. This ship would be coming from Kuwait and other locations, returning military equipment destined primarily for Fort Lewis. No plans or preparations were being made at that time as dates were not set and the shipment had not been confirmed.

I attended another meeting at the Port of Olympia on October 22 where it was confirmed that the shipment would be arriving on or about November 5. The exact date was yet to be determined due to the schedule of the ship and other factors that determine the length of time the vessel would take to reach the Port of Olympia. During this discussion, it was the generally held view of those present that the likelihood of protests similar to those experienced before when shipments moved equipment out of the Port bound for the war zone were unlikely, given the well-documented goal of the protestors to have military assets returned to this Country and the fact that that was the purpose of this ship. Most in attendance believed that significant protests would not occur.

I attended another meeting in Seattle at the United States Coast Guard Headquarters on October 25. Again, most of the meeting dealt with the logistics of moving equipment from the Port to Fort Lewis and other locations, as well as discussion of the need for specific tides, ship pilots and other contingencies. The information at this meeting from Coast Guard and Army Intelligence was that it was likely there would be protests regarding the militarization of the Port of Olympia, but that those protests would likely be peaceful in nature. They had no information at the time that caused concern about the protests turning violent.

During the week prior to the ship's arrival, negotiations between the Port of Olympia and the Thurston County Sheriff's office broke down regarding a contract for providing security at the Port. As a result, the Sheriff's Office was not planning to provide interior security protection for the Port of Olympia during the time the ship was present. As an alternative, the Port hired private security to take the positions previously occupied by the Sheriff's Office in past movements.

In the days leading up to the ship's arrival, and including the day of its arrival on the 5th of November, information from the Olympia Port Militarization Resistance Movement (PMR) was that they intended to stage peaceful protests voicing opposition to the use of the Port of Olympia as a transit point for any and all military equipment. Indications were that these demonstrations would be of the peaceful sort, and they would be approaching the event from the angle of welcoming back the troops, while still voicing their opposition to the use of the Port for military purposes.

The ship, the USS Brittin, arrived at the Port of Olympia mid-day on November 5. We had extra officers on duty at that time, but no special police action of any kind was taken. After the ship's arrival, more information was coming in from a variety of sources indicating that the PMR group was experiencing considerable internal dissension about to how to respond to the arrival of the Brittin. The initial indications that the protests would remain peaceful were beginning to change. By Tuesday, November 6, it had become apparent that the focus of the group's planned actions had altered from conducting a peaceful demonstration to trying to shut down the Port, and, in their words, "quarantining" the equipment being offloaded from the Brittin by any means possible. This change of direction caused considerable concern at the Police Department because it was not known how far the group was willing to go to achieve their new goal. Given the new parameters, OPD expanded its preparations to include the possibility of having to respond to civil disobedience as well as peaceful protest. It should be pointed out that, at no point during the days leading up to the ship's arrival (or after) did any member of PMR or any other protest group attempt to contact the Police Department to discuss their methods of protest. There was no indication of a desire to utilize symbolic arrests or similar devices to augment peaceful demonstrations. What there was, instead, was a call made to the surrounding area - including Seattle, Portland and Eugene - requesting people to respond to the Port of Olympia to help in the effort to contain the equipment being offloaded at the Port. The practice of putting out a general broadcast for assistance has been one that, in past discussions with members of local protest groups, has been a cause for mutual concern, since such appeals can, and do, attract people with many agendas – including those who are committed to engaging in criminal acts as an acceptable adjunct to protest. Historically, local protestors have not advocated the use of violence or criminal acts in conjunction with their activities. However, they have acknowledged that they know that even a few of those who do advocate such actions, if present, can turn a peaceful protest into something very different. Even with that acknowledged concern, the protestors were not deterred from employing the practice in this instance.

In preparation for inevitable protests and actions by groups wanting to close down the Port, we met with the Thurston County Sheriff's Office, the Lacey Police Department and the Tumwater Police Department. Both the Lacey Police Department and the Thurston County Sheriff's Office declined to send extra personnel to the Port. However, the Sheriff's Office did assist us by providing one or two officers to handle Olympia calls on the west side of Olympia so that our officers could be relieved to work at the Port, if needed. Lacey did the same for us on the east side of town, as well as providing us with the use of their tactical van and some of their equipment. Later in the week, both agencies also contributed equipment to replace equipment

SRB 02

that had been expended in previous days by Olympia officers. The Tumwater Police Department sent us a contingent consisting of a supervisor and five or six officers almost every day and evening that we requested it. These officers were integrated into OPD's teams and worked under Olympia supervision.

**Operational Summary**

Tuesday, November 6

On Tuesday, November 6, there was an advertised march from Percival Landing to the Port of Olympia. We had extra officers on duty because the intent of the march and the actions of the protestors were unknown at the time. This march proceeded from Percival Landing through a part of downtown Olympia and eventually to the Port Plaza where the group engaged in listening to speakers and other such activity. This event remained peaceful and no police action was taken.

Wednesday, November 7

By Wednesday, November 7, a large amount of equipment from the ship was ready to be moved from the Port. Inspections had been completed by Customs and other agencies, and we were informed that they would be ready to start convoys that evening.

A briefing was held at 8:00 PM Wednesday evening at the Olympia Police Department. Officers from our Special Operations Unit, which includes our Traffic Officers and Walking Patrol Officers, were assigned to escorting the convoys. The swing shift officers on duty were detailed in total to assist with this operation. We also brought in off duty officers from the Patrol Team that was on its days off.

On Wednesday evening, convoys began running at approximately 9:15 PM and continued through the night until approximately 3:30 in the morning. This was the first opportunity we had to observe the demeanor and actions of the crowd. Approximately 150 to 200 people had gathered at the main entrance of the Port of Olympia, which is at the intersection of Franklin and Market Streets. Our initial deployment was with officers that we refer to as "soft" troops. These are officers in everyday duty uniforms with no special equipment. My feeling was that if the convoys could be moved and the crowds were peaceful and did not impede traffic, then there would be no need to escalate our response to include "hard" troops. Hard troops are those equipped for crowd/riot control - typically with helmets and clear face shields, chest protectors, shin and knee protectors and a longer police baton (which is advantageous to hold in a cross body position and is used either to form a line or, in some cases, to push people back from the roadway).

As the convoys began running on Wednesday, it became clear that the intent of the crowd was not to engage simply in peaceful protest. As our soft troops began moving people from the roadway (I believe during the second convoy), many officers were having their batons grabbed at by individuals who were attempting to take the equipment from them. Officers were also being spit upon by members of the crowd. After the second convoy, a long break was taken due to the Longshoreman's contractual lunch break. At the end of the long break, I again decided to attempt to control the group with soft troops. My feeling was that presenting a softer approach would result in a correspondingly milder, more reasonable reaction from the protestors. The first convoy after the break left successfully, however, from that point on, the protestors turned aggressive and violent. At this time, I ordered a team of hard troops brought

Cmdr. Tor Bjornstad                                                                                                     3 of 10
Port Protests

SRB 03

in and ordered the soft troops to retreat into the Port and get into their protective gear. For the remainder of the night there was strong resistance to movement of convoys, with protestors blocking the streets, jumping in front of moving equipment, and throwing large pieces of debris in the roadway. Specifically on Capital Boulevard, large chunks of concrete, garbage cans and the like were thrown into the roadway.

Thursday, November 8

Operations and convoys from Wednesday night ceased at approximately 3:30 in the morning of Thursday, November 8. Since those operations had run through the night into Thursday morning and more equipment needed to be loaded onto flatbeds and such, no convoy movements and no activity occurred during the rest of the day on Thursday.

After Wednesday night, I made the decision not to use motorcycle escort for any of the remaining convoys the rest of the week due to the fact that officers on motorcycles are particularly vulnerable to debris in the roadway and being knocked from their motorcycles either by people or thrown objects. During Wednesday night and early Thursday morning, two arrests were made. One arrest was made at the Port of Olympia where a protestor grabbed onto an officer's baton - apparently in an effort to take it away from him - and pulled the officer to the ground. The second arrest was made at 8th and Plum where a protestor ran in front of a Stryker that was moving at approximately 25-30 miles a hour, causing the vehicle to slam on its brakes and swerve in order to miss the individual. Fortunately, the protestor was not injured or killed by the vehicle and no other motorists or pedestrians were seriously endangered.

Friday, November 9

On Friday, my information from the military and the Port was that they were still in the process of loading equipment and would not need to move convoys on that day. However, later in the afternoon on Friday, they did attempt to move some independent line haul trucks with military equipment on them without escort. Protestors seated themselves in the middle of the roadway at the main gate and blocked these trucks from leaving. An alarming part of this blockade was that children were being used by the protestors as part of the blockade. One child was reported to have been perhaps just months old. This situation was brought to my attention by Lieutenant Holmes, and, at the end of our discussion, I made the decision not to respond to the blockades and simply not push the point on Friday night. One reason for this decision was that we had not set up the necessary personnel for the evening of November 9. Another reason was that, at the time these vehicles were blocked, the Port and the Military only intended to operate for another one or two hours, and calling in sufficient resources to address the situation was impractical in that context. Finally, the question of how to deal with the children in the blockade presented a tactical challenge for us because employing conventional means of dealing with adults engaging in civil disobedience was clearly not appropriate.

On Friday afternoon, I conferred with Jon Tunheim and Ed Holm of the Thurston County Prosecutors' Office, and, at the end of our discussion, it was decided that, should children be present, we would form a team of officers to place the children in protective custody and turn them over to CPS. Our agreement with the Prosecutor was that the parent or guardian of any child taken into protective custody in conjunction with the protest events would then be referred to the Prosecutor's Office for potential charges of Child Endangerment (on a case by case basis). Fortunately, children were not encountered as part of the barricade or blockades for the rest of the week.

Cmdr. Tor Bjornstad
Port Protests                                                                                    4 of 10

SRB 04

Saturday, November 10

During Friday evening and into the morning of Saturday, November 10, protestors began
erecting a barricade or blockade on Marine Drive to deny access to the north gate of the Port.
This was a substantial barricade made of dumpsters, part of a semi-trailer rig, large cement
blocks, wooden pallets and other loose debris. At one point, Lieutenant Holmes contacted
these individuals and explained to them that they were also blocking access to open businesses
at the north end of the Port such as KGY Radio and the Hearthfire Restaurant (which essentially
was shut down for Friday night). He also pointed out that their barricade prevented response of
Fire and Medic units to those businesses and to people living on boats at the East Bay Marina.
His pleas to the protestors fell on deaf ears. By continuing their actions, they clearly
demonstrated they had no intention of clearing the roadway and really didn't care about the
impact their behavior had on the rest of the community. Also during this time, protestors had
taken some of the temporary fencing that had been erected along Franklin Street by the main
gate and moved it across the roadway with other objects creating a barricade at the main gate.
In talking with Lt. Holmes Friday evening, it was decided that we would not confront the actions
directly at that time, instead doing our best to work around it. There had been acts of
vandalism, theft and other criminal activity in the area as well, and those were being dealt with
individually. The options at this stage were somewhat limited for the Police Department. The
protestors, as declared in Saturday's morning newspaper, had won the day and essentially shut
down the Port of Olympia on Friday.

On Saturday morning, officers were instructed to be at briefing at 6:00 AM. We met with all our
available people at that time, including officers held over from our grave yard shift, our Special
Operations Bureau, people from our Detective Unit and officers called in from their days off. I
met with Lt. Holmes and squad leaders on Saturday morning, and we developed a plan to move
barricades and open the Port that morning. The first barricade to be cleared would be the
barricade on Marine Drive. As we devised our strategy for Saturday morning, we did so with the
knowledge that the protest group was not indicating, either through their behavior or their verbal
communication, any desire for peaceful or symbolic arrests.

Perhaps emboldened by their success the previous day, it was apparent on Saturday that we
were facing a group that fully intended to close the Port by any means possible. As Special
Operations officers entered the Port from a side gate and responded to the front gate of the
Port, Lt. Holmes, two squads of officers and I approached the group on Marine Drive. Lt.
Holmes told me that the barricade had been significantly reinforced from what he had observed
the night before. A group of individuals stood in front of the barricade with their faces concealed
by bandanas and goggles and, based on body language and demeanor, they showed no
willingness to move voluntarily. They also did not seem remotely interested in symbolic arrest
as the means for making their point. Off to the side of the blockade was a small group of six to
eight individuals dressed all in black with black bandanas. They were seen to be loading items -
possibly rocks - into backpacks. Lt. Holmes gave clear verbal direction to the individuals at the
barricade that they needed to leave the area or they would be subject to arrest. He also
advised them that force might be used to remove them from the roadway; to include the use of
OC-10 or chemical agents. After four clear warnings and many minutes of time between those
warnings, a final warning was given. The protestors still refused to leave. Officers from the
Chemical Agent Response Team then moved into place and dispensed OC-10 (oleoresin
capsicum pepper spray) to gain compliance from the group. After approximately two

SRB 05

applications of OC -10, these individuals fled the area moving to the vacant lot west of Marine Drive. Port personnel arrived with a large front loader, several pickup trucks and the necessary personnel to dismantle the barricade and haul it into the Port property. Meanwhile, officers began regrouping to retake the main gate. As protestors ran from Marine Drive over to the main gate, many were heard to be chanting "Off the Pigs" - verbalization of a desire to kill police officers. These and other actions from people present at the time were of great concern to me and other officers at the scene. The officers regrouped and approached the crowd in front of the main gate from the west in the area of Batdorf and Bronson. Approximately twenty-five protestors were lined up along the temporary fencing they had erected as a barricade in front of the entrance to the Port. These individuals were masked up with bandanas and similar items and wore a variety of goggles and eye coverings. They had large sheets of plastic at their feet that appeared to be available for them to pull up over them if chemical agents were used. In addition to the individuals that were lined up against the fence barricade there were approximately 100 other protestors on Franklin Street between the barricade and the intersection of Franklin and Market Streets. .They gave no indication of willingness to move from the area when directed to so by officers. Many were challenging officers - coming up very close to them in the process. They were very hostile and aggressive both vocally and physically.

Again, a number of announcements to move from the roadway were made. When there was no positive response to the announcements, the decision was made to move the people on Franklin Street off to the east or south so that officers could control Franklin Street prior to dealing with the individuals who had locked arms against the barricade. As the line of officers moved from west to east across Franklin in an effort to clear the roadway, they were met with a great deal of resistance. Officers used their longer batons across their body in a pushing mode, and pepper spray was also used in an effort to move this group back. At one point in the action, OC-10 pepperballs were used - again, simply in an effort to get the protestors out of the roadway and back onto the vacant lot. When OC-10 is used, the product often effects both those at whom the material is directed and those who are in the immediate vicinity. Some of the group that had already moved onto the vacant lot may have suffered some of the effects of the OC-10 being used on Franklin Street, even though they had not been the specific ones at whom the material was directed. This was a hostile crowd environment, and it was not possible for persons who chose to be in that crowd to avoid some risk of encountering residual effects from the OC-10.

Once Franklin Street was cleared, officers turned their attention to the individuals lined up along the fence line. Yet again, warnings were given, and, yet again, the individuals refused to move. At that point, OC-10 was used down the line on this group to elicit their compliance. Some of the group fled and others, due probably to the fact that they had masks and goggles on, were not immediately effected by the pepper spray and remained at the barricade. Pepper spray was applied again, and, again, compliance was not achieved. At this point, officers had to physically move the remaining people from the barricade group off to the side of the road. This action was done while having to simultaneously monitor the group that was off to the side to insure officer safety and to prevent the possibility of involvement from others in that area.

After a short period of time, all of Franklin Street was cleared and Port personnel disassembled the barricade erected by the protestors and moved the fencing back to its original location. Convoys then began to move out of the Port.

As had been expected, the protestors did not confine their efforts to the front gate of the Port. They had broken up into small groups with the intent of disrupting the convoys en route to I-5 from the Port of Olympia. Convoys continued to run throughout the day until about 5:00 PM.

Cmdr. Tor Bjornstad
Port Protests                                                                                    6 of 10

SRB 06

During that time, continuous resistance was experienced at a number of different locations. Escort squads were varying the route to I-5 in an effort to avoid confrontations and disruption of the convoys. The routes going up 4th Avenue to Pacific and out to I-5 and down Capitol to 14th and out to the I-5 on ramp were used at different times. Most of the convoys, however, did run the gauntlet of Plum Street, and resistance was encountered in many locations along that route. At one point protestors were pushing dumpsters, garbage cans, newspaper stands and debris into the roadway in front of the usual busy Saturday traffic. Hostile interactions between motorists and protestors happened all along the route. We feared the possibility of violence breaking out between them, and, for that reason, we deployed officers as quickly as possible to these locations in order to clear the roadway and insure that altercations did not erupt.

In the early afternoon, a group of protestors formed what is referred to as a "sleeping dragon" on Plum Street just south of Union prior to the entrance of I-5. A sleeping dragon is created by a number of individuals sitting on the roadway with their arms inside PVC pipe that's been coated with a number of materials. Inside the pipe are hand holds that make it almost impossible to move the group out of the roadway. When this group placed the sleeping dragon on Plum Street, the convoy was able to maneuver around them. However, they remained in the roadway blocking everyday traffic that was attempting to go south from Union. I had responded to this location and conferred with the squad leaders on the scene. It was determined that, although traffic was completely stalled south of Union, there were a number of alternate routes that people could take from the intersection of Union and Plum. Even those backed up in traffic on Plum Street were able to make U-turns and select a different route. For this reason we decided to slow the situation down. We brought up our evidence van that has a portable generator, and officers began to use a cutting tool to separate the protestors by cutting through the plastic pipe and then releasing their hands from the hand holds. The individuals that were involved in the sleeping dragon were all arrested, placed in the jail van and taken to the Olympia City Jail. At the jail they were identified, booked and released on their own recognizance. I believe most, if not all, were released within an hour or two of being arrested. Plum Street was eventually cleared and normal traffic flow was restored. On Saturday, at total of twelve arrests were made; most of those were related to the sleeping dragon.

Sunday, November 11

Department staffing on Sunday was almost an exact repeat of Saturday. We briefed officers at 8:00 AM at the Olympia Police Department and then deployed to the Port. Convoys consisting of Strykers and flatbed trucks and other items continued to move all day until about 5:00 PM. Many of the issues experienced on Saturday were experienced again on Sunday, however the encounters were not as violent as those on Saturday and no barricades were constructed during the night. No other obstacles, such as sleeping dragons, were encountered. A total of three arrests were made on Sunday.

Monday, November 12

Monday, November 12, was the Veterans' Day holiday. The Military and the Longshoremen had the day off. There was no loading or transporting of equipment. We deployed no additional officers. No arrests were made and no activity was noted.

Tuesday, November 13

On Tuesday morning, the Military and the Port indicated that they had more equipment to move. I was also told on Sunday during the day by a representative from Fort Lewis that they felt they

SRB 07

would be able to move the remaining equipment on Tuesday night. They also indicated that they would try their best to use larger convoys so our interactions with protestors at the gate and along the route would not be as numerous.

We briefed officers at 8:00 PM at the Police Department. Again, we had a full contingent - the same as on Saturday and Sunday. All officers were deployed initially to the main gate of the Port. When we arrived at the main gate, we saw that approximately 200 to 300 protestors had massed - primarily at the intersection of Franklin and Market Streets. Just north of Market Street on Franklin, a row of individuals had seated themselves across the roadway and linked arms. These individuals were chanting and singing songs and had blocked the roadway from curb to curb. At that time, I met with Lieutenant Costa, the on-scene supervisor, and we made the decision that, if the group blocking the roadway failed to move voluntarily, we would attempt to make a mass arrest of the individuals seated in the roadway, depending upon how the first couple responded to officers' approach and the idea of being arrested.

Officers moved forward from the main gate to the line of protestors on the street. The protestors were warned numerous times prior to this advance that failure to remove themselves from the roadway could result in their arrest. Part of the warning included the notification that necessary force – including the use of OC-10 – would be used to clear the roadway if they did not comply voluntarily. This warning was given four times with several minutes between each warning. Following the last warning, officers moved up to attempt the mass arrest. Some officers were detailed to hold the crowd back and maintain the security of the scene. Others were detailed into two-man arrest teams for the purpose of arresting the individuals on the roadway. The jail van was brought up as were correction officers to begin the process of the arrests. As officers approached, one individual on the end of the line agreed to stand up and leave, but from that point on, each protestor when advised individually that they would be arrested if they didn't move, chose to be arrested. These arrests were basically peaceful. None of the arrestees struggled with officers. However, several refused to walk under their own power back to the jail van and had to be dragged by officers holding up their arms with their feet dragging along the ground. At one point a rescue chair was brought up and arrested individuals were placed in the chair and rolled back to the van - both to avoid the necessity of dragging people along the ground and to prevent injury to officers having to lift these individuals.

As the arrests continued, it was brought to my attention that, as we arrested one protestor, sometimes two more would sit down to take the first one's place. It became apparent that this situation could possibly go on for many, many hours without the roadway being cleared for traffic. At this time, it was decided to isolate the group seated on the roadway; allow them to be symbolically arrested; and to prevent others from joining the group. Officers moved forward around the group seated on the roadway and moved the rest of the crowd back. This time the crowd was very defiant, vocal and loud and had to be moved back by being pushed. Eventually, enough space was gained around the group sitting on the ground that their symbolic arrests could be achieved without interference. A total of thirty-nine people were arrested from the group seated on the ground. As we completed the last of these arrests, escort units began moving a convoy that had exited from the north gate of the Port and was moving southbound on Marine Drive. As the convoy approached the intersection of Marine Drive and Market Street, people in the crowd at Franklin and Market saw the convoy and many ran over to Marine Drive to intercept it.

I remained at the main gate and instructed the supervisors on scene to use the opportunity of people running over to Marine Drive to gain control over the intersection of Franklin and Market. Officers did so by pushing people back with their batons across their bodies. Some OC-10 was

SRB 08

also used at that point. Meanwhile, on Marine Drive, officers and the convoy were experiencing violent resistance to the movement of the convoy. Marine Drive is a two-lane roadway with a lot of open space around it. The area is very dark at that time of night. Protestors were throwing debris on the roadway. Officers, convoy vehicles and convoy personnel were being hit by rocks and other thrown objects. At one point, our Chemical Agent Response Team deployed a "stinger" grenade into this group (a device that explodes with a loud bang and disperses very small pieces of hard rubber). Stingers get their name because the small rubber pieces do sting when you are hit by them. They are particularly effective for dispersing an out-of-control group. At one point in this action, an individual officer using a pepperball gun was approached in a hostile manner by an individual who was running towards him. That individual was hit by a "bean bag" round deployed by the pepperball officer's backup. Eventually, the involved convoy was able to clear Marine Drive and continue onto the freeway.

As the night progressed, resistance to the convoys became increasingly more violent, and officers encountered roving bands of individuals throughout downtown attempting to stop the movements of the convoys. Again, the same techniques were used Tuesday night as were used on Saturday by officers escorting convoys. Different routes were chosen in an attempt to avoid confrontations with the protestors. Later in the night, the convoys were assaulted in the area of Plum and 4th Avenue as well as Plum and State. Large amounts of debris, dumpsters, garbage cans, newspapers stands and such were thrown into the roadway. Officers, convoy personnel and vehicles were attacked with rocks. Two patrol vehicles were damaged – one severely – by flying rocks. I spoke with one officer who had been struck in the head by a rock (he avoided injury due to his protective helmet). Other officers were either struck on the legs or the body. Thankfully, none of the officers required medical attention for their injuries.

The groups encountered at 4th and Plum and State and Plum were clearly not the least bit interested in peaceful protest. I can best describe them as leaderless, angry mobs with every intent to be violent. As the night progressed, some of these bands moved into the downtown Olympia area. At one point, they broke several windows at the US Bank at 4th and Capitol. As the groups continued moving through town, I had a concern that the lawless activity might escalate into widespread damage downtown; possibly even to the extent of looting. At that point, I considered calling for mutual aid from all our surrounding agencies, but as I weighed the decision, the random damage to buildings and property downtown ceased. Individuals were still throwing articles - basically anything they could pick up and throw - into the street, but the vandalism to buildings ended . At about 2:00 – 3:00 AM Wednesday morning, the number of protestors began to diminish. Convoys eventually stopped rolling at approximately 4:00 AM.

Wednesday, November 14

At 6:00 AM on Wednesday, a train loaded with some equipment left the Port through Olympia without incident. There were very few protestors present at the time. The night was quite cold, and the train moved through without any delay or disruption. Throughout the rest of Wednesday no military equipment was moved and police response was not needed for anything having to do with the Port.

Thursday, November 14

*Note:* Beginning Thursday morning throughout the weekend I was out of town for a family event. Commander Steve Nelson assumed overall responsibility for the Port activity and protests.

On Thursday, November 15, convoys moved from approximately 7:00 AM until 4:30 PM. The protest activity was not as strong as it had been on previous days and officers were able to keep the roadways clear with little resistance for most of the day. Part of the officer contingent was released by Commander Nelson at 2:00 PM, as little resistance was being encountered. However, five arrests were made at approximately 3:15 PM. At that point, all but some of the equipment designated for transport by rail had been removed from the Port of Olympia and no further truck or vehicle convoys were planned. The operation was declared concluded at 4:30 PM on November 15.

Friday, November 16

Although the Military indicated a need to move equipment on the November 16, they were not ready to do so that day. Officers reported to the station on Friday, but none were deployed to the Port of Olympia.

Saturday, November 17

On Saturday, a group of about 300 people gathered and marched through downtown Olympia in protest of the war and other issues. Officers monitored this march to assure that traffic control was adequate to protect the group and meet the needs of motorists. None of the activities seen on Tuesday night repeated themselves on Saturday. The Saturday march was peaceful, although traffic was disrupted for some time. Officers were able to successfully divert traffic around the event, and no other police action was required or taken.

# EXHIBIT Z

EXHIBIT No. 6    Date: 6/27/13
Deposition Of JULIA GARFIELD
PAM DALTHORP    Court Reporter













# EXHIBIT AA

Next Left Notes Is A News Magazine Devoted To Direct Action

# Throwing a Wrench in the War Machine: Olympia SDS is Born of the Struggle at the Port of Olympia

*By Brendan Dunn*
Click Here To Hear Brendan Dunn On Democracy Now



Resisters and SDSers are pepper sprayed

"We had our first meeting and 15 people showed up. A week later we were blocking military convoys. The week after that we were spending time in jail with each other."
-Olympia SDSer Caleb

Olympia SDS held its first meeting at Evergreen State College in Olympia, WA on May 17th. The fifteen students who attended the meeting had no idea that within a week's time, SDSers would join the community in direct action against the war machine.

A call was put out on May 22 that convoys from the Army's first Stryker Brigade Combat Team stationed at Fort Lewis were spotted driving through the streets of Olympia to the city's port. The Stryker Brigade, named after the vehicle of choice for the brigade which is a combination of a tank and a hummer, is currently embarking on its second deployment to Iraq. The moment I heard about the convoys rolling through town, I rode my bike to the port entrance. When I spotted a convoy coming towards the port I walked in front of it, forcing the entire convoy of over ten vehicles to stop, if only momentarily. I was arrested and brought to jail. The actions against the war machine that would engulf the ensuing weeks had begun.

The first day of protests saw a few dozen people come out in the streets. Four resisters from Tacoma SDS came for some time. As the word spread the numbers grew over the following days. On the second day, a total of six people were arrested - one when he tried to lock the port's entrance and the others when they blockaded a convoy. Of the six arrested, two were SDSers and one was a Vietnam War veteran. A few of the arrestees were excessively bruised by the pigs and repeatedly thrown on top of a squad car. The city government and city jail were momentarily shut down for "security reasons" when port resisters came to demand the release of their comrades. Everyone was eventually released that day. These were the first of many arrests.



The resistance makes its way to the port entrance.

Almost every day a meeting was held to discuss direct action, tactics and media. Usually, attendance at the meeting numbered at thirty or forty and the meetings were conducted in a genuinely participatory and democratic way. Affinity groups were formed at meetings, tactics were discussed and strategies and potential outcomes were covered at length. A group calling itself Port Militarization Resistance was established to articulate the aims of the resistance and create a resolutely anti-imperialist and internationalist response to the port's militarization. A diversity of tactics were developed at these meetings and later materialized, along with more spontaneous events, in the streets. Some of the tactics of protest included flyering, banner dropping, critical mass, establishing tent cities and rendezvous points, vigils, blockades, marches, community outreach and maintaining a 24/7 watch on the port.

As the democratic fervor of the meetings increased so too did police surveillance. A house that became defacto headquarters for a while was the target of around the clock police and Coast Guard mobile K9 Unit surveillance. Resisters were followed by pigs to and from the house and a number of resisters were confronted by undercovers on the street who made futile attempts to extract information from them. A painfully obvious undercover federal agent was spotted at the port later in the week, no doubt recording our conversations.

The next large wave of arrests came on Wednesday May 24th. Human chains were propped up on the main road leading to the port entrance. After hauling the convoy for quite some time, nine people, including two SDSers, in the first human chain were arrested and carted off to jail. A second human chain ran to the entrance of the port when the convoy made a detour. The detour occurred because Ultimate Fighter and anarchist Jeff "The Snowman" Monson refused to move; and the pigs, not surprisingly, refused to move him. The second human chain was created by people linking arms through PVC pipes. Thurston County Sheriffs eventually broke the chain apart by pushing, dragging, pulling the hair of and strangling resisters. After over an hour of preventing the convoy from entering the port, the chains were finally broken. However, the convoys stopped coming for the day. Word leaked out from a Stryker Brigade soldier that his daily security briefings were prolonged from two hours to four because of the resisters' actions.

People resisting the military took every opportunity they could to reach out to the soldiers and encourage them to disobey immoral and illegal orders. This largely failed because the soldiers refused to talk, but a number of soldiers gave the peace sign as they returned to Fort Lewis and a few soldiers even came up to resisters when they were off duty and personally thanked them for confronting the war. The precarious situation of the soldiers and their possibility of facing a court-martial if they refuse to fight must deter many from actively resisting the war.

The resistance started keeping a 24/7 watch at the port. Several students had already stopped attending classes to focus their energy on more important matters, namely actively resisting the war. More students would stop going to class in the coming days.



The death ship US Pomeroy docked at the port.

The ship US Pomeroy finally lumbered into the port on Memorial Day, the 29th. Local independent media sources notified the public on the ship's impending arrival earlier in the morning when Coast Guard boats armed with machine guns were spotted in the port. The Coast Guard was given orders to shoot people and boats that came too close to the US Pomeroy. More and more people arrived at the port entrance as the evening set in. A call to make the actions more spirited was made and dozens of musicians flooded the port plaza, playing punk, klezmer and protest folk. As more people arrived the crowd moved closer to the fence where there was a large police presence on the other side. They started rattling and shaking the chain-link fence to make noise and then started to shake the fence even more. On the other side of the fence, the pigs without warning sprayed the entire crowd with pepper spray, even spraying some people in the face at point blank range. Most of the crowd dispersed. Some people had such a bad reaction to the pepper spray that they started convulsing and shaking on the ground. The medics nearby refused to offer help for quite some time. But the resistance did not give in. They went back to the fence and some tried to take it down. The pigs came back time and time again to spray more people.

Members from independent and corporate media also fell victim to the spray and one independent journalist's camera was destroyed by a soldier who was at the port. A barricade was set up by the resistance and the riot police eventually marched in front of the fence. A group of people started a spontaneous march downtown to encourage people to join the resistance and also to divert the pigs. Things eventually calmed down and a large meeting was held in the port plaza for all the people in the resistance. Everyone reached an agreement to rest up and recuperate from the pepper spray burns and trauma and decided everyone should come back the next day in larger numbers. The ship would take at least two days to load up all the Stryker vehicles and supplies but we decided to maintain a 24 hour watch on the port to see when the ship would start loading. A few resisters were followed home by police that night but caught the cops off guard and told them off.

The next day people were down at the port early. We had come prepared this time - we brought food, blankets, plenty of water and many bottles filled with saline solution, cider vinegar and diluted maalox to help people with pepper spray burns. The ship started loading up. A call was made for people to meet down the street at a busy intersection at 4pm. Around 200 people showed up - many of them had their faces covered for protection and security. A number of people carried signs, banners and black and red flags. People soon kicked off a march and went down the main street towards the port entrance. In front, a large banner was unfurled with an image of Bush and another of bin Laden, blazoned with the statement "Against All Terrorism".

People started a few chants through the megaphone. I picked up the megaphone from someone and instructed the marching crowd to yell in unison "tear it down" after everything I said. I originally heard this in Boston at the DNC protests in 2004 and it had a very chilling affect. I went in front of the crowd and marched backwards the whole way. I started chanting:

"Police State!"

To which the crowd responded: "Tear it down!"

I also chanted: imperialism, war machine, capitalism, war in Iraq, war in Afghanistan, free trade, homophobia, sexism, racism, hatred and PATRIOT Act.

The port security must have become a little nervous when I started chanting "Port of Olympia! - TEAR IT DOWN! - Police State! - TEAR IT DOWN! - Port of Olympia! - TEAR IT DOWN!"

Security rushed inside the port and put up a fence in front of the entrance. This however did not prevent the resistance from tearing it down and throwing it aside. A few people threw themselves on the ground in an act of civil disobedience. More police and riot cops gathered at the scene. People were chanting demands like "Out of Olympia - Out of Iraq" and "Peace in Olympia - Peace in the Middle East!" A member from the Olympia Workers Association started passing out flyers to the port workers driving into the entrance to encourage them to refuse loading the ship. To show their solidarity with workers, the crowd started chanting "We love workers!"

A group calling themselves Strykers for Peace made their triumphant arrival to the port entrance. They were clad in makeshift cardboard Strykers and claimed that the government had ordered all the Strykers pulled out of the port and they were there to

pick them up. The pigs for some reason did not believe them one bit and continued to follow illegal orders.



This resister received a number of face injuries...
He was arrested along with 21 others that night.

The pigs started dragging people on the ground away and clubbed others with batons. They then brought out pepper spray and started spraying people on the ground. One of those sprayed, an SDSer, was already in handcuffs and on the ground when a cop told another cop: "I think we should spray him now." They sprayed him in the face and dragged him to a paddy wagon. Another person who did not resist his arrest had his face repeatedly smashed into the pavement by a pig. Others received injuries as well. In total, 20 people were arrested at the port gates. One of the first arrested was a Navy veteran who felt obligated to confront the war machine that day.

The resisters who were brought to the Thurston County Jail were separated by sex and thrown into holding cells. The arrested men held a heated discussion about the Iraq War and also talked about the protests with other arrestees in the jail. Hours later, the doors from outside opened. After wondering what exactly had been happening down at the port for hours, we finally got an idea when two fellow resisters were brought in. They reeked of pepper spray. They were shaking intensely and had trouble speaking. The pigs brought them to another room to be hosed off and to discard their clothes.

When they came back, they told us they were being charged with riot despite the fact their actions were completely non-violent and there was no rioting of any sort. If found guilty, they may face up to a year in prison. Everyone else arrested faces the possibility of spending three months in jail if found guilty for criminal trespass in the second degree. Ten of the twenty-two resisters arrested that night were SDS members - one of the SDSers was one of the resisters charged with riot.

In about 12 hours all of those arrested were released. It was around 4:30am when everyone was finally let out. Many of us made our way down to the port plaza where, in our absence, a massive public art display was constructed with flags, signs, sculptures, banners, and slogans and poetry written in chalk. The watch tower had been occupied and a red and black flag hung from its roof.



Steve Niva from Evergreen State gives a teach-in at the port on the Stryker Brigade.

We found out that after we were arrested, Professor Steve Niva from nearby Evergreen State College gave a teach-in amidst the protests about the Stryker Brigade. He told everyone that the soon to leave 4,000 troops were headed to Mosul where they would be involved in maintaining a massive permanent base that was constructed to safeguard nearby oil fields. The pigs also stepped up their violence after people were arrested - they used more pepper spray, pepper bullets and a tazer on at least one person. People held a large democratic meeting during the protests and decided it best for people to come back in the morning.

The resistance did eventually come back. The US Pomeroy was all loaded up and was set to sail during high tide that morning. Over 100 people staged a die-in on the shore as the US Pomeroy was pulled out by a tugboat. When the ship left, people gathered around and several people made a few short announcements and statements about the resistance. It was followed by a brief moment of silence which was probably the toughest time for me personally during those ten days I spent on the street and at the port. I realized that we did not stop the ship - it was on its way to deliver death and suffering to Iraq. We perhaps only shook the war machine, perhaps slightly. We had a lot of work to do.

It also appears, thus far, that we had the right amount of militancy during our ten days of resistance that garnered enough media coverage. Although the corporate and establishment press were aptly incorrect and dangerously so in their coverage, we did receive a remarkable amount of coverage that made our struggle more accessible to people elsewhere. The New York Times, CNN, AP, and local corporate papers were just a few of countless outlets that picked up our story. Democracy Now!, NPR, Air America, and countless independent radio, internet and print media picked up our story, as did a number of foreign papers.

One SDSer made an irrefutable point that the reason we got the amount of media coverage we did was because of the tactics we used. "If 1000 people got together and sang Kumbaya it would not have caught the attention of as many people, or caused such a word of mouth uproar that has more people coming down to the port every day," he said. Our resistance was a refreshing change from the tried and retried spectacles of years past: sign waving, vigils and marches on the capitol.

The anti-imperialist group Port Militarization Resistance (PMR) which formed amidst the struggle held a meeting the next day where about 70 people showed up. SDSers from both Olympia and Tacoma showed up to the meeting. We knew that the ship had left but we realized the significance of our actions and agreed that the actions we took were a small part of a long struggle. That was perhaps something amazing about resisting the military and war in our city: the spontaneity of the resistance created a momentum we could work off of. The ship was gone, but we are still fighting.

At the meeting, I recommended that our resistance link up with the resistance in Iraq - namely women's groups, student groups, labor unions, and leftist, radical and secular groups. Everyone at the meeting cheered to this suggestion and PMR is currently working on linking up with the Federation of Workers Councils and Unions of Iraq (FWCUI), the Union of Unemployed of Iraq (UUI) and possibly the Iraq Freedom Congress.

To our surprise, on June 7, First Lietenant Ehran Watada from the 3rd Stryker Brigade, the very brigade whose convoys we blocked in the streets, announced in a press conference that he was refusing to fight in Iraq because it is an illegal war. Watada's actions will hopefully encourage more in the military to resist.

Olympia SDS held another meeting the other day where a plethora of issues were discussed and future actions planned. Many Olympia SDSers discovered that through active struggle, their political consciousness raised and they became radicalized. What started out as an organization similar to any other rapidly evolved into an actively resisting group of individuals immersed in the process of direct democracy and direct action.

Another shipment of arms is expected to come to Olympia again this summer. Olympia SDSers, like the last time, will be on the front lines of the battle. Hopefully, the recent events in Olympia will act to further radicalize and revitalize the anti-war movement as a whole. After all, the point is not protest but active resistance to the war machine.

For more information, check out:

http://olympiaimc.org

www.frolympia.org
www.omjp.org
www.olyblog.net

Home

Next Left Notes
(c) 2004,2006 Thomas Good

Verbatim copying and distribution of entire articles is permitted
without royalty in any medium provided this notice is preserved.

# EXHIBIT BB

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

JULIANNE PANAGACOS; et al.,     )
                                )
           Plaintiffs,   )
                                )
       vs.                )    No. C10-5018 RBL
                                )
JOHN J. TOWERY; et al.,       )
                                )
           Defendants.   )

VIDEOTAPED DEPOSITION OF ANDREA M. ROBBINS

January 30, 2014

9:46 a.m.

Tacoma, Washington

GINA M. CLARKE, CCR

9115 - 171st Street Court East
Puyallup, WA 98375
(253)279-3465

ANDREA M. ROBBINS        January 30, 2014

Page 199

1      A.    I believe that it sounds lively.

2      Q.    Well, there's lots of hooting and hollering and

3  clapping.

4      A.    Sure.

5            MS. HOMAN:  Okay, go ahead, Jennifer.

6            MR. HILDES:  Objection to the extent that the

7  question was testimony.

8      Q.    (BY MS. HOMAN)  And the gentleman who's being

9  arrested now, that's Mr. Fetter?

10     A.    Yes.

11     Q.    And he was one of the people that you had gone down

12 to the Port of Tacoma with on March 9th?

13     A.    Yes.

14     Q.    Do you recall if Mr. Fetter was arrested before

15 you?

16     A.    I don't recall.

17           MR. HILDES:  And we said that we were going to take

18 questions out of order so we don't have to go through the

19 video multiple times; right?

20           MS. HOMAN:  We can.  I want her to look at this

21 part because I think this shows Ms. Robbins's arrest.

22           THE WITNESS:  This does indeed show my arrest.

23           MR. HILDES:  Ms. Robbins, in your judgment and your

24 knowledge, were people cheering because they were happy

25 people were getting arrested or were they cheering for the

ANDREA M. ROBBINS        January 30, 2014

Page 200

1    people themselves?

2            MS. HOMAN:  Stop the video.

3            THE WITNESS:  They were cheering for the people

4    expressing their -- as I said before, their right to be

5    against the war in a public situation.

6            MS. HOMAN:  Okay, let's roll it back to 6 minutes

7    and 20 seconds, please.

8            MS. TAYLOR:  Okay.

9            MR. HILDES:  I should have asked to pause the

10   video.  I apologize.

11           MS. HOMAN:  That's okay.

12           Pause the video, please.

13      Q.   (BY MS. HOMAN)  Do you know what you were saying

14   there?

15      A.   I was singing a pop song.

16      Q.   What was that?

17      A.   Do you know what a pop song is or do you want me to

18   define a pop song?

19      Q.   No.  I know what a pop song is.  What song were you

20   singing?

21      A.   I don't recall what the whole song is.

22      Q.   Can you tell me what --

23      A.   I believe it's called London Bridge.

24      Q.   And what words were you saying right there?

25      A.   "How come every time I come around, my London,

ANDREA M. ROBBINS        January 30, 2014

Page 254

1    Q.    Uh-huh.

2    A.    I feel anxious when I'm near police officers, heart

3    racing, palms sweaty, heart pounding fast.

4          It was really, really unpleasant to watch some of

5    those videos today.

6          I don't feel safe at all participating in First

7    Amendment-protected activities.  I don't feel safe going and

8    expressing my beliefs about any political issues.

9          I am very careful about what I put in e-mails, as

10   well as, like, what I post on my Facebook page, for example,

11   because I don't know who is trying to also read about my

12   political beliefs or anything else.

13         I get really scared sometimes when I'm driving, and

14   if I see police around, I get very scared.  Although I do my

15   best not to speed and I wear my seatbelt, I still am real --

16   like, I really get scared when police come behind me.

17         I avoid major institutions where there's, like,

18   lots of cops or military personnel.

19         I don't really trust people who fit the profile of

20   Towery in any, like, community organizing setting, yep.

21   Q.    Anything else in terms of mental or emotional

22   distress?

23   A.    Not that I can think of at this moment other than

24   what we've just talked about.

25   Q.    Have you ever sought medical or psychiatric help as

ANDREA M. ROBBINS        January 30, 2014

Page 299

1                          CERTIFICATE

2     STATE OF WASHINGTON )
                          )
3     COUNTY OF PIERCE    )

4

5          I, GINA M. CLARKE, a Certified Shorthand Reporter

6     and Notary Public in and for Pierce County, Washington, do

7     hereby certify there came before me the deponent herein,

8     namely ANDREA M. ROBBINS, who was by me duly sworn to

9     testify to the truth concerning the matters in this cause.

10    I further certify that the subscribing of the completed

11    deposition by the witness was reserved; that the foregoing

12    transcript was prepared under my personal supervision and

13    constitutes a true record of the testimony of the said

14    witness.

15         I further certify that I am not an attorney or

16    counsel of any parties, nor a relative or employee of any

17    attorney or counsel connected with the action, nor

18    financially interested in the action.

19         WITNESS my hand and seal in Puyallup, County of

20    Pierce, State of Washington, this 14th day of February,

21    2014.

22                          _____
                            Notary Public in and for the
23                          State of Washington, residing
                            at Puyallup.
24

25    My Commission expires 4-13-17.

GINA M. CLARKE, CCR
(253)279-3465